IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GE BUSINESS FINANCIAL SERVICES INC. | ) | |
| (f/k/a Merrill Lynch Business Financial Services | ) | |
| Inc.), a Delaware Corporation | ) | Civil Action No. 08 CV 2678 |
| | ) | |
| Plaintiff, | ) | Magistrate Judge Mason |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN F. ROYCE, a Nevada resident, and | ) | |
| ALEX J. UMANA, a Nevada resident, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INITIAL STATUS REPORT

In accordance with this Court's Standing Order, Plaintiff GE Business Financial Services Inc. (f/k/a Merrill Lynch Business Financial Services Inc.) ("Plaintiff") submits this Initial Status Report for the Court's consideration:

1.      **Nature of Claims and Relief Sought**.  This is an action for breach of a personal guaranties of a commercial loan.  Both John F. Royce and Alex J. Umana (together, the "Defendants") were parties with the Plaintiff to the Limited Joinder executed as of September 20, 2005, by which the Defendants jointly and severally guaranteed the obligations and indebtedness owing to Plaintiff by MM Condominiums LLC, who is now a debtor-in-possession in a bankruptcy proceeding pending in the United States Bankruptcy Court for the District of Nevada.  The Defendants have waived service, and Mr. Royce's answer was due on August 4, 2008, and Mr. Umana's was due August 12, 2008.  Neither filed an answer by their respective due dates.  The Defendants have indicated that unless the parties can resolve their issues amicably, they will contest the allegations raised in the complaint.  At this time, Mr. Royce and Mr Umanan have not retained counsel.  Plaintiff seeks money damages in the amount of

$3,887,347.84 plus interest and other amounts as they accrue.  There has been no jury demand. The complaint is attached as Exhibit 1 hereto.

2.      **Pending Motions and Discovery**.  There are no pending motions.  The parties have agreed to postpone the exchange of initial disclosures and the all discovery while they engage in settlement discussions.

3.      **Settlement**.  The parties have engaged in settlement discussions since the complaint was filed.  The parties, together with MM Condominiums LLC (the primary obligor of the debt owed by the Defendants and as a debtor-in-possession ), have negotiated and structured a process whereby the Plaintiff can be paid the sums it is owed.  (*See* Exhibit 2 hereto.)  That process requires many steps and milestones that must be met over the next several months.  So long as that process continues successfully, the parties have agreed to stay this action.  If, however, any steps or milestones are not met, the Plaintiff will resume the prosecution of this matter and seek entry of an order setting a discovery and trial schedule.

Respectfully submitted,

**GE BUSINESS FINANCIAL SERVICES INC** (f/k/a **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.)**


By: _____*/s/ Peter A. Siddiqui*_____
                One of its Attorneys

John P. Sieger (ARDC # 6240033)
Peter A. Siddiqui (ARDC# 6278445)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5200
Fax:             (312) 902-1061
john.sieger@kattenlaw.com
peter.siddiqui@kattenlaw.com

2

## <u>CERTIFICATE OF SERVICE</u>

I, Peter A. Siddiqui, certify that on August 21, 2008, I served the foregoing ***Initial Status***

***Report*** by United States Mail, postage prepaid, on the following parties:

John F. Royce                          Alex J. Umana
5405 Mountain Meadows Lane              4980 Turning Leaf Way
Reno, Nevada 89511                     Reno, Nevada 89509


_____*/s/ Peter A. Siddiqui*_____

# **Exhibit 1**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GE BUSINESS FINANCIAL SERVICES INC. (f/k/a )
Merrill Lynch Business Financial Services Inc.), )
a Delaware corporation, )
                                   )
                   Plaintiff, )
     v. )
                                     )
JOHN F. ROYCE, a Nevada resident, and )
ALEX J. UMANA, a Nevada resident, )
                                     )
                Defendants. )
                                     )

No. _____

```
FILED:   MAY 8,  2008
08CV2678  NF
JUDGE GUZMAN
MAGISTRATE JUDGE MASON
```

## COMPLAINT

       Plaintiff GE Business Financial Services Inc. (f/k/a Merrill Lynch Business Financial Services Inc.) ("GE"), by and through its undersigned attorneys, hereby complains against defendants John F. Royce ("Royce") and Alex J. Umana ("Umana" together with Royce, the "Guarantors") as follows:

## NATURE OF THE ACTION

       1.      This is an action for the breach of personal guaranties of a commercial loan.  By the Limited Joinder executed as of September 20, 2005 (the "Guaranty"), the Guarantors jointly and severally guaranteed the obligations and indebtedness owing to GE by MM Condominiums, LLC ("Borrower") under the Loan Agreement (as defined below).  A copy of the Guaranty is attached hereto as **Exhibit A**.

       2.      Pursuant to the Guaranty, the Guarantors are directly and immediately liable to GE for all obligations of Borrower under the Loan Agreement.

## PARTIES

3.　　Plaintiff GE is a Delaware corporation with its principal place of business in Chicago, Illinois.

4.　　Defendant Royce is an individual and a citizen of the state of Nevada who resides and is domiciled at 5405 Mountain Meadows Lane, Reno, Nevada, 89511.

5.　　Defendant Umana is an individual and a citizen of the state of Nevada who resides and is domiciled at 4980 Turning Leaf Way, Reno, Nevada, 89509.

## JURISDICTION AND VENUE

6.　　This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1).　Royce and Umana are citizens of different states than GE, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.　　This Court has personal jurisdiction over the Guarantors pursuant to 735 ILL. COMP. STAT. 5/2-209 because, among other things, Royce and Umana transacted business within Illinois and because the making or performance of the Guaranty is substantially connected with Illinois.　Moreover, the Guarantors have consented and voluntarily submitted themselves to the jurisdiction of this Court.

8.　　Venue is proper under 28 U.S.C. §1391(a) because a substantial portion of the events or omissions giving rise to the claim occurred in this district.　Moreover, the Guarantors have waived any objection to venue in respect of a claim brought under the Guaranty in this Court.

## FACTUAL BACKGROUND

9.　　Pursuant to the Loan Agreement dated as of September 23, 2005 (as may have been amended, modified, and/or supplemented, the "Loan Agreement"), GE made certain loans

and other financial accommodations to Borrower.  A copy of the Loan Agreement without its voluminous attachments is attached hereto as **Exhibit B**.[1]

10.     Pursuant to the Loan Agreement, GE agreed to loan Borrower up to $16,000,000 to acquire and improve the real property commonly described as Mountain Meadows Apartments, located at 3230 Wedekind Road, Sparks, Nevada, 89431.

11.     To induce GE to make the loan, Royce and Umana entered into the Guaranty whereby each jointly and severally guarantied repayment of the loan, the Exit Fee, all costs and expenses of GE, and all other obligations of Borrower under the Loan Documents if, among other things, Borrower filed a proceeding for relief under any federal bankruptcy law.  (Ex. A, Guaranty, § 1(b)(D)(ii).)

12.     On April 9, 2008 (the "Petition Date"), Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, in the United States Bankruptcy Court for the District of Nevada, commencing case number 08-50557.

13.     Borrower is in breach of the Loan Agreement for, among other things, filing the Bankruptcy.  (Ex. B, Loan Agreement, § 8.1(f).)

14.     As of the Petition Date, $3,887,347.84 was due and owing to GE by Borrower pursuant to the Loan Documents, inclusive of accrued and unpaid interest and fees and expenses incurred in connection therewith, as provided for under the Loan Documents.  As a result of the Borrower's bankruptcy, the Guarantors are directly, immediately and unconditionally liable to GE for the indebtedness, which consists of:

---

1       All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

| | | |
|---|---|---|
| Principal Outstanding | $ | 3,499,733.19 |
| Accrued Interest | | 5,700.68 |
| Exit Fee | | 360,000.00 |
| Site Inspection Fee | | 1,000.00 |
| Legal Reimbursable | | 14,592.47 |
| Legal Fees | | 6,321.50 |

15.     The amount of indebtedness to GE continues to grow in accordance with the parties' agreement as to interest, default interest, fees, and other charges.  GE has retained its attorneys of record to enforce its claims, rights, and remedies, and has incurred and will continue to incur attorneys' fees and other litigation costs.

16.     GE is not required to demand payment or provide notice of any kind to enforce its rights under the Guaranty.

## COUNT ONE
### (Breach of Guaranty)

17.     GE re-affirms, re-alleges, and incorporates each and every allegation in paragraphs 1 through 16 as though fully set forth herein.

18.     The Guaranty constitutes a valid and enforceable contract among Royce and Umana for the benefit of GE.

19.     Borrower is in breach of the Loan Agreement as a result of the bankruptcy filing, and that breach triggers the obligations of Royce and Umana under the Guaranty.

20.     Royce and Umana have failed to pay to GE the aggregate amount of Borrower's liabilities owing to GE under the Loan Documents, and thus are in breach of their obligations under the Guaranty.

21.     As a result of the Guarantors' breach of the Guaranty, GE has suffered damages in an amount no less than $3,887,347.84 and has incurred, and continues to incur, legal fees, costs, and expenses in an amount to be determined at trial.

**WHEREFORE**, GE respectfully requests that this Court:

4

(a)     enter judgment in its favor against Royce and Umana in an amount not

less than $3,887,347.84, plus additional sums as they accrue;

(b)     award pre- and post-judgment interest, costs, and attorneys' fees; and

(c)     award such other relief this Court deems just and appropriate.

Dated: May 8, 2008

Respectfully submitted,

**GE BUSINESS FINANCIAL SERVICES INC** (f/k/a
**MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.)**

By: _____*/s/ John P. Sieger*_____
One of its Attorneys

John P. Sieger (ARDC # 6240033)
Andrew L. Wool (ARDC# 6284284)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone:     (312) 902-5200
Fax:               (312) 902-1061
john.sieger@kattenlaw.com
andrew.wool@kattenlaw.com

#60645221

# **Exhibit A**

```
08CV 2678 NF
JUDGE GUZMAN
MAGISTRATE JUDGE MASON
```

## LIMITED JOINDER

In order to induce Lender to make the Loan, the undersigned Principal has agreed to enter into this Limited Joinder, which is attached to and made a part of that certain Loan Agreement (the **"Loan Agreement"**) dated September 23, 2005 between MM CONDOMINIUMS, LLC, a Nevada limited liability company (**"Borrower"**), and MERRILL LYNCH CAPITAL, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation (collectively, with its successors and assigns, **"Lender"**). (All capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.) Principal acknowledges that without this Limited Joinder, Lender would be unwilling to make the Loan. NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree and covenant as follows:

1.        **Retained Liabilities**. Principal acknowledges that prior to (i) the receipt by Borrower of all approvals from the appropriate state and local governmental agencies required in connection with the Condominium Conversion, and (ii) the Closing of the sale of a minimum of thirty (30) Condominium Units for a sales price equal to or greater than the Minimum Release Price (items (i) and (ii), collectively, the **"Release Event"**) in accordance with the terms and conditions of Section 11.22 of the Loan Agreement, Principal shall be fully and personally liable for the payment of the Loan and any and all other amounts due pursuant to the Loan Documents, and the performance of any and all obligations under the Loan Documents. Following Lender's receipt of satisfactory evidence that the Release Event has occurred, except for the Retained Liabilities (defined below) and the obligations, if any, of Principal under any separate guaranty provided to Lender in connection with the Loan, no Principal shall be personally liable to pay the Loan, or any other amount due, or to perform any obligation, under the Loan Documents, and Lender agrees to look solely to all revenue and assets of Borrower, the Project and any other collateral heretofore, now, or hereafter pledged by any party to secure the Loan. The obligations of each Principal hereunder are separate and independent obligations and are not secured by the grant or pledge by Borrower pursuant to the Mortgage. This Limited Joinder is a guaranty of full and complete payment and performance and not of collectability. Each Principal, jointly and severally, shall be personally liable for the following (the **"Retained Liabilities"**):

(a)        All losses, damages, causes of actions, suits and Expenses incurred by Lender or any Affiliate or agent thereof as a result of (i) any failure after the occurrence and during the continuance of any default (without benefit of any applicable grace or cure period) to apply any portion of the revenue from the Project to the Loan as required per the Loan Agreement or to customary operating expenses of the Project, (ii) fraud, (iii) misapplication, misappropriation or conversion of any rents, proceeds or funds deriving from (A) the Project, (B) any insurance proceeds paid by reason of any loss, damage or destruction to the Project and not used by Borrower for restoration or repair of the Project; and/or (C) any awards or amounts received in connection with condemnation of all or a portion of the Project and not used by Borrower for restoration or repair of the Project, (iv) material misrepresentation, (v) any material waste or abandonment of the Project, (vi) failure to keep the Project insured in accordance with the terms of the Loan Documents, (vii) any fees paid to a Principal or any Affiliate after any default under the Loan Documents, and (viii) any breach of the Environmental Obligations or any representation or warranty contained in Article 6 of the Loan Agreement (Environmental Matters); and

(b)        Repayment of the Loan, the Exit Fee, all costs and expenses of Lender, and all other obligations of Borrower under the Loan Documents in the event of (i) any breach of any of the following covenants of the Loan Agreement in (A) Section 4.2(b) (transfers and change of control), (B) Section 4.2(l) (no additional debt or encumbrances), (C) Section 4.2(m) (organizational documents), or (D) Section 4.2(n) (single purpose entity), or (ii) the filing by Borrower, or the filing against Borrower by

Principal or any Affiliate of Principal, of any proceeding for relief under any federal or state bankruptcy, insolvency or receivership laws or any assignment for the benefit of creditors made by Borrower.

The liability of Principal shall be direct and immediate as a primary and not a secondary obligation or liability, and is not conditional or contingent upon the pursuit of any remedies against Borrower, or any other Principal or any other person, or against any collateral or liens held by Lender.

The foregoing shall in no way limit or impair the enforcement against the Borrower, Project or any other collateral security granted by the Loan Documents of any of the Lender's rights and remedies pursuant to the Loan Documents.

2.     **Waivers**. To the fullest extent permitted by applicable law, Principal waives all rights and defenses of sureties, guarantors, accommodation parties and/or co-makers and agrees that its obligations under this Joinder shall be direct, primary, absolute and unconditional and that its obligations under this Joinder shall be unaffected by any of such rights or defenses, including,

(a)     Any rights which it may have to require that (1) Lender first proceed against Borrower, any other Principal or any other person or entity with respect to the Retained Liabilities or (2) Lender first proceed against any collateral held by Lender or (3) any party to be joined in any proceeding to enforce the Retained Liabilities;

(b)     The incapacity, lack of authority, death or disability of Borrower, Principal or any other person or entity;

(c)     The failure of Lender to commence an action against Borrower or any other person or entity or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy whatsoever at any time;

(d)     Any duty on the part of Lender to disclose to Principal any facts it may now or hereafter know regarding Borrower regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Principal intends to assume or has reason to believe that such facts are unknown to Principal, Principal acknowledging that it is fully responsible for being and keeping informed of the financial condition and affairs of Borrower;

(e)     Lack of notice of default, demand of performance or notice of acceleration to Borrower, any other person or entity with respect to the Loan or the Retained Liabilities;

(f)     The consideration for this Limited Joinder;

(g)     Any acts or omissions of Lender which vary, increase or decrease the risk on Principal;

(h)     Any statute of limitations affecting the liability of Principal hereunder, the liability of Borrower or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(i)     The application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Principal;

(j)    An election of remedies by Lender, including any election to proceed against any collateral by judicial or non-judicial foreclosure, whether real property or personal property, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, and whether or not any such election of remedies destroys or otherwise impairs the subrogation rights of Principal or the rights of Principal to proceed against Borrower or any guarantor for reimbursement, or both;

(k)    Any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other aspects more burdensome than that of a principal;

(l)    Any rights to enforce any remedy which Lender may have against Borrower, any rights to participate in any security for the Loan and any rights of indemnity, reimbursement, contribution or subrogation which Principal may have against Borrower or Principal or any other person;

(m)    Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute; and

(n)    Any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code.

3.    **Consents and Releases.**  Principal hereby consents and agrees that Lender may at any time, and from time to time, without notice to or further consent from Principal and either with or without consideration do any one or more of the following, all without affecting the agreements contained herein or the liability of Principal for the Retained Liabilities:  (a) surrender without substitution any property or other collateral of any kind or nature whatsoever held by it, or by any person, firm or corporation on its behalf or for its account, securing the Loan or the Retained Liabilities; (b) modify the terms of any document evidencing, securing or setting forth the terms of the Loan; (c) grant releases, compromises and indulgences with respect to the Loan or the Retained Liabilities or any persons or entities now or hereafter liable thereon; or (d) take or fail to take any action of any type whatsoever with respect to the Loan or the Retained Liabilities.  To the maximum extent permitted by law, Principal knowingly, voluntarily and intentionally agrees to be bound, just as Borrower is bound, by the provisions of Article 3 of the Loan Agreement (solely with respect to providing financial information with respect to himself) and Article 11 of the Loan Agreement, including, without limitation, the waiver of the right to a trial by jury in Section 11.2, and the consents to jurisdiction and the governing law of Illinois set forth in Sections 11.3, and 11.4, respectively.

4.    **Indemnification.**  Principal shall indemnify, defend and hold each Indemnified Party harmless from and against all claims, injury, damage, liability, criminal and civil penalties, excise taxes and Expenses of any and every kind to any persons or property by reason of any breach of representation or warranty, default or Event of Default hereunder.  Notwithstanding the immediately preceding sentence, no Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct.  Upon written request by an Indemnified Party, Principal will undertake, at its own cost and expense, on behalf of such Indemnified Party, using counsel reasonably satisfactory to the Indemnified Party, the defense of any legal action or proceeding whether or not such Indemnified Party shall be a party and for which such Indemnified Party is entitled to be indemnified pursuant to this section.  At Lender's option, Lender may, at Principal's expense, prosecute or defend any action

LJ-3

involving the priority, validity or enforceability of this Limited Joinder.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

Executed as of September 20, 2005.

**PRINCIPAL:**

Name: JOHN F. ROYCE
Address: 5405 Mountain Meadows Lane
          Reno, Nevada 89511
Tax I.D.#: 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

Name: ALEX J. UMANA
Address: 4980 Turning Leaf Way
          Reno, Nevada 89509
Tax I.D. #: 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

## SPOUSAL CONSENT AND WAIVER

The undersigned, who is the wife of John Royce, hereby acknowledges and consents to the foregoing Limited Joinder and acknowledges and agrees that Lender may look to the assets of John Royce to satisfy the claims of Lender against John Royce under this Limited Joinder, which assets shall include all community or marital property in which the undersigned may otherwise have an interest.

IN WITNESS WHEREOF, the undersigned has executed this Spousal Consent and Waiver as of the date first above written.

Name: _Bernadine Stewart_
_Bernadine Stewart_

## CERTIFICATION

The undersigned, Alex J. Umana, hereby certifies that, as of the date of the foregoing Limited Joinder, he is unmarried and no other person has any community property rights or interests in or to his assets.

_____

Name: Alex J. Umana

```
08CV 2678 NF
JUDGE GUZMAN
MAGISTRATE JUDGE MASON
```

# **Exhibit B**



EXECUTION COPY

## LOAN AGREEMENT

for a loan in the amount of

## $16,000,000.00

### MADE BY AND BETWEEN

**MM CONDOMINIUMS, LLC, a
Nevada limited liability company**

As "Borrower"

AND

**MERRILL LYNCH CAPITAL,**
a Division of Merrill Lynch Business Financial Services Inc.,
a Delaware corporation
222 North LaSalle Street – 16th Floor
Chicago, Illinois 60601

As "Lender"

Mountain Meadows

3230 Wedekind Road
Sparks, Nevada (Washoe County)

Dated as of September 23, 2005

## TABLE OF CONTENTS

ARTICLE 1 INCORPORATION OF RECITALS, EXHIBITS AND SCHEDULES ...........................................1

    1.1    INCORPORATION OF RECITALS. ..............................................................................................1
    1.2    INCORPORATION OF EXHIBITS AND SCHEDULE. ..........................................................2
    1.3    DEFINITIONAL PROVISIONS. .................................................................................................2

ARTICLE 2 LOAN AND LOAN DOCUMENTS....................................................................................2

    2.1    CONDITIONS PRECEDENT TO INITIAL FUNDING. ......................................................2
    2.2    DISBURSEMENTS. ....................................................................................................................2
    2.3    TERM OF THE LOAN. ..............................................................................................................4
    2.4    PREPAYMENTS. .........................................................................................................................4
    2.5    INTEREST. ...................................................................................................................................5
    2.6    MONTHLY PAYMENTS. ...........................................................................................................5
    2.7    EXIT FEE. ....................................................................................................................................6
    2.8    DEFAULT INTEREST AND LATE CHARGE. .......................................................................6
    2.9    NET SALES PROCEEDS. .........................................................................................................6
    2.10    CONDOMINIUM CONVERSION. ...........................................................................................7

ARTICLE 3    10

FINANCIAL REPORTING COVENANTS.............................................................................................10

    3.1    FINANCIAL INFORMATION REPORTING. ........................................................................10
    3.2    FINANCIAL INFORMATION FORM AND EXAMINATION. ...........................................11

ARTICLE 4 OPERATIONAL AND OTHER COVENANTS..................................................................12

    4.1    LEASING AND OPERATIONAL COVENANTS. ..................................................................12
    4.2    OTHER BORROWER COVENANTS. ......................................................................................15
    4.3    AUTHORIZED REPRESENTATIVE. .....................................................................................21

ARTICLE 5 BORROWER'S REPRESENTATIONS AND WARRANTIES...........................................22

    5.1    BORROWER'S REPRESENTATIONS AND WARRANTIES. .............................................22

ARTICLE 6 ENVIRONMENTAL MATTERS .......................................................................................26

    6.1    ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES. .....................................26
    6.2    ENVIRONMENTAL COVENANTS. .........................................................................................27
    6.3    RIGHT OF ENTRY AND DISCLOSURE OF ENVIRONMENTAL REPORTS. ................28
    6.4    ENVIRONMENTAL INDEMNITOR'S REMEDIAL WORK. .............................................29
    6.5    ENVIRONMENTAL INDEMNITY. ........................................................................................29
    6.6    REMEDIES UPON AN ENVIRONMENTAL DEFAULT. .....................................................30
    6.7    UNCONDITIONAL ENVIRONMENTAL OBLIGATIONS...................................................30
    6.8    ASSIGNMENT OF ENVIRONMENTAL OBLIGATIONS PROHIBITED............................30
    6.9    INDEMNIFICATION SEPARATE FROM THE LOAN. ........................................................31

ARTICLE 7 CASUALTIES AND CONDEMNATION ...........................................................................31

    7.1    LENDER'S ELECTION TO APPLY INSURANCE PROCEEDS ON INDEBTEDNESS. ....31
    7.2    BORROWER'S OBLIGATION TO REBUILD AND USE OF INSURANCE PROCEEDS THEREFOR...............32

ARTICLE 8 EVENTS OF DEFAULT AND REMEDIES........................................................................32

    8.1    EVENTS OF DEFAULT. ............................................................................................................32
    8.2    REMEDIES CONFERRED UPON LENDER. .........................................................................34

ARTICLE 9 LOAN EXPENSE, COSTS AND ADVANCES...................................................................35

| | | |
|---|---|---|
| **9.1** | LOAN AND ADMINISTRATION EXPENSES. | 35 |
| **9.2** | RIGHT OF LENDER TO MAKE ADVANCES TO CURE BORROWER'S DEFAULTS | 35 |
| **9.3** | INCREASED COSTS. | 35 |
| **9.4** | BORROWER WITHHOLDING. | 36 |
| **9.5** | DOCUMENT AND RECORDING TAX INDEMNIFICATION. | 36 |

**ARTICLE 10 ASSIGNMENTS BY LENDER AND DISCLOSURE** ................................ **36**

| | | |
|---|---|---|
| **10.1** | ASSIGNMENTS AND PARTICIPATIONS. | 36 |
| **10.2** | DISCLOSURE OF INFORMATION AND CONFIDENTIALITY. | 36 |

**ARTICLE 11 GENERAL PROVISIONS** ................................................................. **37**

| | | |
|---|---|---|
| **11.1** | CAPTIONS. | 37 |
| **11.2** | WAIVER OF JURY TRIAL. | 37 |
| **11.3** | JURISDICTION. | 38 |
| **11.4** | GOVERNING LAW. | 38 |
| **11.5** | LAWFUL RATE OF INTEREST. | 38 |
| **11.6** | MODIFICATION; CONSENT. | 39 |
| **11.7** | WAIVERS; ACQUIESCENCE OR FORBEARANCE NOT TO CONSTITUTE WAIVER OF LENDER'S REQUIREMENTS. | 39 |
| **11.8** | DISCLAIMER BY LENDER. | 40 |
| **11.9** | PARTIAL INVALIDITY; SEVERABILITY. | 40 |
| **11.10** | DEFINITIONS INCLUDE AMENDMENTS. | 40 |
| **11.11** | EXECUTION IN COUNTERPARTS. | 40 |
| **11.12** | ENTIRE AGREEMENT. | 40 |
| **11.13** | WAIVER OF DAMAGES. | 41 |
| **11.14** | CLAIMS AGAINST LENDER. | 41 |
| **11.15** | SET-OFFS. | 41 |
| **11.16** | RELATIONSHIP. | 41 |
| **11.17** | AGENTS. | 41 |
| **11.18** | INTERPRETATION. | 41 |
| **11.19** | SUCCESSORS AND ASSIGNS. | 42 |
| **11.20** | TIME IS OF THE ESSENCE. | 42 |
| **11.21** | NOTICES. | 42 |
| **11.22** | RELEASE OF CONDOMINIUM UNITS. | 43 |

## LIST OF EXHIBITS AND SCHEDULES TO LOAN AGREEMENT

| | |
|---|---|
| Joinder | Principal's Limited Joinder |
| Exhibit A | Legal Description of Land |
| Exhibit B | Construction Completion Schedule |
| Exhibit C | Construction Budget |
| Exhibit D | Rent Roll |
| Exhibit E | Insurance Requirements |
| Exhibit F | Environmental Documents |
| Exhibit G | Litigation |
| Exhibit H | Form of Contractor's Consent |
| Schedule I | Definitions |
| Schedule II | Minimum Release Price |

## LOAN AGREEMENT

THIS LOAN AGREEMENT ("**Agreement**") is made as of September 23, 2005, by and among MM CONDOMINIUMS, LLC, a Nevada limited liability company ("**Borrower**"), and MERRILL LYNCH CAPITAL, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation (collectively, with its successors and assigns, "**Lender**").

### RECITALS

A.    Borrower is or on the closing date will be the owner in fee simple of land located at 3230 Wedekind Road in the City of Sparks, County of Washoe, State of Nevada, commonly known as Mountain Meadows and legally described on <u>Exhibit A</u> attached hereto (the "**Land**"). Such Land contains improvements generally consisting of twenty-four (24) buildings containing in the aggregate approximately one hundred thirty-one (131) apartment units (each a "**Unit**", and collectively, the "**Units**"), having approximately 154,020 net rentable square feet of residential space and approximately two hundred twenty-five (225) parking spaces (collectively, the "**Improvements**").

B.    Borrower has applied to Lender for a loan in the amount of up to SIXTEEN MILLION and NO/100THS DOLLARS ($16,000,000.00) (the "**Loan**") for (i) the acquisition of the Project and the conversion of the Improvements to Condominium Units through the filing of a condominium plat, a declaration and other related documents, and (ii) renovations to the Improvements in connection therewith, including any renovations required to convert the Units into Condominium Units (the "**Conversion Renovations**"), and Lender is willing to make the Loan on the terms and conditions hereinafter set forth. The Loan is evidenced by that certain Promissory Note of even date herewith made by Borrower in the original principal amount of SIXTEEN MILLION and NO/100THS DOLLARS ($16,000,000.00) and payable to Lender (the Promissory Note and all amendments thereto and substitutions therefor are hereinafter referred to as the "**Note**"). The terms and provisions of the Note are hereby incorporated by reference, in this Agreement.

C.    Borrower's obligations under the Loan will be secured by, among other items, a first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith (the "**Mortgage**") encumbering the Project, and granting Lender a first priority lien in the Project. This Agreement, the Note, the Mortgage, and any other documents evidencing or securing the Loan or executed in connection therewith, and any modifications, renewals and extensions thereof, are referred to herein collectively as the "**Loan Documents**".

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

### ARTICLE 1
### INCORPORATION OF RECITALS, EXHIBITS AND SCHEDULES

**1.1    Incorporation of Recitals.**

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

**1.2    Incorporation of Exhibits and Schedule.**

Exhibits A through H, the Limited Joinder and Schedules I and II to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

**1.3    Definitional Provisions.**

All terms defined in Schedule I of this Agreement or otherwise in this Agreement shall, unless otherwise defined therein, have the same meanings when used in the Note, Mortgage, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement. The word "include(s)" when used in this Agreement and the other Loan Documents means "include(s), without limitation," and the word "including" means "including, but not limited to."

**ARTICLE 2**
**LOAN AND LOAN DOCUMENTS**

**2.1    Conditions Precedent to Initial Funding.**

(a)    Loan Application.  Borrower agrees that Lender's obligation to close the Loan is conditioned upon Borrower's delivery, performance and satisfaction, in Lender's sole discretion, of (i) all items set forth in that certain mortgage Loan Application accepted by John F. Royce on August 22, 2005 (the "**Loan Application**"), (ii) all items set forth on that certain Closing Checklist issued with respect to such Loan Application, (iii) any requirements set forth in this Agreement and the other Loan Documents, (iv) the requirement set forth in subsection (b) below, (v) the requirement set forth in Section 4.1(o) herein below, (vi) a legal opinion for the benefit of Lender issued by counsel for Borrower, and (vii) all other documents, instruments or certificates as Lender and its counsel may require, including such documents as Lender deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the other Loan Documents, and to comply with the laws of the states of Illinois and Nevada.

(b)    Sales and Marketing Documents.  On or before the Closing Date, Borrower shall submit to Lender, for approval by Lender, a description of the sales and marketing program for the sale of Condominium Units (the "**Sales and Marketing Program**"), including a schedule for such Sales and Marketing Program ("**Sales and Marketing Program Schedule**") and a Sales and Marketing Program budget (the "**Sales and Marketing Program Budget**"), all of the foregoing and all other documents and reports used in connection with the Sales and Marketing Program, shall collectively be called the "**Sales and Marketing Program Documents.**"

**2.2    Disbursements.**

(a)    Initial Funding Amount.  Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, on the Closing Date, Borrower agrees to borrow from Lender and Lender shall disburse to Borrower from the proceeds of the Loan the sum of $11,813,146.00 (the "**Initial Funding Amount**").

(b)    Holdback.  A portion of the Loan Amount proceeds in an amount equal to $3,811,854.00 (the "**Holdback**") shall be retained by Lender for the costs and expenses incurred in connection with the Condominium Conversion and the Conversion Renovations.  The Holdback is allocated among the following categories in the following maximum stated amounts:  (A) for the upgrades to the Units to

convert them into Condominium Units and any other costs incurred in connection with the Conversion Renovations as or to be approved by the Lender: $2,166,242.00, (B) for any and all working capital costs and expenses as approved by Lender (the "**Working Capital Expenses**"): $300,000.00, (C) for any and all marketing costs incurred in connection with the sale of any Individual Units as approved by Lender: $150,000.00 (the "**Marketing Expenses**"), (D) for any and all administrative costs and expenses incurred in connection with the Conversion Renovations and the Condominium Conversion as approved by Lender (the "**Administrative Expenses**"): $200,000.00, (E) for costs and expenses relating to the Association as approved by Lender (the "**Association Expenses**"): $15,000.00, (F) for any and all insurance and tax expenses incurred in connection with the Condominium Conversion as approved by Lender (the "**Tax and Insurance Expenses**"): $291,312.00, (G) for any entitlements, permits and engineering platting required in connection with the Conversion Renovations and the Condominium Conversion (the "**Permitting Expenses**"): $350,000.00, (H) for any and all contingency costs as approved by Lender (the "**Contingency Costs**"): $300,000.00, and (I) for any expenses incurred in connection with moving and relocating the tenants of the Units ("**Moving Expenses**"): $39,300.00 (items (A) through (I) above collectively, the "**Project Expenses**"). No amounts held back for any such category may be used or distributed for costs and expenses of any other category without Lender's prior written consent, which may be withheld in Lender's sole discretion. Once the maximum stated amount for any category is disbursed, no further disbursements for that category will be made. Absent a default hereunder or under any of the other Loan Documents, Lender shall make disbursements of portions of the Holdback subject to the following conditions (except to the extent waived in writing by Lender and any such condition waived by Lender as to any particular disbursement may be re-imposed as a condition of subsequent disbursements):

   (i) Prior to the Closing Date, Lender and Lender's Consultant shall have reviewed and approved (a) the construction schedule indicating the anticipated progress of construction of the Conversion Renovations ("**Construction Completion Schedule**"), a copy of which is attached hereto as <u>Exhibit B</u>, (b) final plans and specifications for construction of the Conversion Renovations (the "**Plans**"), (c) a detailed budget for construction of the Conversion Renovations in an aggregate amount not to exceed $2,166,242.00 ("**Construction Budget**"), a copy of which is attached hereto as <u>Exhibit C</u>, and (d) any and all architect's, contractor's and engineer's agreements relating to such Conversion Renovations, all of the foregoing and all other documents and reports used in preparation for or in the actual construction of the Improvements shall collectively be called the "**Construction Documents**."

   (ii) At least fifteen (15) business days prior to the date of any such disbursement, Borrower shall provide Lender with a written request for payment executed by Borrower together with copies of invoices, lien waivers, applications for payments, canceled checks, or other evidence of payment of amounts due and payable by Borrower in connection with the Project Expenses.

   (iii) Lender shall have approved, in its reasonable discretion, the Conversion Renovations, the Construction Completion Schedule and the Construction Budget.

   (iv) Borrower shall have delivered evidence satisfactory to Lender, in its sole discretion, that the Holdback is sufficient to complete the Conversion Renovations and any costs related to the Condominium Conversion or, if insufficient, Borrower shall have deposited with Lender additional funds necessary to complete the Conversion Renovations and the Condominium Conversion (Borrower's deposit to be disbursed before any balance of the Holdback).

- 3 -

(v)     Lender's independent consultant shall have inspected and approved the portion of the Conversion Renovations completed.

(vi)     Lender shall have received, at Borrower's expense, an endorsement to the Title Policy insuring the priority of the Mortgage with respect to such disbursement and indicating that no intervening liens exist against the Project.

(vii)     Such disbursements shall be utilized to pay the actual costs of the Conversion Renovations as portions of same are completed.

(viii)     At Lender's option, disbursements shall be made by Lender to Borrower, directly to an architect, contractor, supplier, broker or other third party, or through an escrow pursuant to an agreement with the Title Insurer (for payments with respect to work or services for which any third party has a statutory right to file a lien against the Project which may be superior to Lender's Mortgage lien priority).

(ix)     Borrower shall have paid, upon demand, any and all fees due Lender and any and all costs incurred by Lender up to the date of such disbursement.

(x)     Borrower shall have completed the Conversion Renovations on or before the Completion Date.

(xi)     <u>Terms Applicable to All Disbursements</u>.  Notwithstanding anything to the contrary set forth herein, other than the Initial Funding Amount, all disbursements to be made pursuant to this <u>Section 2.2</u>, shall be made as a single disbursement by Lender not more than once in any calendar month pursuant to a single monthly disbursement request from Borrower covering all amounts to be disbursed in any calendar month. Each disbursement shall be in an amount not less than $25,000.00 (other than the last disbursement, if the remaining undisbursed amount is less than $25,000.00) and each disbursement shall be subject to a $200.00 disbursement-processing fee payable to Lender.

2.3     <u>Term of the Loan.</u>

Unless due and payable sooner pursuant to <u>Section 2.7</u> or <u>Article 8</u>, all principal, interest and other sums due under the Loan Documents shall be due and payable in full on September 30, 2007 (the "**Maturity Date**").

2.4     <u>Prepayments.</u>

Borrower shall have the right to make prepayments of the Loan, in whole or in part at any time <u>provided</u> Borrower (a) gives Lender at least seven (7) days' prior written notice, (b) pays all accrued and unpaid interest, (c) pays the proportionate amount of the Exit Fee due hereunder based upon the amount of the Loan prepaid at such time, and (d) pays all other fees and costs due from Borrower to Lender including any attorneys' fees and disbursements incurred by Lender as a result of the prepayment. In the event Lender declares the Loan immediately due and payable at a time when an Exit Fee would be due, such Exit Fee shall be paid upon any tender of payment at any time or upon acceleration of the Loan. Borrower shall not be required to pay any portion of the Exit Fee at the time of the payment of any scheduled principal amortization payment required hereunder. In the event Borrower receives any payment with respect to a non-residential lease of the Project (other than rental payments and expense reimbursements) including lease termination, cancellation or similar fees and insurance or condemnation

proceeds, such payment shall be made to Lender and shall be applied by Lender to prepay the principal balance of the Loan and a proportionate share of the Exit Fee.

**2.5     Interest.**

Provided that no Event of Default exists, the principal amount of the Loan outstanding from time to time shall bear interest until paid at a rate equal to a floating rate per annum equal to the sum of three and one-half of one percent (3.50%) plus the Base Rate (the aggregate rate referred to as the "**Interest Rate**"), but in no event shall the Interest Rate be less than seven and thirty-three hundredths percent (7.33%). Interest shall be calculated based on a three hundred sixty (360) day year and charged for the actual number of days elapsed. Borrower and Lender hereby agree that certain provisions of this Agreement and certain provisions of the Note shall result in the compounding of interest, and in accordance with NRS Section 99.050, Borrower and Lender consent thereto. Notwithstanding the foregoing, upon the occurrence of a default under Section 4.4(a) below and Guarantor's failure to deliver the Letter of Credit to Lender within ten (10) days after its receipt of Lender's notice of such default pursuant to Section 4.4(b), below, the Interest Rate shall increase to a floating rate per annum equal to four and one-half of one percent (4.50%) plus the Base Rate (such aggregate rate is referred to herein as the ("**Increased Interest Rate**") and Borrower shall pay interest on the outstanding principal balance of the Loan at the Increased Interest Rate from the date of such default under Section 4.4(a) until the Letter of Credit has been delivered to Lender. All references in this Agreement and the other Loan Documents to the "Interest Rate" shall be deemed to refer to the "Increased Interest Rate" until the Letter of Credit has been delivered to Lender.

**2.6     Monthly Payments.**

Commencing on November 1, 2005, Borrower shall pay interest computed on the outstanding principal balance of the Loan at the Interest Rate monthly in arrears on the first (1st) day of each month.

Notwithstanding the amount due at the Interest Rate, commencing on November 1, 2005, Borrower shall make monthly payments in an amount equal to Net Cash Flow for the calendar month which is two months in arrears (for example, on June 1st, a monthly payment equal to the Net Cash Flow for the month of April shall be due). Borrower's monthly Net Cash Flow payments shall be applied first to interest due in arrears at the Interest Rate for the immediately preceding calendar month, then to Accrued Interest (as defined below) and then to principal outstanding on the Loan.

To the extent that during the Loan, interest at the Interest Rate for any month exceeds the monthly Net Cash Flow payment made, the excess interest ("**Accrued Interest**") shall immediately accrue and be added to principal outstanding on the Loan for purposes of computing interest only, and shall itself bear interest at the Interest Rate. The aggregate outstanding amount of Accrued Interest shall not exceed the lesser of (i) Three Hundred Seventy-Five Thousand and No/100ths Dollars ($375,000.00), or (ii) four percent (4.0%) of the then outstanding principal balance of the Loan (the "**Maximum Interest Accrual**"). In the event Accrued Interest reaches the Maximum Interest Accrual, no further interest accrual shall be permitted, and Borrower shall immediately commence monthly payments equal to the greater of (a) interest on the outstanding principal balance of the Loan at the Interest Rate or (b) Net Cash Flow for the month which is two months in arrears. If Net Cash Flow due in a month exceeds the current interest due at the Interest Rate for such month, Borrower's payment of Net Cash Flow will be limited to the amount necessary to pay first, current interest due and second, Accrued Interest. Once a repayment of Accrued Interest has occurred, Borrower shall not be permitted to again accrue interest for such amount of Accrued Interest that has been repaid.

Monthly payments of interest and Net Cash Flow due to Lender as described in this Section 2.6 shall be paid to Lender by Automated Clearing House debit of immediately available funds from the financial institution account designated by Borrower in the Automated Clearing House debit authorization executed by Borrower in connection with this Agreement; and shall be effective upon receipt. Borrower shall execute any and all forms and documentation necessary from time to time to effectuate such automatic debiting. In no event shall any such payments be refunded to Borrower.

### 2.7    Exit Fee.

Upon the repayment of the Loan (whether on the Maturity Date or on any other date) or upon the acceleration of the Loan by Lender as provided herein, Borrower will pay to Lender an exit fee equal to the sum of Three Hundred Sixty Thousand and No/100ths Dollars ($360,000.00) (or if partial pre-payments are permitted, the amount of the Loan being pre-paid at such time) LESS any portion of the Exit Fee already paid to Lender pursuant to Section 2.4 PLUS, if the Borrower has not paid to Lender a total amount of interest at least equal to $700,000.00, then $700,000.00 less the amount of interest actually paid by Borrower to Lender prior to such repayment or acceleration (collectively, the "**Exit Fee**").

The Exit Fee shall be deemed to be earned upon the execution of this Agreement. The Exit Fee shall be due from Borrower whether or not there are sufficient funds generated from the Project or from Net Sales Proceeds to pay the Exit Fee.

### 2.8    Default Interest and Late Charge.

(a)    So long as an Event of Default remains outstanding, interest shall accrue at a rate per annum equal to five percentage points (500 basis points) in excess of the Interest Rate otherwise applicable on each outstanding advance of the Loan, but shall not at any time exceed the highest rate permitted by law (the "**Default Rate**").

(b)    If payments of principal (other than the final payment of principal), interest due on the Loan, or any other amounts due hereunder or per the Note or the other Loan Documents are not timely made and remain overdue for a period of five (5) days, Borrower, without notice or demand by Lender, promptly shall pay an amount ("**Late Charge**") equal to five percent (5%) of each delinquent payment which Late Charge represents a fair estimate as of the date hereof of processing costs, accounting costs and other costs that the Lender shall bear as a result of any such late payment, which are difficult or impractical to assess as of the date hereof, or the maximum amount permitted by law, whichever is less.

### 2.9    Net Sales Proceeds.

(a)    Payment of Net Sales Proceeds. As a condition precedent to Lender's delivery of any partial release of the Mortgage in connection with the sale of a Condominium Unit in accordance with Section 11.22, Borrower shall pay to Lender an amount equal to the greater of (i) 100% of the Net Sales Proceeds for such Condominium Unit, or (ii) the Minimum Release Price for such Condominium Unit.

(i)    Application of Net Sales Proceeds. All payments to Lender in accordance with this Section 2.9 shall be applied first, to the payment of all fees, costs and expenses of Borrower under the Loan Documents, second, to interest due under the Loan Documents, third, to the outstanding principal balance of the Loan, and fourth, to the payment of the Exit Fee. Thereafter, any remaining Net Sales Proceeds shall be paid to Borrower.

**2.10**    <u>Condominium Conversion.</u>

(a)    <u>Conversion to Condominiums.</u> Borrower shall not be entitled to convert any portion of the Project to condominium ownership (the **"Condominium Conversion"**) until Lender has approved the form of all Condominium Documents. Prior to any Condominium Unit being sold, it shall be operated as rental property (provided that any reasonably necessary time to vacate the Unit to renovate it shall be allowed).

(b)    <u>Condominium Representations and Warranties.</u> In connection with the Condominium Conversion, Borrower hereby warrants and covenants to:

(i)    Subject to the provisions of <u>Section 2.10(a)</u> above, submit the Project to the provisions of the Condominium Statute and will satisfy all of the requirements thereof and of any other applicable law or restriction necessary to create a valid residential condominium regime in respect of the Project provided that the form and substance of the Condominium Documents including, without limitation, the Condominium Unit designations, descriptions, floor plans, sale prices and proposed form of contract of sale for the Condominium Units, as well as the description of common elements and breakdown of common interests appurtenant to each Condominium Unit, shall be subject to the written approval of Lender and its counsel and consultants prior to such submission;

(ii)    duly perform or cause to be duly performed all obligations of developers or sponsors under the Condominium Documents, provided, however that Borrower will not record or file the declaration of condominium with the appropriate land records if there shall be a default under this Agreement or any other Loan Documents or without Lender's prior written consent; comply with all laws, including, securities laws, that apply to the sale of Condominium Units and furnish such evidence of compliance therewith as Lender may reasonably request;

(iii)    not rent or lease any Condominium Unit or other portions of the Property without Lender's prior written consent, except for short term extensions of existing leases not to exceed a term of three (3) months, new month-to-month residential leases, and extensions required by the Condominium Statute;

(iv)    not transfer the Property or any part thereof other than in connection with the sale of Condominium Units pursuant to Approved Sale Contracts subject to the terms of this <u>Section 2.10</u> and <u>Section 11.22</u> herein;

(v)    not enter into any contract of sale for any Condominium Unit other than pursuant to an Approved Sale Contract having a sales price of not less than the Minimum Sales Price;

(vi)    not enter into any contract of sale of any Condominium Unit to any Affiliate of Borrower or a Principal without Lender's prior written consent;

(vii)    deliver to the broker handling the marketing of the Condominium Units or the Title Insurer all deposits received in respect of Approved Sale Contracts, to be held by Title Insurer in accordance with the terms and provisions of an escrow agreement approved by Lender;

(viii)    upon its receipt, deliver to Lender a certified copy of the recorded declaration of condominium;

(ix)    submit to Lender, on a weekly basis, a condominium sales report in a form reasonably satisfactory to Lender;

(x)    Lender shall not be required to join in any Condominium Documents, except Lender shall execute a consent, in form acceptable to Lender, to the Condominium Documents that confirms that upon foreclosure of the Mortgage, any Condominium Documents recorded prior to such foreclosure shall be unaffected, and any other consents or documents as shall be required in Nevada to effectuate a valid condominium that must be executed by Lender shall be executed by Lender upon Lender's review and approval of the same (notwithstanding the foregoing, Lender shall not be obligated to perform any of Borrower's obligations under the Condominium Documents). Furthermore, such review and approval by Lender of the Condominium Documents shall not mean that Lender has reviewed and approved the Condominium Documents for purposes of confirming whether such documents comply with applicable Nevada laws;

(xi)    Borrower shall give Lender not less than ten (10) days' prior written notice of each proposed closing of the sale of any Condominium Unit and, unless the closing for such sale is pursuant to an Approved Sale Contract, having a sales price of not less than the Minimum Sales Price, Lender shall have the right to review the closing documents for any such sale, at the cost and expense of Borrower;

(xii)    upon the recording of any declaration of Condominium, the following covenants of Borrower shall become operative and in effect without any requirement of any further instrument or agreement:

(1) Borrower shall not, without the prior written consent of the Lender, give any consent or perform any action in furtherance of any material modification or amendment of such declaration of condominium;

(2) Borrower shall pay all assessments for common charges and expenses and all real estate taxes and assessments and insurance premiums made against or relating to the portion of the Project then owned by Borrower, whether pursuant to such declaration of condominium, any by-laws of the condominium adopted in connection therewith or otherwise, or pay the assessment shortfall in accordance with the Condominium Statute, as the same shall become due and payable, and promptly upon demand to exhibit to Lender receipts for all such payments, and in the event Borrower shall fail to make such payments as the same become due and payable, Lender may from time to time at its option, but without any obligation to do so and without notice or demand upon Borrower, make such payments, and all Expenses paid by Lender for such purpose, including, without limitation, attorneys' fees, shall be added to the Indebtedness and shall be payable on demand and bear interest at the Default Rate until repaid;

(3) Borrower will comply with all of the terms, covenants and conditions on such party's part to be complied with pursuant to such declaration of condominium or any by-laws of the condominium or any rules and regulations that may be adopted for the condominium, as the same shall be in force and effect from time to time; provided Lender may from time to time at its option, but without any obligation to do so, cure or remedy any such default by Borrower (Borrower hereby

- 8 -

authorizing Lender to enter upon the Project as may be necessary for such purpose), and all Expenses paid by Lender for such purpose, including, without limitation, attorneys' fees, shall be added to the Indebtedness and shall be payable on demand and bear interest at the Default Rate until repaid;

(4) Borrower shall deliver to Lender a true and full copy of each and every notice of default, if any, received by Borrower with respect to Borrower under any of the Condominium Documents or applicable law regarding the condominium;

(5) Borrower will not, without the prior written consent of Lender, exercise any right it may have to vote for (A) the expenditure of insurance proceeds (which are governed by subsection (7) below) or condemnation awards for the repair or restoration of the Property or (B) any additions or improvements to the common elements of such condominium;

(6) Borrower shall indemnify and save harmless Lender, and all those claiming by, through or under Lender, from and against any Expense or other liability of any nature whatsoever arising out of (A) any obligations of the developer of condominium or the declarant under the condominium declaration or other Condominium Documents, (B) the Project, whether to Condominium Unit owners or otherwise, including, without limitation, liability arising under applicable law, or (C) Lender's review and approval of the Condominium Documents; and

(7) In the event of any casualty loss to the condominium or any Condominium Units therein, Borrower covenants and agrees that: (A) Borrower shall immediately notify Lender of such loss, (B) Lender may, in its sole discretion, with respect to any Condominium Units and their appurtenant common interest which are subject to the Mortgage from time to time, and to the extent permitted by law, elect to vote in place and stead of Borrower with respect to all matters of repair and restoration of the same and with respect to insurance under the terms and as provided in the by-laws and rules and regulations adopted thereunder, to the extent that any such votes are taken, (C) in order to effectuate the foregoing, Borrower hereby irrevocably appoints Lender, or any agent designated by Lender, as the agent of Borrower so to act with respect to said right to vote, (D) written notice from Lender of such election in each such event to the Condominium Unit owners association and to Borrower is to be deemed conclusive evidence as to such right to vote, (E) said agency is coupled with an interest, (F) Borrower shall make all advances for repair and restoration due to inadequacy of insurance, (G) if Borrower fails to promptly do so, Lender may make such advances and the same together with interest thereon at the Default Rate shall be added to the Indebtedness and secured by the Mortgage, and (H) if Lender makes such advances pursuant to the immediately preceding clause (G), Borrower shall execute and deliver and record, at no expense to Lender, such documents Lender may reasonably require further evidencing and confirming such advances and such security.

(xiii)   Borrower shall execute and deliver all documentation as Lender requires, in form and substance acceptable to Lender, to reflect that the Project has been converted to condominium ownership and to spread the lien of the Mortgage to encumber all Condominium Units as well as other rights of Borrower in and to the condominium so created (including, without limitation, rights as declarant and interests in the common elements), with the exception of any Condominium Units which shall be released in accordance with the terms and provisions of Section 11.22 hereof;

(xiv)   Borrower shall obtain, to the extent available, endorsements, in form acceptable to the Lender, to the Title Policy insuring (A) the continuing validity and priority of Lender's lien on the Condominium Units and the other rights of Borrower in and to the Condominium, and (B) Lender against losses arising as a result of the invalidity of the Condominium Conversion, in each case with premium and costs related to the title examination and issuance of such endorsement to be paid by Borrower (Lender agrees that the issuance of an ALTA Endorsement – Form 4 (Condominium) (3/27/92) to the Title Policy will satisfy the requirements of this subsection);

(xv)   Borrower shall pay to Lender upon demand from time to time any and all reasonable fees, costs and expenses incurred by Lender, including, but not limited to, reasonable legal fees and disbursements, with respect to the conversion of the Property or any portion thereof to condominium ownership, the sale of Condominium Units in connection therewith and/or the approvals of Lender in connection with such conversion or sale; and

(xvi)   Lender shall have the right to approve all condominium association documents prepared by Borrower or its agents or Affiliates, or which are required to be approved by Borrower or its agents or Affiliate, while the Loan is outstanding.

(c)   Failure to Obtain Approvals and Commence Construction.   The failure of Borrower to (i) obtain all necessary approvals from the appropriate state and local governmental agencies required in connection with the Condominium Conversion by February 1, 2006, and (ii) commence construction of the Conversion Renovations by April 1, 2006, shall constitute an Event of Default hereunder. Upon such an Event of Default, Borrower shall make monthly payments to Lender equal to 100% of Excess Cash Flow which shall be applied after the payment of debt service in accordance with Section 2.6 hereof, to reduce the outstanding principal balance of the Loan.

(d)   Sales Requirement.   The failure of Borrower to close the sale of a minimum of sixty-five (65) Condominium Units in accordance with the terms and conditions of the Approved Sale Contracts prior to December 31, 2006 (the "Sales Requirement"), shall constitute an Event of Default hereunder, entitling Lender to declare the Indebtedness immediately due and payable and to exercise all remedies available to Lender pursuant to the Loan Documents in accordance with applicable law.

## ARTICLE 3
## FINANCIAL REPORTING COVENANTS

3.1   Financial Information Reporting.

(a)   Weekly Information.   On a weekly basis, Borrower shall deliver to Lender a summary of the reservations, contracts and closings at the Project.

(b)    Monthly Information: Within fifteen (15) days following the end of each month, Borrower shall deliver to Lender: (i) monthly unaudited operating statements for the Project, certified as true, complete and correct by Borrower showing actual sources and uses of cash during the preceding month, (ii) a current rent roll (including monthly delinquency reports and a monthly schedule of delinquency receipts and payments) and (iii) a summary of all leasing activity then taking place with respect to the Project, particularly describing the status of all pending non-residential lease negotiations, if any. For any period in which Borrower is obligated to pay Lender all or a portion of Net Cash Flow (or at other times as requested by Lender), Borrower shall deliver to Lender, within twenty (20) days after the end of every calendar month during the term of the Loan, a statement and report, on a form approved by Lender in its sole and absolute discretion, detailing Borrower's calculation of Net Operating Income, Revenue and Net Cash Flow for such month. Upon Lender's request, Borrower shall deliver to Lender back-up documentation for such period as Lender shall specify (including, without limitation, invoices, receipts and other evidence of costs incurred) evidencing the propriety of the deductions from revenues in determining Net Operating Income and Net Cash Flow.

(c)    Quarterly Information. Borrower shall deliver to Lender quarterly financial statements (including, balance sheet, an income statement and a statement of cash flows) of Borrower within twenty (20) days after the end of each calendar quarter. Unless otherwise requested more frequently by Lender, within twenty (20) days after the end of each six (6) month period during the term of the Loan beginning on February 15, 2006, Borrower shall cause Guarantor to provide Lender with written confirmation of his compliance with the net worth covenant contained in Section 4.4 below, which evidence could include, without limitation, a certified financial statement or a statement from Guarantor that there has been no material adverse change in the financial condition of Guarantor since the certified financial statement most recently delivery to Lender.

(d)    Annual Information. Borrower has delivered to Lender the Project's updated annual operating budget for the first fiscal year. No later than thirty (30) days before the end of each fiscal year of Borrower, Borrower shall deliver to Lender the Project's updated annual operating budget for the following fiscal year. No later than forty-five (45) days after the end of each calendar year, Borrower shall deliver or cause to be delivered to Lender annual financial statements (including, balance sheet, an income statement and a statement of cash flows) of Borrower, certified by an officer or manager of Borrower. Unless otherwise requested more frequently by Lender, Borrower shall cause Principal and Guarantor to provide Lender with his/her/its annual certified financial statements within thirty (30) days after each fiscal year of such Principal and Guarantor.

## 3.2    Financial Information Form and Examination.

In addition to the foregoing required information, Borrower shall provide to Lender any additional financial information or back-up documentation that Lender may reasonably request. All financial statements to be provided to Lender as described herein shall be in a format approved in writing by Lender in Lender's reasonable discretion, in accordance with sound accounting practices prepared on a consistent basis, which fairly present the financial condition(s) as of the date(s) indicated. Lender may request that Borrower's, Guarantor's or Principal's annual financial statement be audited by an independent certified public accountant reasonably acceptable to Lender, at Borrower's sole cost and expense, at any time after an Event of Default has occurred or after Lender asserts any claim under the Limited Joinder attached hereto. Each financial statement shall be certified as true, complete and correct by its preparer and by Borrower or, in the case of the Principal's financial statements, by the Principal, and in the case of Guarantor's financial statements, by the Guarantor. Borrower, Guarantor and the Principal shall provide such additional financial information as Lender reasonably requires (which may include specific information concerning Borrower's, Guarantor's and Principal's other real estate

holdings, including property income and expenses, debt service requirements and occupancy). Borrower shall during regular business hours permit Lender or any of Lender's representatives (including an independent firm of certified public accountants) to have access to and examine all of its books and records regarding Borrower, Guarantor, and/or the Principal and the development and operation of the Project. Borrower shall within ten (10) days after Lender's request, furnish Lender with a written statement, duly acknowledged, setting forth the sums then owing under the Loan Documents according to Borrower's books and records and any right of set-off, counterclaim or other defense that exists against such sums and Borrower's obligations under the Loan Documents.

## ARTICLE 4
## OPERATIONAL AND OTHER COVENANTS

**4.1    Leasing and Operational Covenants.**

(a)    Leasing Restrictions. Without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, Borrower shall not (i) enter into any non-residential leases, (ii) modify the form of lease previously approved by Lender, (iii) modify, amend or terminate any non-residential Lease, (iv) accept any rental payment more than thirty (30) days in advance of its due date or (v) enter into any ground lease of the Project. Borrower shall provide Lender with not less than ten (10) Business Days to review any non-residential proposed leases and any proposed modifications or amendments to any non-residential Lease. In the event that Lender fails to respond to a request for consent pursuant to this Section 4.1(a) within ten (10) Business Days, Borrower shall provide Lender with a second request which specifically states that "LENDER'S FAILURE TO RESPOND WITHIN FIVE (5) DAYS SHALL BE DEEMED APPROVAL OF SUCH REQUEST", and in the event that Lender fails to respond to such second request within such five-day period, such request shall be deemed approved. All Leases must contain an automatic attornment provision whereby in the event of a foreclosure, the tenant automatically shall recognize the successor owner as landlord and such tenant shall have no right to terminate its Lease in the event of such foreclosure. If Borrower enters into any new Lease or any modification or renewal of any existing Lease, at Lender's request, Borrower shall cause the Tenant thereunder to execute a subordination and attornment agreement in form and substance satisfactory to Lender. Borrower shall provide Lender with a copy of the fully executed original of all Leases promptly following their execution.

(b)    Defaults Under Leases. Borrower will not suffer or permit any breach or default to occur in any of Borrower's obligations under any of the Leases nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the lessee. Borrower shall notify Lender promptly in writing in the event a Tenant (other than, if applicable, a residential tenant or a tenant of a self-storage unit at the Project) commits a material default under a Lease.

(c)    Project Management. Lender hereby approves Gaston & Wilkerson Management Group, Inc., a Nevada corporation ("Manager"), as the manager of the Project. Borrower shall not change the manager of the Project or enter into, modify, amend, terminate or cancel any management contracts for the Project or agreements with lenders or brokers, without the prior written approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed. To the extent that Borrower shall desire to change the management of the Project during the term of the Loan, Borrower shall cause such replacement manager to execute and deliver to Lender an assignment and subordination of its management agreement in substantially the same form as that delivered by Manager to Lender as of the date hereof.

(d)    Furnishing Notices.  Borrower shall provide Lender with copies of all material notices pertaining to Borrower, Guarantor, Principal or the Project received by Borrower from any Tenant, Principal, Governmental Authority or insurance company within seven (7) days after such notice is received.  In addition, Borrower shall promptly provide Lender with written notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's or Principal's knowledge, threatened against Borrower, Principal or Guarantor or relating to the Project. Notwithstanding the foregoing, Borrower shall not be obligated to provide Lender with such written notice in respect of personal injury litigation against Borrower or the Project if the amount claimed is less than One Hundred Thousand and No/100ths Dollars ($100,000.00), as long as the maximum liability under such cases is covered in its entirety by liability insurance maintained by Borrower and the insurance carrier has not refused the tender of defense or coverage.  Furthermore, upon the written request of Lender, Borrower shall promptly provide Lender with a written statement detailing all capital or other equity contributions to Borrower.

(e)    Alterations.  Without the prior written consent of Lender, Borrower shall not make any material alterations to the Project, except for tenant improvements required by the terms of Leases and improvements contemplated by the Construction Documents.

(f)    Cash Distributions.  Borrower shall not make any distributions to partners, members or shareholders while the Loan is outstanding, except as permitted pursuant to this Agreement.

(g)    Replacement Reserve.  At any time during the term of the Loan, Lender shall have the right, in its sole discretion, to require that Borrower expend an amount equal to at least $300.00/Unit per year on maintenance of the Project (although such amount need not be expended specifically on each Unit at the Project), including completing all repairs recommended by Lender's engineering consultants. To the extent that Lender requires that Borrower expend such amount and Borrower does not provide evidence, reasonably satisfactory to Lender, that Borrower has spent such sum on a cumulative annual basis, Borrower shall pay Lender such amount not spent.  Lender shall hold such sum for Borrower's use to fund future maintenance expenses after Borrower has spent at least $300.00/Unit in the aggregate during the then current Loan Year.  The remaining portion, if any, of any such sum held by Lender may be applied to the Indebtedness upon the occurrence of an Event of Default or, upon payment in full of the Loan and all amounts due under the Loan Documents, shall be paid to Borrower.

(h)    Construction.  No later than January 1, 2006, Lender shall have received fully-executed copies of: (i) the construction contract with a general contractor for the Conversion Renovations, which shall be acceptable to Lender in all respects ("General Contractor's Contract"), and (ii) a Contractor's Consent from the general contractor performing the Conversion Renovations, in the form attached hereto as Exhibit H.  Borrower hereby agrees and acknowledges that in no event shall construction of the Conversion Renovations commence prior to Lender's receipt of items (i) and (ii) above.  The Conversion Renovations shall be completed in substantial accordance with the Construction Documents and the Plans in compliance with all applicable Laws, regulations, ordinances, codes, permits, licenses, declarations, covenants, or restrictions of record or other agreements relating to the Project or any part thereof, including, without limitation, all zoning, subdivision and platting requirements.  Borrower shall not amend or modify the Construction Documents, except as permitted pursuant to this Agreement and as set forth in the Construction Budget approved by Lender, without Lender's prior written consent; provided that Borrower may implement change orders (each a "Change Order" and collectively, the "Change Orders") to the Construction Budget and Construction Documents or Plans without Lender's prior written approval if (i) the Change Order is for less than $25,000.00, (ii) the aggregate sum of all Change Orders does not exceed $150,000.00, and (iii) the Change Order does not materially alter the design or quality of the Project.  Line item reallocations for demonstrable cost savings and from

- 13 -

contingency lines shall be expressly permitted with Lender's consent, not to be unreasonably withheld, conditioned or delayed. Borrower shall submit to Lender, for Lender's approval, all other Change Orders. In no event shall Borrower be permitted to reallocate funds from a hard cost line item to a soft cost line item in the Construction Budget or reallocate any funds regarding the interest reserve or developer's overhead fee.

(i)        Completion.   Borrower shall cause Completion of construction of all of the Conversion Renovations on or before October 1, 2006, with respect to all exterior Conversion Renovations, and April 1, 2007, with respect to all interior Conversion Renovations (collectively, the "**Completion Date**"); provided that if Completion is delayed due to fire or other casualty, adverse weather, labor disputes or other causes beyond Borrower's control (collectively, "**Force Majeure Events**"), the Completion Date shall be extended by such time as Lender's Consultant shall determine is reasonable based upon the delay caused by the Force Majeure Event.   "**Completion**" means 100% completion of the Conversion Renovations (subject to usual and customary punch list items which do not adversely affect Borrower's ability to lease or operate the Project or to sell the Condominium Units) in compliance with all applicable laws, and in substantial accordance with the Construction Documents and Change Orders permitted by this Agreement, free and clear of all liens, claims, encumbrances and rights of others (other than those created by liens for taxes and assessments that are not delinquent and those liens which Borrower is contesting in accordance with the terms of this Agreement), as evidenced by the issuance of certificates of Completion by Lender's Consultant and Borrower's contractor in form and substance reasonably acceptable to Lender and a final certificate of occupancy.

(j)        Building Code Violations.   Notwithstanding anything to the contrary set forth herein, no later than: (i) February 1, 2006, Borrower shall obtain any and all necessary building permits required in connection with the construction of the carports to be located on the Project, which permits shall satisfy, in all respects, those certain building code violations set forth in the letter dated September 19, 2005, from Curt Weagel, Building Official of the City of Sparks, Nevada, (ii) December 21, 2005, Borrower shall complete demolition of the carports currently located on the Project, and (iii) October 1, 2006, Borrower shall complete construction of all carports to be located on the Project.

(k)        Compliance With Laws.   Borrower shall comply with all applicable requirements (including applicable Laws) of any Governmental Authority having jurisdiction over Borrower or the Project including all building, zoning, density, land use, covenants, conditions and restrictions, subdivision requirements (including parcel maps and environmental impact and other environmental requirements), whether now existing or later to be enacted and whether foreseen or unforeseen. The Condominium Documents shall comply with all applicable Laws.

(l)        Use of Project.   Unless required by applicable Law or disclosed to Lender in writing prior to the Closing Date, Borrower shall not permit changes in the use of the Project from that of the time this Agreement was executed other than the conversion of the Units into Condominium Units in accordance with the terms and conditions of this Agreement. Without Lender's prior written consent, Borrower shall not (i) initiate or acquiesce in a change in the plat of subdivision (unless required in connection with the Conversion Renovations), or zoning classification or use of the Project, or (ii) grant any encumbrances or easements burdening the Project, except such encumbrances or easements that do not materially adversely affect the current or anticipated use of the Project.

(m)        No Commingling of Funds.   Borrower shall not commingle the funds related to the Project with funds from any other property.

(n)    Maintenance and Preservation of the Project. Borrower shall keep the Project in good condition and repair (normal wear and tear excepted) and if all or part of the Project becomes damaged or destroyed, Borrower shall promptly and completely repair and/or restore the Project in a good and workmanlike manner in accordance with sound building practices. Borrower shall not commit or allow waste or permit impairment or deterioration of the Project. Borrower shall perform such acts to preserve the value of Project and Borrower shall not abandon the Project.

(o)    Compliance. All work on the Project shall be performed by the Construction Contractor or subcontractor engaged by the Construction Contractor and shall substantially conform to the Plans (subject to modifications permitted herein) approved by Lender and shall be of good quality and workmanship.   Any work, material, or equipment not so conforming to the Plans (subject to modifications permitted herein) that would in any material way affect the structural soundness, utility, size, value, or appearance of the Improvements may be disapproved by Lender and shall be replaced or revised as may be required to bring about conformity promptly thereafter, at no expense to Lender. There shall be no change or amendment to the Construction Contract, or the Plans without the prior written consent of Lender, except that immaterial changes in the Plans not affecting in any way the structural soundness, utility, size, value, appearance, or quality of any of the Improvements and change orders permitted pursuant to Section 4.1(h) above shall not require Lender's prior consent. In no event shall Borrower cause or permit the Plans to be changed or amended in any manner that would affect (a) the number and/or average size of the residential units in the Project, or (b) the number of parking spaces in the Project, in any case by a material amount as determined by Lender in the exercise of its reasonable discretion, unless the written consent of Lender is first obtained. Lender shall not unreasonably withhold, condition or delay its consent to any such change(s) or amendment(s); provided, however, that Lender may require, among other things, as a condition of its consent to any such change(s) or amendment(s) costing $250,000.00 or greater, that, Borrower provide to Lender a new appraisal of the Land (such appraisal being prepared by an appraiser acceptable to Lender at Borrower's sole cost and expense).

(p)    Borrower's Equity. On or before the date hereof, Borrower shall contribute for disbursement in connection with the Project for project costs approved by Lender an amount equal to One Million Seven Hundred Seventy-Four Thousand Three Hundred Fifty-Four and No/100 Dollars ($1,774,354.00) (at least Two Hundred Thousand and No/100 Dollars ($200,000.00) of which shall be contributed by Principal) ("**Borrower's Equity Contribution**"), which Borrower's Equity Contribution shall be contributed and utilized for costs and expenses to be incurred in owning the Project and completing the construction of the Conversion Renovations approved by Lender in accordance with the approved Construction Budget. All of Borrower's Equity Contribution shall be expended, and proof thereof shall be provided to Lender, prior to the Lenders' advancing any funds under the Loan.

**4.2    Other Borrower Covenants.**

Borrower further covenants and agrees as follows:

(a)    Loan Closing. All conditions precedent to the closing of the Loan shall be complied with on or prior to the Closing Date. If such conditions are not complied with as of the Closing Date, Lender may terminate Lender's obligation to fund the Loan by written notice to Borrower.

(b)    Prohibition of Assignments and Transfers by Borrower.

(i)    Generally. Borrower shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void. Without the prior written consent of

Lender, which consent may be withheld in Lender's sole discretion, Borrower shall not suffer or permit any Transfer. In addition, if John F. Royce ("**Royce**") and Alex J. Umana ("**Umana**") fail to continue to Control (i) the day to day management and operation of Borrower's business and (ii) all material business decisions (including a sale or refinance) for Borrower during the term of the Loan (with Royce having two (2) controlling votes and Umana having one (1) vote until the release of Guarantor from liability under the Completion Guaranty and the Limited Payment Guaranty, at which point Royce and Umana shall have equal voting control), then Lender may, at Lender's option, declare the Loan to be immediately due and payable, and Lender may invoke any remedies permitted by the Loan Documents.

(ii)    Transfers Prohibited by ERISA.    In addition to the prohibitions set forth in Section 4.2(b)(i), above, Borrower shall not engage in or permit a Transfer that would constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Internal Revenue Code. Borrower agrees to unwind any such Transfer upon notice from Lender or, at Lender's option, to assist Lender in obtaining such prohibited transaction exemption(s) from the Employee Benefits Security Administration with respect to such Transfer as are necessary to remedy such prohibited transactions. In addition to its general obligation to indemnify Lender under Section 4.2(k), Borrower shall reimburse Lender for any Expenses incurred by Lender to obtain any such prohibited transaction exemptions. Borrower's obligations under this Section 4.2(b)(ii) shall survive the expiration of this Agreement and the other Loan Documents.

(c)    Mechanics' Liens and Contest Thereof.    Borrower will not suffer or permit any mechanics' lien claims to be filed or otherwise asserted against the Project and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower shall have the right to contest in good faith and with reasonable diligence the validity of any such lien or claim provided that Borrower notifies Lender of its desire to do so in writing and posts a statutory lien bond or provides other security acceptable to Lender and the Title Company that removes such lien from title to the Project within twenty (20) days of the earlier of written notice by Borrower to Lender of the existence of such lien or written notice by Lender to Borrower of the existence of the lien. Lender will not be required to make any further disbursements of the proceeds of the Loan unless or until either (i) all mechanics' lien claims have been removed, or completely bonded over, or insured over by the Title Insurer, or (ii) Lender, at its sole option, elects to restrict disbursements to reserve sufficient sums to pay 150% of all such lien claims. In the event either Borrower fails to prosecute such contest as set forth above, or such lien is not otherwise fully reserved for or bonded over as set forth above, Lender may, at its election in its sole discretion, cause such lien to be satisfied and released or otherwise provide security to the Title Insurer to indemnify over such lien. Any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder owing to Lender by Borrower. In settling, compromising or discharging any claims for lien, Lender shall not be required to inquire into the validity or amount of any such claim.

(d)    Renewal of Insurance.

(i)    Borrower shall timely pay all premiums on all insurance policies to assure that at all times Borrower has in effect insurance as required pursuant to the Insurance Requirements attached hereto as Exhibit E, and as and when additional insurance is required, from time to time, and as and when any policies of insurance may expire, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts satisfactory to Lender. Borrower shall not bring or keep any article on the Project or cause or allow any

condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Borrower on the Project. Unless Borrower provides Lender with appropriate evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Project and to maintain the insurance required by this Agreement. Prior to purchasing any such insurance, Lender will use its good faith efforts to provide notice to Borrower of its intention to do so, provided, however, that Lender's failure to provide such notice shall not affect Borrower's responsibility for the expenses of such insurance purchased by Lender. This insurance may, but need not, protect Borrower's interests. The coverage purchased by Lender may not pay any claim made by Borrower or any claim that is made against Borrower in connection with the Project or any required insurance policy. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with appropriate evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Project or insurance otherwise required by this Agreement, Borrower will be responsible for the costs of that insurance and other charges imposed by Lender in connection with the placement of the insurance until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Indebtedness effective as of the date Lender purchases such insurance and such costs may be more than the cost of insurance Borrower is able to obtain on its own. The effective date of coverage may be the date the prior coverage lapsed or the date on which Borrower failed to provide Lender proof of coverage.

(ii)     Notwithstanding any of the foregoing, from and after the date the Condominium Documents become effective, the obligation of Borrower to provide the insurance required to be maintained pursuant to this Agreement may be satisfied by the maintenance of such insurance by the condominium association (the "Association") established pursuant to the Condominium Documents. Borrower hereby acknowledges that since the Project is to become part of a condominium regime, the requirements of this Section 4.1(d) and Exhibit E shall also pertain to and be applicable to the insurance coverages obtained on behalf of the Condominium by the Association pursuant to the Condominium Documents. Borrower further acknowledges that given the interconnections among the Condominium Units within the Condominium, it is reasonable and appropriate for Lender to require receipt of insurance certificates and other evidence as reasonably required by Lender that insurance coverages meeting the requirements of this Section 4.1(d) and Exhibit E are in place for the common elements and such Condominium Units as may be subject to the Mortgage from time to time, and Borrower shall cause the delivery of all such information to Lender and the compliance with the Condominium Documents and this Section 4.1(d), all in form and content reasonably acceptable to Lender.

(iii)     In the event of any casualty loss to the Project, the Condominium or any Condominium Units therein as may be subject to the Mortgage from time to time, Borrower covenants and agrees that: (A) Borrower shall immediately notify Lender of such loss, (B) Borrower shall make all advances for repair and restoration due to inadequacy of insurance, (C) if Borrower fails to promptly do so, Lender may make such advances and the same together with interest thereon at the Default Rate shall be added to the Indebtedness and secured by the Mortgage, and (D) if Lender makes such advances pursuant to the immediately preceding clause (C), Borrower shall execute and deliver and record, at no expense to Lender, such documents Lender may reasonably require further evidencing and confirming such advances and such security.

(e)     Payment of Taxes. Borrower shall, subject to the terms of Section 4.2(f) below, pay all real estate taxes and assessments and charges of every kind upon the Project (including, without

limitation, all assessments imposed under any declaration of covenants, owner's associations, the Condominium, and any other condominium associations or special improvement districts affecting the Property), before the same become delinquent, provided, however, that Borrower shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes, and (iii) Borrower has deposited security in form and amount satisfactory to Lender, in its sole discretion, and has increased the amount of such security so deposited promptly after Lender's request therefor. If Borrower fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Lender for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Lender shall be deemed to constitute disbursements of the Loan proceeds hereunder (even if the total amount of disbursements would exceed the face amount of the Note). Borrower shall, unless Lender has paid such taxes directly on Borrower's behalf, furnish to Lender evidence that taxes are paid at least five business (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

(f)     Funds for Insurance and Taxes. Borrower shall pay to Lender, at the time of and in addition to the monthly installments of principal and/or interest due under the Note, a sum equal to 1/12 of the amount estimated by Lender to be sufficient to enable Lender to pay at least sixty (60) days before they become due and payable, all taxes, assessments and other similar charges levied against the Project and all insurance premiums relating to Borrower and the Project as determined by Lender (the "**Property Tax and Insurance Reserve**"). So long as no Event of Default exists hereunder and provided that Borrower shall have delivered to Lender a copy of the tax bill or insurance premium bill, as the case may be, and the Property Tax and Insurance Reserve is sufficient for the purpose of paying such tax bill and/or insurance premium bill, Lender shall apply the sums to pay such real estate tax items and/or insurance premiums, as the case may be. All sums so reserved may be commingled with the general funds of Lender, and shall not be deemed to be held in trust for the benefit of Borrower. The Property Tax and Insurance Reserve shall not be deemed to be a deposit with a depository institution insured by the Federal Deposit Insurance Corporation. If such amount reserved with Lender is insufficient to fully pay such tax items and/or insurance premiums, as the case may be, Borrower shall, within ten (10) days following notice at any time from Lender, remit such additional sum as may be required for the full payment of such tax items and/or insurance premiums, as the case may be. Borrower hereby grants Lender a first priority security interest in such funds, including all interest accruing thereon, and all such funds are pledged as additional collateral for the Loan and Borrower shall execute any other documents and take any other actions necessary to provide Lender with such a perfected security interest in such funds. Upon the Maturity Date or at any time following an Event of Default, the moneys then remaining reserved with Lender or its agent shall, at Lender's option, be applied against the Indebtedness. The obligation of Borrower to pay such tax items and/or insurance premiums is not affected or modified by the provisions of this paragraph.

(g)     Personal Property. All of Borrower's personal property, fixtures, attachments and equipment delivered upon, attached to, used or required to be used in connection with the operation of the Project (collectively, the "**Personal Property**") shall always be located at the Project and shall be kept free and clear of all liens, encumbrances and security interests. Borrower shall not (nor shall it permit any tenant to), without the prior written consent of Lender, sell, assign, transfer, encumber, remove or permit to be removed from the Project any of the Personal Property. So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out,

- 18 -

inadequate, unserviceable or unnecessary for use in the operation of the Project, but, if material to the operation of the Project, only upon replacing the same with other Personal Property at least equal in value and utility to the Personal Property that is disposed.

(h)    Appraisals.  Lender shall have the right to obtain a new or updated Appraisal of the Project from time to time.  Borrower shall cooperate with Lender in this regard.  If the Appraisal is obtained to comply with this Agreement or any applicable law or regulatory requirement, or bank policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay for any such Appraisal upon Lender's request.

(i)    Loss of Note or other Loan Documents.  Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of an affidavit of lost note and an indemnity reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note.  If any of the other Loan Documents were lost or mutilated, Borrower agrees to execute and deliver replacement Loan Documents in the same form of such Loan Document(s) that were lost or mutilated.

(j)    Publicity.  Lender reserves the right to publicize the making of the Loan and, in such publicity, may include a brief description of the Project and the Loan.

(k)    Indemnification.  Borrower shall indemnify Lender, including each party owning an interest in the Loan and their respective successors, assigns, officers, directors, employees and consultants (each, an "Indemnified Party") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, liability, criminal and civil penalties, excise taxes and Expenses of any and every kind to any persons or property by reason of (i) the operation or maintenance of the Project; (ii) any breach of representation or warranty, default or Event of Default hereunder or under any of the other Loan Documents; or (iii) any other matter arising in connection with the Loan, Borrower, or Principal, any Lease or any Tenant, or the Project.  Notwithstanding the immediately preceding sentence, no Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct.  Upon written request by an Indemnified Party, Borrower will undertake, at its own costs and expense, on behalf of such Indemnified Party, using counsel reasonably satisfactory to the Indemnified Party, the defense of any legal action or proceeding whether or not such Indemnified Party shall be a party and for which such Indemnified Party is entitled to be indemnified pursuant to this section.  At Lender's option, Lender may, at Borrower's expense, prosecute or defend any action involving the priority, validity or enforceability of any of the Loan Documents.

(l)    No Additional Debt or Encumbrances.  Except for the Loan, Borrower shall not (i) incur any indebtedness (whether personal or nonrecourse, secured or unsecured), including, without limitation, for borrowed money, liabilities under guaranties, or reimbursement obligations of lessee under capital or operating leases other than customary trade payables paid within sixty (60) days after they are incurred, and (ii) permit there to be any encumbrances against the Project except the Permitted Exceptions.  Borrower shall also not default on the payment of any indebtedness that is not cured within the time, if any, specified therefor in any agreement governing the same.

(m)    Organizational Documents.  Borrower shall not, without the prior written consent of Lender, permit or suffer (i) a material amendment or modification of its Organizational Documents or the organizational documents of any constituent entity within Borrower, (ii) the admission of any new member, partner or shareholder, (iii) any dissolution or termination of its existence, or (iv) change in Borrower's state of formation or incorporation or Borrower's name.

(n)     Single Purpose Entity.  Borrower is and at all times shall remain a Single Purpose Entity until after the Indebtedness has been repaid in full.

(o)     Furnishing Reports.  Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower, which in any way relate to the Project or any part thereof.

(p)     Affiliate Transactions.  Prior to entering into any agreement with an Affiliate pertaining to the Project, Borrower shall deliver to Lender a copy of such agreement, which shall be satisfactory to Lender in its sole discretion.  If requested by Lender, such agreement shall provide Lender the right to terminate it upon Lender's (or its designee's) taking possession of the Project or acquisition of the Project through foreclosure, a deed in lieu of foreclosure, UCC sale or otherwise.

(q)     Site Visits, Observation and Testing.  Lender and its agents and representatives shall have the right at any reasonable time to enter and visit the Project for the purpose of performing appraisals, observing the Project, inspecting the progress of construction of the Conversion Renovations, taking and removing soil or groundwater samples, and conducting tests on any part of the Project. Lender has no duty, however, to visit or observe the Project or to conduct tests, and no site visit, observation or testing by Lender, its agents or representatives shall impose any liability on any of Lender, its agents or representatives.  Neither Borrower nor any other party is entitled to rely on any site visit, observation or testing by any of Lender, its agents or representatives.  Neither Lender, its agents nor representatives owe any duty of care to protect Borrower or any other party against, or to inform Borrower or any other party of any other adverse condition affecting the Project.  Lender shall give Borrower reasonable notice before entering the Project.  Lender shall make reasonable efforts to avoid interfering with Borrower's use of the Project in exercising any rights provided in this Section 4.2(q).

(r)     Compliance With U.S.A. Patriot Act and Anti-Terrorism Laws.  Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "**Patriot Act**"), and Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies Borrower and each Principal, which information includes the name and address of Borrower and each Principal and such other information that will allow Lender to identify such party in accordance with the Patriot Act. Borrower is not, and will not become a person (individually, a "**Prohibited Person**" and collectively, "**Prohibited Persons**") either listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, U.S. Department of the Treasury (the "**OFAC List**") or otherwise subject to any other prohibition or restriction imposed by laws, regulations or executive orders, including Executive Order No. 13224, administered by the Office of Foreign Asset Control, U.S. Department of the Treasury (collectively the "**OFAC Rules**").  Borrower (i) is not and will not become owned or controlled by a Prohibited Person, (ii) is not acting and will not act for or on behalf of a Prohibited Person, (iii) is not otherwise associated with and will not become associated with a Prohibited Person, (iv) is not providing and will not provide material, financial or technological support or other services to or in support of acts of terrorism of a Prohibited Person.  Borrower will not transfer any interest in Borrower to, or enter into a Lease with, any Prohibited Person. Borrower will not enter into any Lease or undertake any activities related to this Agreement in violation of the Federal Bank Secrecy Act, 31 U.S.C. §5311, et seq. or any federal or state laws, including but not limited to, 18 U.S.C. §§1956, 1957 and 1960 prohibiting money laundering and terrorist financing (collectively, "**Anti-Money Laundering Laws**").  Borrower shall provide information as Lender may require from time to time to permit Lender to satisfy its obligations under the Patriot Act, the OFAC Rules or the Anti-Money Laundering Laws.  Borrower shall immediately notify Lender if Borrower has knowledge that any Tenant, any Principal, Guarantor or any member or beneficial owner of Borrower is or becomes a

Prohibited Person or (A) is convicted of, (B) pleads nolo contendere to (C) is indicted on or (D) is arraigned and held over on charges under the Anti-Money Laundering Laws or involving money laundering or predicate crimes to money laundering.

(s)     Notice of Change. Borrower shall give Lender prior written notice of any change in: (i) the location of its place of business or its chief executive office if it has more than one place of business; (ii) the location of any of the Personal Property, including Borrower's books and records; and (iii) Borrower's name or business structure. Unless otherwise approved by Lender in writing, all Personal Property (other than the books and records) will be located at the Project and all books and records will be located at Borrower's place of business or chief executive office if Borrower has more than one place of business.

(t)     No Use of Merrill Lynch Name. Borrower shall not directly or indirectly publish, disclose or otherwise use in any advertising or promotional material, or press release or interview, the name, logo or any trademark of Lender, Merrill Lynch & Co., Inc. or any of their affiliates.

(u)     Escrow Accounts. Borrower shall set up all escrow accounts required to be set up hereunder or under any of the other Loan Documents with the Title Insurer. In addition, all Condominium Unit Deposits under Approved Sale Contracts shall also be held by the Title Insurer or the broker handling the marketing of the Condominium Units in accordance with the terms of this Loan Agreement and the applicable Approved Sale Contract.

**4.3     Authorized Representative.**

Borrower hereby appoints John Royce as its **"Authorized Representative"** for purposes of dealing with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. Subject to the terms of Section 4.2(b) above (concerning transfers by Borrower), the Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by the Authorized Representative shall be final and binding on Borrower. Borrower may appoint a new Authorized Representative with Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Lender may rely on the authority given to the Authorized Representative until actual receipt by Lender of a duly authorized resolution substituting a different person as the Authorized Representative whom Lender has previously approved. No more than one person shall serve as Authorized Representative at any given time.

**4.4     Guarantor's Net Worth and Letter of Credit.**

(a)     Until the date on which the Limited Payment Guaranty is terminated in accordance with the terms thereof, (1) the net worth of Guarantor (calculated in accordance with the methodology used to prepare the Guarantor's certified financial statements dated June 30, 2005 previously delivered to Lender) shall be greater than Seventy-Five Million and No/100ths Dollars ($75,000,000.00), and (2) the minimum liquidity of Guarantor (calculated in accordance with the methodology used to prepare the Guarantor's certified financial statements dated June 30, 2005 previously delivered to Lender) shall be greater than Fifty Million and No/100ths Dollars ($50,000,000.00). Guarantor's net worth and liquidity shall be evidenced by the certified financial statements of Guarantor required to be delivered to Lender pursuant to Article 3 above. Borrower shall cause Guarantor to provide Lender with written evidence satisfactory to Lender regarding the above.

(b)     Upon the occurrence of a default under Section 4.4 (a) above, Guarantor shall, within ten (10) days of receipt of Lender's notice of such default, (i) prepay the outstanding principal balance of the Loan in an amount equal to Five Million and No/100 Dollars ($5,000,000.00), or (ii) deliver to Lender an irrevocable standby letter of credit (as amended, renewed or replaced from time to time, the "**Letter of Credit**"), in the face amount of Five Million and No/100ths Dollars ($5,000,000.00). The Letter of Credit shall be: (a) in a form and substance acceptable to Lender, (b) unconditional and non-documentary (meaning free of any conditions whatsoever); (c) payable in whole or in part up to its face amount upon presentation of Lender's sight draft only; (d) issued by a bank with a credit rating of A or better by either Moody's or S&P; and (e) continuously renewed for periods of twelve (12) months, at least thirty (30) days at all times prior to each expiration or renewal date, until such time as the Loan has been paid in full. In the event the issuer's credit rating by neither Moody's nor S&P is A or better, Guarantor shall, upon Lender's request, provide Lender with a new Letter of Credit meeting all of the terms and conditions of this section within thirty (30) days of such request.

(c)     Lender shall be entitled to draw on the Letter of Credit: (i) upon the occurrence of any Event of Default under the Loan Documents; (ii) if any Letter of Credit is not, at all times, renewed or extended at least thirty (30) days prior to its then current expiration or renewal date; or (iii) if Guarantor fails to provide a replacement Letter of Credit within thirty (30) days after Lender's request concerning a change in the net worth or financial condition of the issuing bank. Lender shall apply Letter of Credit proceeds to principal, interest, fees, charges, costs, expenses and other indebtedness and obligations under the Loan Documents in such manner and in such order as Lender may elect, in its sole discretion. Lender shall have no obligation to notify Borrower or Guarantor of any draw on the Letter of Credit.

(d)     Upon the failure of Guarantor to deliver the Letter of Credit, the Interest Rate shall equal the Increased Interest Rate pursuant to the terms of Section 2.5, but such default (upon its occurrence or following the expiration of any applicable notice and cure period) shall not by itself constitute an independent Event of Default under Section 8.1 of this Agreement.

## ARTICLE 5
## BORROWER'S REPRESENTATIONS AND WARRANTIES

**5.1**     **Borrower's Representations and Warranties.**

To induce Lender to execute this Agreement and perform its obligations hereunder, Borrower hereby represents and warrants to Lender as follows:

(a)     Borrower lawfully possesses and holds fee simple title to the Project, free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interest and claims of others, except only the Permitted Exceptions. Borrower is a Single Purpose Entity.

(b)     Except as set forth in <u>Exhibit G</u>, there is no litigation or proceedings pending, or to the best of Borrower's knowledge threatened, against the Project, Borrower, or Principal, which could, if adversely determined, cause a Material Adverse Change with respect to Borrower, Principal or the Project. There are no Environmental Proceedings and Borrower has no knowledge of any threatened Environmental Proceedings or any facts or circumstances which may give rise to any future Environmental Proceedings.

(c)     Borrower is a duly formed and validly existing limited liability company and is in good standing under the laws of the State of Nevada with its principal place of business at c/o Royce Capital Advisors, 1281 Terminal Way, Reno, Nevada 89502. Borrower is in good standing under the laws of the

State of Nevada and is authorized to transact business in the State of Nevada. Borrower has full power and authority to execute, deliver and perform all Loan Documents to which Borrower is a party, and such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower. The Loan Documents have each been duly executed and delivered and each constitutes the duly authorized, valid and legally binding obligation of Borrower and the Principal, as the case may be, enforceable against Borrower and the Principal, as the case may be, in accordance with their respective terms. Borrower uses no trade name(s) other than its actual name(s) set forth herein.

(d) Borrower's Members are each duly organized or formed, validly existing and in good standing under the laws of the State of Nevada, and each is authorized to transact business in the State in which such entity is required to be authorized in order to lawfully conduct its business and operation. Borrower's Members are the sole members of Borrower, with each owning twenty-five percent (25%) of the ownership interests in Borrower free and clear of all liens, claims, encumbrances, and rights of others. The management and control of Borrower is vested solely in Royce and Umana, who have the full right, power and authority to execute the Loan Documents on behalf of Borrower.

(e) A true and complete copy of the articles of organization, and certificate of formation and limited liability company operating agreement creating Borrower, and all other documents creating and governing Borrower and any and all amendments thereto (collectively, the **"Organizational Documents"**) have been furnished to Lender. There are no other agreements, oral or written, among Borrower's Members, Royce or Umana, relating to Borrower or Borrower's Members. The Organizational Documents were duly executed and delivered, are in full force and effect, and binding upon and enforceable against each of the respective partners and members, as the case may be, in accordance with their terms. The Organizational Documents constitute the entire understanding among Borrower's Members, Royce and Umana relating to Borrower. No breach exists under the Organizational Documents and no act has occurred and no condition exists which, with the giving of notice or the passage of time would constitute a breach under any of the Organizational Documents.

(f) A true and complete copy of the articles of organization, and certificates of formation and limited liability company operating agreements creating Borrower's Members, and all other documents creating and governing Borrower's Members, and any and all amendments thereto (collectively, the **" Borrower's Members Organizational Documents"**) have been furnished to Lender. There are no other agreements, oral or written, among the members of Borrower's Members, relating to such entities. The Borrower's Members Organizational Documents were duly executed and delivered, are in full force and effect, and binding upon and enforceable against each of the respective partners and members, as the case may be, in accordance with their terms. No breach exists under the Borrower's Members Organizational Documents and no act has occurred and no condition exists which, with the giving of notice or the passage of time would constitute a breach under any of the Borrower's Members Organizational Documents.

(g) No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental person or entity, including any creditor, partner, or member of Borrower or Principal, is required in connection with the execution, delivery and performance of this Agreement or any of the other Loan Documents other than the recordation of the Mortgage and the filing of UCC Financing Statements, except for such consents, approvals or authorizations of or declarations or filings with any Governmental Authority or non-governmental person or entity where the failure to so obtain would not have an adverse effect on Borrower or such Principal or which have been obtained as of any date on which this representation is made or remade. Neither Borrower, nor any of Borrower's Members, nor Principal is insolvent and there has been no: (i) assignment made for the benefit of the

creditors of any of them; (ii) appointment of a receiver for any of them or for the property of any of them; or (iii) bankruptcy, reorganization, or liquidation proceeding instituted by or against any of them.

(h)    There is no default under this Agreement or the other Loan Documents, nor any condition, which, after notice or the passage of time or both, would constitute a default or an Event of Default under, said documents. In addition, Borrower is not in default under any contract, agreement or commitment to which it is a party. The execution, delivery and compliance with the terms and provisions of this Agreement and the other Loan Documents will not (i) to the best of Borrower's knowledge, violate any provisions of law or any applicable regulation, order or other decree of any court or governmental entity, or (ii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which Borrower is bound. Borrower has delivered to Lender copies of any agreements (including Leases) between Borrower and any Affiliate related in any way to the Project and any other agreements or documents materially affecting the construction, use and operation of the Project.

(i)    To the best of Borrower's and Principal's knowledge, (1) no condemnation of any portion of the Project, (2) no condemnation or relocation of any roadways abutting the Project, and (3) no proceeding to deny access to the Project from any point or planned point of access to the Project, has commenced or is contemplated by any Governmental Authority.

(j)    Neither the current use of the Project as an apartment complex containing one hundred thirty-one (131) Units, the proposed use of the Project as a condominium complex when the construction of the Project is completed, nor the contemplated accessory uses violate (i) any Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (ii) any building permits, covenants, conditions and restrictions of record, or agreements affecting the Project or any part thereof. Neither the zoning authorizations, subdivision approvals or variances nor any other right to construct the Conversion Renovations or to use the Project (either currently or after the Condominium Conversion is completed) is to any extent dependent upon or related to any real estate other than the Land. No building or other improvement encroaches upon any property line, building line, set back line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) with respect to the Project, except as shown or disclosed in the survey provided to Lender. The Project is not situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973, as amended, or as a wetland by any governmental entity having jurisdiction over the Project. All Governmental Approvals required for the operation of the Project and the construction of the Conversion Renovations have been obtained, or with respect to matters occurring after Closing, are obtainable by the date(s) necessary for Borrower to comply with the Construction Schedule. All Laws relating to the construction of the Conversion Renovations and operation of the Improvements have been complied with and all permits required for the construction of the Conversion Renovations and operation of the Project have been obtained or, with respect to matters occurring after Closing, are obtainable by the date(s) necessary for Borrower to comply with the Construction Schedule. The Project is accessible through fully improved and dedicated roads, accepted for maintenance and public use by public authority having jurisdiction. The Project has adequate water, gas and electrical supply, storm and sanitary sewerage facilities, telephone facilities, other required public utilities, fire and police protection, and means of access between the Project and public highways; none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any applicable Laws. The Project includes all property and rights that may be reasonably necessary or desirable to promote the present and any reasonable future beneficial uses and enjoyment thereof. To the best of Borrower's knowledge, there are no, nor are there any alleged or asserted, violations of law, regulations, ordinances, codes, permits, licenses, declarations, covenants,

- 24 -

conditions or restrictions of record, or other agreements relating to the Project, the Conversion Renovations, or any part thereof.

(k)     No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan to be disbursed hereunder other than those paid to Mr. David Bleiweiss or Holliday Fenoglio Fowler, L.P.

(l)     All financial statements and other documents and information previously furnished by Borrower, Principal or Guarantor to Lender in connection with the Loan are true, complete and correct and fairly present on a consistent basis with the financial conditions of the subjects thereof for the immediately prior periods as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and no Material Adverse Change with respect to Borrower, Principal, Guarantor or the Project has occurred since the respective dates of such statements and information.  None of Borrower, Guarantor or Principal has any material liability, contingent or otherwise, not disclosed in such financial statements.  The Principal and Guarantor have delivered collateral value statements prepared on a basis that is acceptable to Lender and certified as true and correct by such Principal or Guarantor, as applicable.

(m)     The Project is taxed separately without regard to any other property and for all purposes the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel.  There are no unpaid or outstanding real estate or other taxes or assessments on or against the Project or any part thereof, except general real estate taxes for 2005 not yet due or payable.  To Borrower's and Principal's knowledge, there is no pending or contemplated action pursuant to which any special assessment may be levied against any portion of the Project.

(n)     Except for Leases which have been provided to and approved by Lender in writing, Borrower and its previous owners have not entered into any Leases, subleases or other arrangements for occupancy of space within the Project that are currently in effect other than as set forth on the rent roll attached hereto as Exhibit D, which Borrower certifies is true and correct in all material respects.  True, correct and complete copies of Borrower's form lease and all Leases, as amended, have been delivered to Lender.  All Leases are in full force and effect.  Neither Borrower nor any Tenant is in default under any Lease.  Borrower has disclosed to Lender in writing any material default by any Tenant under any Lease and no notice of termination has been issued under any Lease.

(o)     The proceeds of the Loan shall be used for proper business purposes.  The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System and no portion of the proceeds of the Loan shall be used in any matter that would violate such Regulations or otherwise violate the Securities Act of 1933 or the Securities Exchange Act of 1934, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(p)     Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(q)     None of Borrower, any member in Borrower, Guarantor or Principal is or will be, and no legal or beneficial interest of a member in Borrower is or will be held, directly or indirectly, by a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of the

- 25 -

Internal Revenue Code Sections 897, 1445 or 7701, the Foreign Investments in Real Property Tax Act of 1980, the International Investment and Trade in Services Survey Act, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

(r)     Borrower and Principal have furnished Lender with a true and complete copy of all Construction Documents and any other documents or agreements relating to the Conversion Renovations, the Condominium Conversion and the Project.

(s)     None of Borrower, Guarantor or Principal, or any beneficial owner of Borrower, Guarantor or Principal, is currently listed on the OFAC Lists.

(t)     All statements set forth in the Recitals are true and correct.

(u)     There has been no damage or destruction of any part of the Project by fire or other casualty that has not been repaired.

(v)     The Construction Budget constitutes Borrower's good faith estimate of all cost and expenses which will be incurred by Borrower in the acquisition of the Project, and conversion of the Units through the Completion Date.

Borrower agrees that all of the representations and warranties set forth above and elsewhere in this Agreement are true as of the date hereof, will be true at the Closing Date and, except for matters that have been disclosed by Borrower and approved by Lender in writing, at all times thereafter. It shall be a condition precedent to the Closing Date and each subsequent disbursement, if any, that each of said representations and warranties is true and correct as of the date of such requested disbursement. Each disbursement of Loan proceeds or accrual of interest under the Maximum Interest Accrual account shall be deemed to be a reaffirmation by Borrower that each of the representations and warranties is true and correct as of the date of such disbursement. In addition, at Lender's request, Borrower shall reaffirm such representations and warranties in writing prior to each disbursement hereunder, including with respect to accrual under the Maximum Interest Accrual account as set forth in this Agreement.

## ARTICLE 6
## ENVIRONMENTAL MATTERS

**6.1     Environmental Representations and Warranties.**

Each Environmental Indemnitor hereby represents and warrants to Lender that (i) except as specifically disclosed in the documents listed in <u>Exhibit F</u> attached hereto (the **"Environmental Documents"**), to the best of Environmental Indemnitor's knowledge, (a) the Project is in a clean, safe and healthful condition and has been and is free of all Hazardous Material, and (b) no release of any Hazardous Material has occurred on, onto or about the Project; (ii) except as disclosed in the Environmental Documents, neither Borrower nor, to the best of Environmental Indemnitor's knowledge, any other person or entity, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used (whether by Borrower or, to the best of Environmental Indemnitor's knowledge, by any other person or entity) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material; (iii) that, except as specifically disclosed in the Environmental Documents, the Project currently complies, and will comply based on its anticipated use, with all Laws relating to Hazardous Material; (iv) except as disclosed in the

- 26 -

Environmental Documents, to the best of Environmental Indemnitor's knowledge, in connection with the ownership, operation, and use of the Project, all necessary notices have been filed and all required permits, licenses and other authorizations have been obtained, including those relating to the generation, treatment, storage, disposal or use of Hazardous Material; (v) except as disclosed in the Environmental Documents, to the best of Environmental Indemnitor's knowledge, there is no present, past or threatened investigation, inquiry or proceeding relating to the environmental condition of, or to events on or about, the Project; (vi) except as disclosed in the Environmental Documents, neither the Project nor Borrower is subject to any remedial obligations under any Laws relating to Hazardous Material, health or the environment; (vii) except as disclosed in the Environmental Documents, there are no underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Material of any sort on, under or affecting the Project; and (viii) it has not, nor will it, release or waive the liability of any previous owner, lessee or operator of the Project or any party who may be potentially responsible for the presence of or removal of Hazardous Material from the Project, nor has it made promises of indemnification regarding Hazardous Material on the Project to any party, except as contained herein and in the Loan Documents.

**6.2    Environmental Covenants.**

Environmental Indemnitors shall:

(a)    comply, and cause all other persons on or occupying the Project to comply, with all Laws relating to Hazardous Material;

(b)    not install, use, generate, manufacture, store, treat, release or dispose of, nor permit the installation, use, generation, storage, treatment, release or disposal of, Hazardous Material on, under or about the Project except as specifically disclosed in the Environmental Documents and except for materials used or stored in the ordinary course of maintenance and operation (and in compliance with all Laws) of Borrower's or any Tenant's business or the construction of the Conversion Renovations;

(c)    immediately advise Lender in writing of: (i) any and all Environmental Proceedings; (ii) except for materials used or stored in the ordinary course of maintenance and operation (and in compliance with all Laws) of the Project or the construction of the Conversion Renovations), the presence of any Hazardous Material on, under or about the Project of which Lender has not previously been advised in writing; (iii) any remedial action taken by, or on behalf of, any Environmental Indemnitor in response to any Hazardous Material on, under or about the Project or to any Environmental Proceedings of which Lender has not previously been advised in writing; (iv) the discovery by any Environmental Indemnitor of the presence of any Hazardous Material on, under or about any real property or bodies of water adjoining or in the vicinity of the Project; and (v) the discovery by any Environmental Indemnitor of any occurrence or condition on any real property adjoining or in the vicinity of the Project that could cause the Project or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Project under any Laws relating to Hazardous Material;

(d)    provide Lender with copies of all reports, analyses, notices, licenses, approvals, orders, correspondences or other written materials in its possession or control relating to the environmental condition of the Project or real property or bodies of water adjoining or in the vicinity of the Project or Environmental Proceedings immediately upon receipt, completion or delivery of such materials;

(e)    not install or allow to be installed any tanks for the storage of Hazardous Materials on, at or under the Project;

(f)     not create or permit to continue in existence any lien (whether or not such lien has priority over the lien created by the Mortgage) upon the Project imposed pursuant to any Laws relating to Hazardous Material; and

(g)     not change or alter the present use of the Project unless Environmental Indemnitors shall have notified Lender thereof in writing and Lender shall have determined, in its sole and absolute discretion, that such change or modification will not result in the presence of Hazardous Material on the Project in question in such a level that would increase the potential liability for Environmental Proceedings.

**6.3     Right of Entry and Disclosure of Environmental Reports.**

Borrower hereby grants to Lender its agents, employees, consultants and contractors, an irrevocable license and authorization to enter upon and inspect the Project at reasonable times and upon reasonable advance notice, and conduct such environmental audits and tests, including, without limitation, subsurface testing, soils and groundwater testing, and other tests which may physically invade the Project, in its sole and absolute discretion, determine are necessary or desirable. With respect to invasive testing, such as soil borings, Lender shall consult with Borrower in advance of such tests. Lender agrees, however, that it shall not conduct any such audits or tests, unless a default which has continued beyond the expiration of any applicable grace period exists under the Loan Documents or Lender has reason to believe that such audit or test may disclose the presence or release of Hazardous Material or unless an environmental audit deems further testing necessary. Without limiting the generality of the foregoing, Borrower agrees that Lender shall have the right to appoint a receiver to enforce this right to enter and inspect the Project to the extent such authority is provided under applicable law. All reasonable out-of-pocket costs and expenses incurred by Lender in connection with any inspection, audit or testing conducted in accordance with this Section 6.3 shall be paid by Borrower. The results of all investigations and reports prepared by Lender shall be and at all times remain the property of Lender and under no circumstances shall Lender have any obligation whatsoever to disclose or otherwise make available to Environmental Indemnitors or any other party such results or any other information obtained by it in connection with such investigations and reports; provided, however, that if there exists no Event of Default under the Loan Documents, if requested by Borrower, Lender shall provide to Borrower a copy of the written report with respect to any inspection, audit or testing for which Borrower has paid hereunder. Lender hereby reserves the right, and Environmental Indemnitors hereby expressly authorize Lender to make available to any party in connection with a sale of the Project any and all environmental reports, whether prepared by Lender or prepared by Borrower and provided to Lender (collectively, the **"Environmental Reports"**), which Lender may have with respect to the Project. Borrower consents to Lender notifying any party under such circumstances of the availability of any or all of the Environmental Reports and the information contained therein. Each Environmental Indemnitor further agrees that Lender may disclose such Environmental Reports to any governmental agency or authority if they reasonably believe that they are required to disclose any matter contained therein to such agency or authority; provided that Lender shall give Borrower at least 48 hours' prior written notice before so doing. Each Environmental Indemnitor acknowledges that Lender cannot control or otherwise assure the truthfulness or accuracy of the Environmental Reports, and that the release of the Environmental Reports, or any information contained therein, to prospective bidders at any foreclosure sale of the Project may have a material and adverse effect upon the amount, which a party may bid at such sale. Each Environmental Indemnitor agrees that Lender shall not have any liability whatsoever as a result of delivering any or all of the Environmental Reports or any information contained therein to any third party, and each Environmental Indemnitor hereby releases and forever discharges Lender from any and all claims, damages, or causes of action arising out of connected with or incidental to the Environmental Reports or the delivery thereof.

## 6.4   Environmental Indemnitor's Remedial Work.

Environmental Indemnitors shall promptly perform any and all necessary remedial work ("Remedial Work") in response to any Environmental Proceedings or the presence, storage, use, disposal, transportation, discharge or release of any Hazardous Material on, under or about any of the Project; provided, however, that Borrower shall perform or cause to be performed such Remedial Work so as to minimize any impairment to Lender's security under the Loan Documents.

All Remedial Work shall be conducted: (a) in a diligent and timely fashion by licensed contractors acting under the supervision of a consulting environmental engineer; (b) pursuant to a detailed written plan for the Remedial Work approved by any public or private agencies or persons with a legal or contractual right to such approval; (c) with such insurance coverage pertaining to liabilities arising out of the Remedial Work as is then customarily maintained with respect to such activities; and (d) only following receipt of any required permits, licenses or approvals. The selection of the Remedial Work contractors and consulting environmental engineer, the contracts entered into with such parties, any disclosures to or agreements with any public or private agencies or parties relating to Remedial Work and the written plan for the Remedial Work (and any changes thereto) shall each be subject to Lender's prior written approval, which shall not be unreasonably withheld or delayed. In addition, Environmental Indemnitors shall submit to Lender, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, proposed removal or other Remedial Work contracts and similar information prepared or received by Environmental Indemnitors in connection with any Remedial Work, or Hazardous Material relating to the Project. All costs and expenses of such Remedial Work shall be paid by Environmental Indemnitors, including, without limitation, the charges of the Remedial Work contractors and the consulting environmental engineer, any taxes or penalties assessed in connection with the Remedial Work and Lender's reasonable fees and out-of-pocket costs incurred in connection with monitoring or review of such Remedial Work. Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any Environmental Proceedings.

## 6.5   Environmental Indemnity.

Environmental Indemnitors shall protect, indemnify, defend and hold Lender and any successors to Lender's interest in the Loan, and any other party who acquires any portion of the Loan at a foreclosure sale or otherwise through the exercise of Lender's rights and remedies under the Loan Documents, and all directors, officers, employees and agents of all of the aforementioned indemnified parties, harmless from and against any and all actual or potential claims, liabilities, damages (direct or indirect), and Expenses which arise out of or relate in any way to any breach of any representation, warranty or covenant contained herein, or any Environmental Proceedings or any use, handling, production, transportation, disposal, release or storage of any Hazardous Material in, under or on the Project, whether by any Environmental Indemnitor or any other person, including, without limitation:

(a)      all foreseeable and all unforeseeable Expenses (including any loss of principal and interest due and owing on the Loan) arising out of: (i) Environmental Proceedings or the use, generation, storage, discharge or disposal of Hazardous Material by Environmental Indemnitors, any prior owner or operator of the Project or any person on or about the Project; (ii) any residual contamination affecting any natural resource or the environment; or (iii) any exercise by Lender of any of its rights and remedies under this Article 6; and

(b)      the costs of any required or necessary investigation, assessment, testing, remediation, repair, cleanup, or detoxification of the Project and the preparation of any closure or other required plans.

Environmental Indemnitors' liability to the aforementioned indemnified parties shall arise upon the earlier to occur of (1) discovery of any Hazardous Material on, under or about the Project, or (2) the institution of any Environmental Proceedings, and not upon the realization of loss or damage, and Environmental Indemnitors shall pay to Lender from time to time, immediately upon request, an amount equal to such Expenses, as reasonably determined by Lender. In addition, in the event any Hazardous Material is removed, or caused to be removed from the Project, by Environmental Indemnitors, Lender or any other person, the number assigned by the U.S. Environmental Protection Agency to such Environmental Proceedings or any similar identification shall in no event be in the name of Lender or identify the Lender as a generator, arranger or other designation. The foregoing indemnity shall not include Expenses arising solely from Hazardous Material which first exist on the Project following the date on which the Lender (or its nominee) takes title to the Project, whether by foreclosure of the Mortgage, by a deed-in-lieu thereof or otherwise.

### 6.6    Remedies Upon an Environmental Default.

In addition to any other rights or remedies Lender may have under this Article 6, at law or in equity, in the event that Environmental Indemnitors shall fail to timely comply with any of the provisions of this Article 6, or in the event that any representation or warranty made in this Article 6 proves to be false or misleading, then, in such event, after (i) delivering written notice to Environmental Indemnitors, which notice specifically states that Environmental Indemnitors have failed to comply with the provisions of this Article 6; and (ii) the expiration of the earlier to occur of (A) a (30) day period after receipt of such notice and (B) the cure period, if any, permitted under any applicable law, rule, regulation or order with which Environmental Indemnitors shall have failed to comply, Lender may declare an Event of Default in this Agreement or any other Loan Documents and exercise any and all remedies provided for therein, and/or do or cause to be done whatever is reasonably necessary to cause the Project to comply with all Laws relating to Hazardous Material and other applicable Laws, rules, regulations or orders and the cost thereof shall constitute an Expense hereunder and shall become immediately due and payable without notice and with interest thereon at the Default Rate until paid. Environmental Indemnitors shall give to Lender and its agents and employees access to the Project for the purpose of effecting such compliance and hereby specifically grant to Lender a license, effective upon expiration of the applicable period as described above, if any, to do whatever is necessary to cause the Project to so comply, including, without limitation, to enter the Project and remove therefrom any Hazardous Material or otherwise comply with any Laws relating to Hazardous Material.

### 6.7    Unconditional Environmental Obligations.

Notwithstanding any term or provision contained herein or in the other Loan Documents, the covenants and obligations of the Environmental Indemnitors under this Article 6 (the "**Environmental Obligations**") are unconditional. Environmental Indemnitors shall be fully, personally, jointly and severally liable for the Environmental Obligations, and such liability shall not be limited to the original principal amount of the Loan. The Environmental Obligations shall be enforceable by Lender, its Affiliates, and its successors and assigns. The Environmental Obligations shall survive the repayment of the Loan and any foreclosure, deed-in-lieu, or transfer in lieu of foreclosure or similar proceedings or any transfer of title to the Project or any portion thereof or to the ownership interests in Borrower.

### 6.8    Assignment of Environmental Obligations Prohibited.

The Environmental Obligations may not be assigned or transferred, in whole or in part, by Environmental Indemnitors and any purported assignment by Environmental Indemnitors of the Environmental Obligations shall be void ab initio and of no force or effect.

- 30 -

6.9    **Indemnification Separate from the Loan.**

(a)    The Environmental Indemnitors agree that the Environmental Obligations are separate, independent of and in addition to the undertakings of the Environmental Indemnitors, as applicable, pursuant to the Loan, the Note, the other provisions of this Agreement and the other Loan Documents. A separate action may be brought to enforce the provisions of this Article 6, which shall in no way be deemed to be an action on the Note, whether or not the Loan has been repaid and whether or not Lender would be entitled to a deficiency judgment following a judicial foreclosure, trustee's sale or UCC sale. The Environmental Obligations shall not be affected by any exculpatory provisions contained in the Note, this Agreement or any of the other Loan Documents. All rights and obligations of this Article 6 shall survive performance and repayment of the obligations evidenced by and arising under the Loan Documents, surrender of the Note, reconveyance of the Mortgage, release of other security provided in connection with the Loan, trustee's sale or foreclosure under the Mortgage and/or any of the other Loan Documents (whether by deed or other assignment in lieu of foreclosure, or otherwise), acquisition of the Project by Lender, any other transfer of the Project, and transfer of all of Lender's rights in the Loan, the Loan Documents, and the Project.

(b)    Environmental Indemnitors waive all rights to require Lender to (i) proceed against or exhaust any security for the Loan or (ii) pursue any remedy in Lender's power whatsoever. Borrower waives all defenses by reason of any disability or other defense under the Loan or by reason of the cessation from any cause whatsoever of its liability under the Loan, or that it may acquire by reason of Lender's election of any remedy against it including, without limitation, Lender's exercise of its rights to foreclose under the Mortgage.

**ARTICLE 7**
**CASUALTIES AND CONDEMNATION**

7.1    **Lender's Election to Apply Insurance Proceeds on Indebtedness.**

(a)    Subject to the provisions of Section 7.1(b) below, Lender may elect to collect, retain and apply upon the Indebtedness of Borrower under this Agreement or any of the other Loan Documents all proceeds of insurance in excess of $50,000 resulting from any loss at the Project or condemnation award resulting from any condemnation or other taking of the Project or a portion thereof (individually and collectively referred to as **"Insurance Proceeds"**) after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and charges. Any proceeds remaining after repayment of the Indebtedness shall be paid by Lender to Borrower.

(b)    Notwithstanding anything in Section 7.1(a) to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Project, Lender agrees to make available the Insurance Proceeds to restoration of the Improvements if (i) no Event of Default exists, (ii) all Insurance Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Insurance Proceeds in excess of $50,000 available for restoration of the Improvements is sufficient to pay the full and complete costs of such restoration, or if not sufficient, Borrower has deposited with Lender an amount, which together with the amount of the Insurance Proceeds available for restoration of the Improvements, in Lender's reasonable judgment, will be sufficient to pay the full and complete costs of such restoration, (iv) no material Leases (which for this purpose shall mean Leases demising more than five percent (5%) of the rentable square feet of space at the Project) in effect at the time of such casualty or condemnation are or will be terminated as a result of such casualty or condemnation, (v) the income from the Project will not decrease more than fifteen percent (15%) as a result of such casualty or condemnation, (vi) the cost of restoration will not exceed fifteen percent (15%) of the Loan

- 31 -

Amount, (vii) in Lender's sole determination after completion of restoration, the Loan Amount will not exceed seventy-five percent (75%) of the fair market value of the Project, (viii) in Lender's reasonable determination, the Project can be restored to an architecturally and economically viable project in compliance with applicable Laws, (ix) Principal reaffirms in writing its/his/her obligations under the Limited Joinder and under any other guaranty to Lender, and (x) in Lender's reasonable determination, such restoration is likely to be completed not later than six (6) months prior to the Maturity Date.

(c)    From and after the date on which the Condominium Documents become effective, the disposition of (i) insurance proceeds upon the occurrence of a casualty affecting the portion of the Project that is encumbered by the Mortgage, and (ii) condemnation awards upon the occurrence of a condemnation affecting the portion of the Project that is encumbered by the Mortgage, shall be governed by the Condominium Documents and the Condominium Statute, as amended from time to time. In connection with the application of any casualty proceeds or condemnation awards following the date upon which the Condominium Documents become effective, Borrower shall exercise all voting rights under the Condominium Documents in accordance with the written instructions of Lender.

### 7.2    Borrower's Obligation to Rebuild and Use of Insurance Proceeds Therefor.

In case Lender does not elect to apply or does not have the right to apply the Insurance Proceeds to the Indebtedness, as provided in Section 7.1 above, Borrower shall:

(a)    Proceed with diligence to make settlement with insurers or the appropriate Governmental Authorities and cause the Insurance Proceeds to be deposited with Lender;

(b)    In the event of any delay by Borrower or Principal in making settlement with insurers or the appropriate Governmental Authorities or effecting collection of the Insurance Proceeds, deposit with Lender the full amount required to complete construction as aforesaid;

(c)    In the event the Insurance Proceeds and the available proceeds of the Loan are insufficient to assure Lender that all contemplated repairs or construction will be completed, promptly deposit with Lender any amount necessary to assure that such contemplated repairs or construction will be completed; and

(d)    Promptly proceed with the assumption of construction of the Improvements, including the repair of all damage resulting from such fire, condemnation or other cause and restoration to its former condition.

Any request by Borrower for a disbursement by Lender of Insurance Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for an advance of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an advance of the Loan.

## ARTICLE 8
## EVENTS OF DEFAULT AND REMEDIES

### 8.1    Events of Default.

The occurrence of any one or more of the following shall constitute an **"Event of Default"** as said term is used herein:

(a)     Failure of Borrower to pay the outstanding principal amount, all interest thereon and all other amounts owing hereunder or the other Loan Documents (the "**Indebtedness**") on the Maturity Date or the failure to pay, within five (5) days of the due date, any of other payment obligations of Borrower to Lender, including any payments of interest, principal or Net Cash Flow due pursuant to this Agreement;

(b)     Failure of Borrower to strictly comply with the provisions of Section 2.10(c)(construction commencement and governmental approvals) and 2.10(d) (Sales Requirement), Section 4.2(b) (transfers and change of control), Section 4.2(d) (insurance), Section 4.2(l) (no additional debt or encumbrances), Section 4.2(m) (organizational documents), Section 4.2(n) (single purpose entity), and Article 6 (environmental matters; subject to any applicable grace periods set forth in Section 6.6).

(c)     Failure of Borrower for a period of thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Loan Documents not set forth in the subsections above; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as (y) Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice, and (z) the existence of such default will not result in any Tenant having the right to terminate its Lease due to such default; and provided further that if a different notice or grace period is specified under any other subsection of this Section 8.1 with respect to a particular breach, or if another subsection of this Section 8.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control;

(d)     Any material default by Borrower, as lessor, under the terms of any Lease following the expiration of any applicable notice and cure period, provided that if the Lease does not provide a notice and cure period, then the notice and cure period provided in (a) above will apply to any such monetary default, and the notice and cure period provided in (c) will apply to any such non-monetary default (which respective periods shall commence upon written notice of default from Lender or the applicable Tenant, whichever occurs first);

(e)     If any warranty, representation, statement, report or certificate made now or hereafter by Borrower or Principal is untrue or incorrect in any material respect at the time made or delivered, provided that if such breach is reasonably susceptible of cure, then no Event of Default shall exist so long as the applicable party cures said breach (i) by the due date provided in (a) above for a breach that can be cured by the payment of money or (ii) within the notice and cure period provided in (c) above for any other breach;

(f)     A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower, Guarantor or Principal (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days of its filing), or a custodian, receiver or trustee for any of the Project is appointed, or Borrower, Guarantor or Principal makes an assignment for the benefit of creditors, or any of them are adjudged insolvent by any state or federal court of competent jurisdiction, or any of them admit their insolvency or inability to pay their debts as they become due or an attachment or execution is levied against any of the Project;

- 33 -

(g)     The occurrence of any other event or circumstance denominated as an Event of Default herein or under any of the other Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be; or

(h)     The failure by Borrower to have furnished Lender with a final condominium plat and with final Plans for the Conversion Renovations, which condominium plat and Plans shall have been approved by all Governmental Authorities having jurisdiction thereover, by the Completion Date.

## 8.2     Remedies Conferred Upon Lender.

Lender's rights, remedies and powers, as provided herein and the other Loan Documents, are cumulative and concurrent, and may be pursued singly, successively or together against Borrower, any guarantor of the Loan, the security described in the Loan Documents, and any other security given at any time to secure the payment hereof, all at the sole discretion of Lender. Additionally, Lender may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Lender's sole discretion. Failure of Lender, for any period of time or on more than one occasion, to exercise its option to accelerate the Maturity Date shall not constitute a waiver of the right to exercise the same at any time during the continued existence of any Event of Default or any subsequent Event of Default. At any time after the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)     Take possession of the Project and do anything that is necessary or appropriate in its sole judgment to fulfill the obligations of Borrower under this Agreement and the other Loan Documents. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the Project to use unadvanced funds remaining under the Note or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Note, to pay, settle or compromise all existing bills and claims, which may be liens or security interests, or to avoid such bills and claims becoming liens against the Project; to execute all applications and certificates in the name of Borrower prosecute and defend all actions or proceedings in connection with the Improvements or Project; and to do any and every act which the Borrower might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(b)     Declare the Note or the Indebtedness to be immediately due and payable;

(c)     Use and apply any monies or letters of credit deposited by Borrower with Lender, regardless of the purposes for which the same was deposited, to cure any such default or to apply on account of any Indebtedness under this Agreement which is due and owing to Lender; and

(d)     Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Lender by operation of Law.

Notwithstanding the foregoing, upon the occurrence of any Event of Default under Section 8.1(f) all amounts evidenced by the Note shall automatically become due and payable, without any presentment, demand, protest or notice of any kind to Borrower.

## ARTICLE 9
## LOAN EXPENSE, COSTS AND ADVANCES

### 9.1    Loan and Administration Expenses.

Borrower unconditionally agrees to pay all costs and expenses of the Loan, including all amounts payable pursuant to Sections 2.7, 2.8 and 9.2 and any and all other reasonable fees owing to Lender pursuant to the Loan Documents, and also including all documentation, modification, or workout costs relating to the Loan, recording, filing and registration fees and charges, mortgage or documentary taxes, UCC searches, title and survey charges, all reasonable fees and disbursements of Lender's consultants, any costs involved in the disbursement, syndication and administration of the Loan, any repair or maintenance costs or payments made to remove or protect against liens, all reasonable costs and expenses incurred by Lender in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Lender hereunder and, if any default or Event of Default occurs hereunder or under any of the Loan Documents or if the Loan or Note or any portion thereof is not paid in full when and as due, all reasonable costs and expenses of Lender incurred in attempting to enforce or collect payment of the Loan or enforce any rights of Lender or Borrower's obligations hereunder and expenses of Lender incurred (including expenses relating to documentary and expert evidence, publication costs) in attempting to realize, while a default or Event of Default exists, on any security or incurred in connection with the sale, disposition (or preparation for sale or disposition) or liquidation of any security for the Loan (including any foreclosure sale, deed in lieu transaction or costs incurred in connection with any litigation or bankruptcy or administrative hearing and any appeals therefrom and any post-judgment enforcement action including, without limitation, supplementary proceedings in connection with the enforcement of this Agreement). All such costs or expenses incurred or advances or payments made by Lender shall also include court costs, reasonable legal fees and disbursements relating thereto and shall be included as additional Indebtedness evidenced by the Note and secured by the Mortgage and the other Loan Documents bearing interest at the Default Rate set forth in the Note until paid. Borrower agrees to pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify, defend and hold Lender harmless against all claims, liabilities, and Expenses arising in relation to any claim by broker, finder or similar person. Lender may require the payment of Lender's outstanding fees and expenses as a condition to any disbursement of the Loan. Lender is hereby authorized, without any specific request or direction by Borrower, to make disbursements from time to time in payment of or to reimburse Lender for all Loan expenses and fees.

### 9.2    Right of Lender to Make Advances to Cure Borrower's Defaults.

In the event that Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Loan Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing and shall constitute additional Indebtedness evidenced by the Note and secured by the Mortgage and the other Loan Documents and shall bear interest at a rate per annum equal to the Interest Rate (or Default Rate following an Event of Default).

### 9.3    Increased Costs.

Borrower agrees to pay Lender additional amounts to reasonably compensate Lender for any increase in its actual costs incurred in maintaining the Loan or any portion thereof outstanding or for the reduction of any amounts received or receivable from Borrower as a result of any change after the date

hereof in any applicable Law, regulation or treaty, or in the interpretation or administration thereof, or by any domestic or foreign court, changing the basis of taxation of payments under this Agreement to Lender (other than taxes imposed on or measured by the net income or receipts of Lender or any franchise tax imposed on Lender). Any amount payable by Borrower under this Article 9 shall be paid within five (5) days of receipt by Borrower of a notice by Lender setting forth the amount due and the basis for the determination of such amount, which statement shall be conclusive and binding upon Borrower, absent manifest error. Failure on the part of Lender to demand payment from Borrower for any such amount attributable to any particular period shall not constitute a waiver of Lender's right to demand payment of such amount for any subsequent or prior period.

**9.4    Borrower Withholding.**

If by reason of a change in any applicable Laws occurring after the date hereof, Borrower is required by Law to make any deduction or withholding in respect of any taxes (other than taxes imposed on or measured by the net income of or receipts of Lender or any franchise tax imposed on Lender), duties or other charges from any payment due under the Note, the sum due from Borrower in respect of such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, Lender receives and retains a net sum equal to the sum which it would have received had no such deduction or withholding been required to be made.

**9.5    Document and Recording Tax Indemnification.**

Borrower agrees to indemnify, defend and hold harmless Lender from and against any claim that any documentary or mortgage tax is due and payable in connection with the Loan or the execution, delivery or recording of the Loan Documents to pay such taxes and Expenses incurred by Lender in connection therewith. Borrower may contest any determination that any such taxes are due, but shall pay any such taxes (including penalties and interest) when legally required. This paragraph shall survive repayment of the Loan.

## ARTICLE 10
## ASSIGNMENTS BY LENDER AND DISCLOSURE

**10.1    Assignments and Participations.**

Lender may from time to time, without the consent of Borrower, sell, transfer, pledge, assign and convey the Loan and the Loan Documents (or any interest therein) and may grant participations in the Loan. Borrower agrees to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith which do not materially adversely affect Borrower's rights under the Loan Documents. In connection with any such sale, transfer, assignment, conveyance or participation, Lender may, acting for this purpose as an agent of Borrower, maintain at its offices a register for the recordation of the names and addresses of Lender's participants or assignees, and the amount and terms of Lender's sales, transfers, assignments, conveyances and participations including specifying any such participant's or assignee's entitlement to payments of principal and interest, and any payments made, with respect to each such sale, transfer, assignment, conveyance or participation.

**10.2    Disclosure of Information and Confidentiality.**

Lender shall have the right (but shall be under no obligation) to make available to (i) agents, employees, Affiliates, attorneys, advisors of Lender and any regulator, governmental agency or authority

and (ii) prospective transferees, participants or purchasers of any interest in the Loan (including any prospective bidder at any foreclosure sale of the Project), any and all information that Lender may have with respect to the Project, Borrower or Principal whether provided by such person or any third party, including, without limitation, (A) as required by law, regulation, rule, request or order, subpoena, judicial order or similar order and in connection with any litigation and (B) as may be required in connection with the examination, audit or similar investigation of such person, *provided,* that Lender exercise the same degree of care that it exercises with respect to its own proprietary information to maintain the confidentiality of any confidential information thereby received or received with respect to the Project, the Borrower, or Principal. Confidential information shall include only such information identified as such at the time provided to Lender and shall not include information that either: (i) is in the public domain, or becomes part of the public domain after disclosure to such person through no fault of such person, or (ii) is disclosed to such person by a third party (including information obtained as a result of any environmental assessments), *provided* Lender does not have actual knowledge that such third party is prohibited from disclosing such information. Borrower and Principal agrees that Lender shall have no liability whatsoever as a result of delivering any such information to any third party as described above, and Borrower and Principal, on behalf of themselves and their successors and assigns, hereby release and discharge Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party.

## ARTICLE 11
## GENERAL PROVISIONS

### 11.1    Captions.

The captions and headings of various Articles, Sections and subsections of this Agreement and the other Loan Documents and the Exhibits and Schedules pertaining thereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof or thereof.

### 11.2    Waiver of Jury Trial.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER, LENDER AND PRINCIPAL EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CLAIM, CONTROVERSY DISPUTE, ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (INCLUDING WITHOUT LIMITATION ANY ACTIONS OR PROCEEDINGS FOR ENFORCEMENT OF THE LOAN DOCUMENTS) AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER, LENDER AND PRINCIPAL EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.   BORROWER, LENDER AND PRINCIPAL EACH WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

**11.3  Jurisdiction.**

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER AND PRINCIPAL HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A **"PROCEEDING"**), BORROWER AND PRINCIPAL IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF CHICAGO, COUNTY OF COOK AND STATE OF ILLINOIS, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER AND PRINCIPAL HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY ILLINOIS STATE OR UNITED STATES COURT SITTING IN THE CITY OF CHICAGO AND COUNTY OF COOK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER OR, AS APPLICABLE, TO PRINCIPAL, AT THE ADDRESS INDICATED BELOW OR AT THE ADDRESS ON THE ATTACHED LIMITED JOINDER (AS APPLICABLE), AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER OR SUCH PRINCIPAL SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

**11.4  Governing Law.**

Irrespective of the place of execution and/or delivery, this Agreement and the other Loan Documents shall be governed by, and shall be construed in accordance with, the internal laws of the State of Illinois, without regard to conflicts of law principles except as provided in the Mortgage.

**11.5  Lawful Rate of Interest.**

In no event whatsoever shall the amount of interest paid or agreed to be paid to Lender pursuant to this Loan Agreement, the Note or any of the Loan Documents exceed the highest lawful rate of interest permissible under applicable law. If, from any circumstances whatsoever, fulfillment of any provision of this Loan Agreement, the Note and the other Loan Documents shall involve exceeding the lawful rate of interest which a court of competent jurisdiction may deem applicable hereto (**"Excess Interest"**), then ipso facto, the obligation to be fulfilled shall be reduced to the highest lawful rate of interest permissible under such law and if, for any reason whatsoever, Lender shall receive, as interest, an amount which would be deemed unlawful under such applicable law, such interest shall be applied to the Loan (whether or not due and payable), and not to the payment of interest, or refunded to Borrower if such Loan has been paid in full. Neither Borrower nor any guarantor, endorser or surety nor their heirs, legal representatives, successors or assigns shall have any action against Lender for any damages whatsoever arising out of the payment or collection of any such Excess Interest.

### 11.6    Modification; Consent.

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought. Consent by Lender to any act or omission by Borrower shall not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Lender's consent to be obtained in any future or other instance.

### 11.7    Waivers; Acquiescence or Forbearance Not to Constitute Waiver of Lender's Requirements.

(a)    Borrower for itself and all endorsers, guarantors and sureties and their heirs, legal representatives, successors and assigns, (i) waives presentment for payment, demand, notice of nonpayment or dishonor, protest of any dishonor, protest and notice of protest and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of the Loan; (ii) waives and renounces all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption and homestead laws now provided, or which may hereafter be provided, by the laws of the United States and of any state thereof against the enforcement and collection of the obligations evidenced by the Note or this Loan Agreement or as a bar to the enforcement of the lien created by any of the Loan Documents.

(b)    Borrower for itself and all endorsers, guarantors and sureties and their heirs, legal representatives, successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions of this Loan Agreement, the Note, and to any substitution, exchange or release of the collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Borrowers, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other tax; and (iv) expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)    Each and every covenant and condition for the benefit of Lender contained in this Agreement and the other Loan Documents may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loan or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds and Lender may at any time after such acquiescence require Borrower to comply with all such requirements. Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law, including any failure to accelerate the Maturity Date shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Note or as a reinstatement of the Loan or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the Loan Documents. Lender's acceptance of payment of any sum secured by any of the Loan Documents after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's

right to accelerate the maturity of the Loan, nor shall Lender's receipt of any awards, proceeds, or damages under <u>Article 7</u> of this Agreement operate to cure or waive Borrower's or the Principal's default in payment of sums secured by any of the Loan Documents.

**11.8**   <u>Disclaimer by Lender.</u>

This Agreement and the other Loan Documents are made for the sole benefit of Borrower and Lender, and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement or the other Loan Documents, or by reason of any actions taken by Lender pursuant to this Agreement or the other Loan Documents. Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, Tenant or other party for labor or services performed or materials supplied in connection with the Project. Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Project. Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project. Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only, and neither Borrower nor any third party is entitled to rely thereon.

**11.9**   <u>Partial Invalidity; Severability.</u>

If any of the provisions of this Agreement or the other Loan Documents, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the other Loan Documents, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law and to this end, the provisions of this Agreement and all the other Loan Documents are declared to be severable. All covenants and agreements of Borrower and Principal shall be joint and several.

**11.10**   <u>Definitions Include Amendments.</u>

Definitions contained in this Agreement which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

**11.11**   <u>Execution in Counterparts.</u>

This Agreement and the other Loan Documents may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**11.12**   <u>Entire Agreement.</u>

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior commitments, agreements, representations, and understandings, written or oral, relating to the subject

matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto.

### 11.13 Waiver of Damages.

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower for itself and its Principal waive all claims for punitive, exemplary or consequential damages.

### 11.14 Claims Against Lender.

Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within three (3) months after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter. Borrower waives any claim, set-off or defense against Lender arising by reason of any alleged default by Lender as to which Borrower does not give such notice timely as aforesaid. Borrower acknowledges that such waiver is or may be essential to Lender's ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with regard to the Loan. No Principal or Tenant is intended to have any rights as a third-party beneficiary of the provisions of this Section 11.14.

### 11.15 Set-Offs.

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by the Borrower with Lender (or its Affiliates).

### 11.16 Relationship.

The relationship between Lender and Borrower shall be that of creditor-debtor only. No term in this Agreement or in the other Loan Documents and no course of dealing between the parties shall be deemed to create any relationship of agency, partnership or joint venture or any fiduciary duty by Lender to Borrower or any other party.

### 11.17 Agents.

In exercising any rights under the Loan Documents or taking any actions provided for therein, Lender may act through its employees, agents or independent contractors as authorized by Lender.

### 11.18 Interpretation.

With respect to all Loan Documents, whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The word "obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations. It further includes all

principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language in the Loan Documents. This Agreement and all of the other Loan Documents shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties.

**11.19    Successors and Assigns.**

Subject to the restrictions on transfer and assignment contained in <u>Section 4.2(b)</u> of this Agreement, this Agreement and the other Loan Documents shall inure to the benefit of and shall be binding on Lender, Borrower and Principal and their respective heirs, successors and permitted assigns.

**11.20    Time is of the Essence.**

Borrower agrees that time is of the essence under this Agreement and the other Loan Documents and the performance of each of the covenants and agreements contained herein and therein.

**11.21    Notices.**

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) Business Days after mailing (c) if by any reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission if before 3:00 p.m. (Chicago time) on a Business Day so long as copy is sent on the same day by overnight courier as set forth below:

> If to Borrower:
>
> > MM Condominiums, LLC
> > c/o Royce Capital Advisors
> > 1281 Terminal Way
> > Reno, Nevada 89502
> > Attention: John F. Royce and Alex J. Umana
> > Telephone: 775-322-5797
> > Facsimile: 775-322-1083
>
> With a copy to:
>
> > Jones Vargas
> > 100 West Library Street, 12th Floor
> > Reno, Nevada 89501
> > Attention: William C. Davis, Esq.
> > Telephone: 775-786-5000
> > Facsimile: 775-786-1177
>
> If to Lender:
>
> > Merrill Lynch Capital, a Division
> > of Merrill Lynch Business Financial

- 42 -

Services Inc.
222 North LaSalle Street – 16th Floor
Chicago, Illinois 60601
Attention:        National Portfolio Manager
Telephone:       312-499-3128
Facsimile:        312-499-3026

With a copy to:

Merrill Lynch Capital, a Division
of Merrill Lynch Business Financial
Services Inc.
222 North LaSalle Street – 16th Floor
Chicago, Illinois 60601
Attention:        Real Estate Legal
Telephone:       312-499-3140
Facsimile:        312-499-3026

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice. Any notice or demand delivered to the person or entity named above to accept notices and demands for such party shall constitute notice or demand duly delivered to such party, even if delivery is refused.

**11.22    Release of Condominium Units.**

Provided no default has occurred and is continuing, Lender shall permit the sale (the "**Unit Release**") of a particular Condominium Unit (the "**Individual Unit**") by Borrower pursuant to an Approved Sale Contract, and shall deliver into escrow any required deed release, upon Borrower's compliance with the following terms and conditions, in form and substance satisfactory to Lender:

(a)       The Individual Unit is a separate tax lot (or will as a result of the filing of the Condominium Documents become a separate tax lot upon January 1 of the next succeeding calendar year) and is not required to be included within the Project, for purposes of any governmental rule or necessary or appropriate to satisfy or facilitate the requirements or terms of any Leases;

(b)       Borrower shall have given to Lender a written request for the Unit Release accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the Approved Sale Contract approved by Lender, not less than ten (10) days prior to the desired Unit Release date;

(c)       Each Individual Unit and the remaining portion of the Project and the Unit Release and the conveyance shall be in compliance with all applicable zoning, land use and other governmental rules and regulations of all Governmental Authorities;

(d)       Prior to the first (1st) Unit Release, Lender shall have received an opinion from Borrower's counsel (which opinion and counsel shall be acceptable to Lender in the reasonable exercise of its discretion) to the effect that (i) the Condominium Documents satisfy all applicable requirements of Governmental Authorities and have been duly executed and, where necessary, duly recorded or filed pursuant to the Condominium Statute, (ii) the condominium has been duly created and no filing, registration or other compliance with any federal or state securities or other law will be required in

- 43 -

connection with the sale of Units, or if such filing is necessary, that the applicable law governing the same has been fully complied with;

(e)    The Association which shall have been created by the Condominium Documents shall have furnished to Lender at no cost or expense to Lender, an insurance policy in substance and from an insurance company reasonably acceptable to Lender naming Lender, the Association, and the owners of each Condominium Unit, as their respective interests may appear, as the insureds;

(f)    Borrower shall have delivered to Lender a copy of the seller's closing statement for the sale of the Individual Unit certified by Borrower as true and correct. Borrower shall use its best efforts to deliver to Lender such seller's closing statement not less than one (1) Business Day prior to the desired Unit Release date; and

(g)    Borrower shall, until such time as the Loan is repaid in full, (1) deposit, at the time such Condominium Unit Deposit is received by Borrower or its agent, into escrow with the Title Insurer or broker handling the sale of the Condominium Units all Condominium Unit Deposits relating to Approved Sale Contracts to be held by Title Insurer in accordance with the terms of the Approved Sale Contract, and (2) upon closing of the Unit Release, pay to Lender the greater of (x) the Minimum Release Price, and (y) all Net Sales Proceeds, in each case to be applied in accordance with Section 2.10.

EXECUTED as of the date first set forth above.

BORROWER:　　　　　　**MM CONDOMINIUMS, LLC,** a Nevada limited liability
　　　　　　　　　　　company

　　　　　　　　　　　By: _____
　　　　　　　　　　　Name: John F. Royce
　　　　　　　　　　　Title: Manager

　　　　　　　　　　　By: _____
　　　　　　　　　　　Name: Alex J. Umana
　　　　　　　　　　　Title: Manager
　　　　　　　　　　　Borrower's Tax ID No. 20-3249580

LENDER:　　　　　　　**MERRILL LYNCH CAPITAL,** a Division of Merrill Lynch
　　　　　　　　　　　Business Financial Services Inc., a Delaware corporation

　　　　　　　　　　　By: _____
　　　　　　　　　　　Name: Linda Menich
　　　　　　　　　　　Title: Assistant Vice President

EXECUTED as of the date first set forth above.

BORROWER:           **MM CONDOMINIUMS, LLC,** a Nevada limited liability company

By: _____
Name: John F. Royce
Title: Manager

By:_____
Name: Alex J. Umana
Title: Manager
Borrower's Tax ID No. 20-3249580

LENDER:          **MERRILL LYNCH CAPITAL,** a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation

By: _____
Name: Linda Menich
Title: Assistant Vice President

## LIMITED JOINDER

In order to induce Lender to make the Loan, the undersigned Principal has agreed to enter into this Limited Joinder, which is attached to and made a part of that certain Loan Agreement (the **"Loan Agreement"**) dated September 23, 2005 between MM CONDOMINIUMS, LLC, a Nevada limited liability company (**"Borrower"**), and MERRILL LYNCH CAPITAL, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation (collectively, with its successors and assigns, **"Lender"**). (All capitalized terms not otherwise defined herein shall have the meanings set forth in the Loan Agreement.) Principal acknowledges that without this Limited Joinder, Lender would be unwilling to make the Loan. NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree and covenant as follows:

1. **Retained Liabilities.** Principal acknowledges that prior to (i) the receipt by Borrower of all approvals from the appropriate state and local governmental agencies required in connection with the Condominium Conversion, and (ii) the Closing of the sale of a minimum of thirty (30) Condominium Units for a sales price equal to or greater than the Minimum Release Price (items (i) and (ii), collectively, the **"Release Event"**) in accordance with the terms and conditions of Section 11.22 of the Loan Agreement, Principal shall be fully and personally liable for the payment of the Loan and any and all other amounts due pursuant to the Loan Documents, and the performance of any and all obligations under the Loan Documents. Following Lender's receipt of satisfactory evidence that the Release Event has occurred, except for the Retained Liabilities (defined below) and the obligations, if any, of Principal under any separate guaranty provided to Lender in connection with the Loan, no Principal shall be personally liable to pay the Loan, or any other amount due, or to perform any obligation, under the Loan Documents, and Lender agrees to look solely to all revenue and assets of Borrower, the Project and any other collateral heretofore, now, or hereafter pledged by any party to secure the Loan. The obligations of each Principal hereunder are separate and independent obligations and are not secured by the grant or pledge by Borrower pursuant to the Mortgage. This Limited Joinder is a guaranty of full and complete payment and performance and not of collectability. Each Principal, jointly and severally, shall be personally liable for the following (the **"Retained Liabilities"**):

(a) All losses, damages, causes of actions, suits and Expenses incurred by Lender or any Affiliate or agent thereof as a result of (i) any failure after the occurrence and during the continuance of any default (without benefit of any applicable grace or cure period) to apply any portion of the revenue from the Project to the Loan as required per the Loan Agreement or to customary operating expenses of the Project, (ii) fraud, (iii) misapplication, misappropriation or conversion of any rents, proceeds or funds deriving from (A) the Project, (B) any insurance proceeds paid by reason of any loss, damage or destruction to the Project and not used by Borrower for restoration or repair of the Project; and/or (C) any awards or amounts received in connection with condemnation of all or a portion of the Project and not used by Borrower for restoration or repair of the Project, (iv) material misrepresentation, (v) any material waste or abandonment of the Project, (vi) failure to keep the Project insured in accordance with the terms of the Loan Documents, (vii) any fees paid to a Principal or any Affiliate after any default under the Loan Documents, and (viii) any breach of the Environmental Obligations or any representation or warranty contained in Article 6 of the Loan Agreement (Environmental Matters); and

(b) Repayment of the Loan, the Exit Fee, all costs and expenses of Lender, and all other obligations of Borrower under the Loan Documents in the event of (i) any breach of any of the following covenants of the Loan Agreement in (A) Section 4.2(b) (transfers and change of control), (B) Section 4.2(l) (no additional debt or encumbrances), (C) Section 4.2(m) (organizational documents), or (D) Section 4.2(n) (single purpose entity), or (ii) the filing by Borrower, or the filing against Borrower by

Principal or any Affiliate of Principal, of any proceeding for relief under any federal or state bankruptcy, insolvency or receivership laws or any assignment for the benefit of creditors made by Borrower.

The liability of Principal shall be direct and immediate as a primary and not a secondary obligation or liability, and is not conditional or contingent upon the pursuit of any remedies against Borrower, or any other Principal or any other person, or against any collateral or liens held by Lender.

The foregoing shall in no way limit or impair the enforcement against the Borrower, Project or any other collateral security granted by the Loan Documents of any of the Lender's rights and remedies pursuant to the Loan Documents.

2. **Waivers**. To the fullest extent permitted by applicable law, Principal waives all rights and defenses of sureties, guarantors, accommodation parties and/or co-makers and agrees that its obligations under this Joinder shall be direct, primary, absolute and unconditional and that its obligations under this Joinder shall be unaffected by any of such rights or defenses, including:

(a)    Any rights which it may have to require that (1) Lender first proceed against Borrower, any other Principal or any other person or entity with respect to the Retained Liabilities or (2) Lender first proceed against any collateral held by Lender or (3) any party to be joined in any proceeding to enforce the Retained Liabilities;

(b)    The incapacity, lack of authority, death or disability of Borrower, Principal or any other person or entity;

(c)    The failure of Lender to commence an action against Borrower or any other person or entity or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy whatsoever at any time;

(d)    Any duty on the part of Lender to disclose to Principal any facts it may now or hereafter know regarding Borrower regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Principal intends to assume or has reason to believe that such facts are unknown to Principal, Principal acknowledging that it is fully responsible for being and keeping informed of the financial condition and affairs of Borrower;

(e)    Lack of notice of default, demand of performance or notice of acceleration to Borrower, any other person or entity with respect to the Loan or the Retained Liabilities;

(f)    The consideration for this Limited Joinder;

(g)    Any acts or omissions of Lender which vary, increase or decrease the risk on Principal;

(h)    Any statute of limitations affecting the liability of Principal hereunder, the liability of Borrower or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(i)    The application by Borrower of the proceeds of the Loan for purposes other than the purposes represented by Borrower to Lender or intended or understood by Lender or Principal;

(j)     An election of remedies by Lender, including any election to proceed against any collateral by judicial or non-judicial foreclosure, whether real property or personal property, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, and whether or not any such election of remedies destroys or otherwise impairs the subrogation rights of Principal or the rights of Principal to proceed against Borrower or any guarantor for reimbursement, or both;

(k)     Any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other aspects more burdensome than that of a principal;

(l)     Any rights to enforce any remedy which Lender may have against Borrower, any rights to participate in any security for the Loan and any rights of indemnity, reimbursement, contribution or subrogation which Principal may have against Borrower or Principal or any other person;

(m)     Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute; and

(n)     Any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code.

3.     **Consents and Releases.**  Principal hereby consents and agrees that Lender may at any time, and from time to time, without notice to or further consent from Principal and either with or without consideration do any one or more of the following, all without affecting the agreements contained herein or the liability of Principal for the Retained Liabilities:  (a) surrender without substitution any property or other collateral of any kind or nature whatsoever held by it, or by any person, firm or corporation on its behalf or for its account, securing the Loan or the Retained Liabilities; (b) modify the terms of any document evidencing, securing or setting forth the terms of the Loan; (c) grant releases, compromises and indulgences with respect to the Loan or the Retained Liabilities or any persons or entities now or hereafter liable thereon; or (d) take or fail to take any action of any type whatsoever with respect to the Loan or the Retained Liabilities.  To the maximum extent permitted by law, Principal knowingly, voluntarily and intentionally agrees to be bound, just as Borrower is bound, by the provisions of Article 3 of the Loan Agreement (solely with respect to providing financial information with respect to himself) and Article 11 of the Loan Agreement, including, without limitation, the waiver of the right to a trial by jury in Section 11.2, and the consents to jurisdiction and the governing law of Illinois set forth in Sections 11.3, and 11.4, respectively.

4.     **Indemnification.**  Principal shall indemnify, defend and hold each Indemnified Party harmless from and against all claims, injury, damage, liability, criminal and civil penalties, excise taxes and Expenses of any and every kind to any persons or property by reason of any breach of representation or warranty, default or Event of Default hereunder.  Notwithstanding the immediately preceding sentence, no Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct.  Upon written request by an Indemnified Party, Principal will undertake, at its own cost and expense, on behalf of such Indemnified Party, using counsel reasonably satisfactory to the Indemnified Party, the defense of any legal action or proceeding whether or not such Indemnified Party shall be a party and for which such Indemnified Party is entitled to be indemnified pursuant to this section.  At Lender's option, Lender may, at Principal's expense, prosecute or defend any action

involving the priority, validity or enforceability of this Limited Joinder.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

Executed as of September 20, 2005.

**PRINCIPAL:**

Name: JOHN F. ROYCE
Address: 5405 Mountain Meadows Lane
      Reno, Nevada 89511
Tax I.D.#: 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

Name: ALEX J. UMANA
Address: 4980 Turning Leaf Way
      Reno, Nevada 89509
Tax I.D. #: 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

## SPOUSAL CONSENT AND WAIVER

The undersigned, who is the wife of John Royce, hereby acknowledges and consents to the foregoing Limited Joinder and acknowledges and agrees that Lender may look to the assets of John Royce to satisfy the claims of Lender against John Royce under this Limited Joinder, which assets shall include all community or marital property in which the undersigned may otherwise have an interest.

IN WITNESS WHEREOF, the undersigned has executed this Spousal Consent and Waiver as of the date first above written.

Name: _Bernadine Stewart_

_Bernadine Stewart_

## CERTIFICATION

The undersigned, Alex J. Umana, hereby certifies that, as of the date of the foregoing Limited Joinder, he is unmarried and no other person has any community property rights or interests in or to his assets.

Name: Alex J. Umana

**EXHIBIT A**

Legal Description of Land

[To Be Attached]

PARCEL 1:

COMMENCING at the Southwest corner of Parcel A, as shown on the parcel map for "ELTON AND AUSTIN, ET AL", filed July 27, 1983, as File No. 869566, Parcel Map No. 1505; thence North 09°22'02" West, 309.81 feet to the true point of beginning; thence North 09°22'02" West, 415.19 feet to the Southerly right-of-way line of Wedekind Road; thence along said Southerly right-of-way line North 60°32'12" East, 455.11 feet; thence along a tangent curve to the right, with a radius of 25.00 feet, through a central angle of 91°51'04", and an arc distance of 40.08 feet to the Westerly right-of-way of El Rancho Drive; thence along a non-tangent line along said Westerly right-of-way line South 27°36'53" East, 608.38 feet; thence leaving said right-of-way line South 62°23'07" West, 194.50 feet; thence North 27°36'53" West, 1.75 feet; thence North 88°15'31" West, 308.70 feet; thence South 09°22'02" East, 10.19 feet; thence North 88°15'31" West, 165.04 feet to the true point of beginning.

Situate in the South 1/2 of the Southeast 1/4 of Section 31, Township 20 North, Range 20 East, M.D.B.&M.  This property lies within the exterior boundary of Parcel Map 1605, recorded February 29, 1984, File No. 909882, in the office of the County Recorder, Washoe County, Nevada.

PARCEL 2:

An easement for ingress and egress over that certain private street known as Garfield Drive as shown and depicted on the maps of FALCONCREST, UNIT NO. 1, PHASE NO. 1, (a townhouse subdivision) as per map recorded December 20, 1983, as File No. 897418 and shown on the map of FALCONCREST, UNIT NO. 1, PHASE 2, recorded May 22, 1984 as File No. 926371.

APN:  026-342-12

## **EXHIBIT B**

Construction Completion Schedule

| | TOTAL | 1 Jan-05 | 2 Feb-05 | 3 Mar-05 | 4 Apr-05 | 5 May-05 | 6 Jun-05 | 7 Jul-05 | 8 Aug-05 | 9 Sep-05 | 10 Oct-05 | 11 Nov-05 | 12 Dec-05 | 13 Jan-06 | 14 Feb-06 | 15 Mar-06 | 16 Apr-06 | 17 May-06 | 18 Jun-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Disbursements: | | | | | | | | | | | | | | | | | | | |
| Land & Acquisition | 13,000,000 | | | | | | | | | 13,000,000 | | | | | | | | | |
| Senior Loan Fee | 160,000 | | | | | | | | | 160,000 | | | | | | | | | |
| Broker Fee | 160,000 | | | | | | | | | 160,000 | | | | | | | | | |
| Interest/Carry Reserve | 871,000 | | | | | | | | | | | | | | | | | | |
| Application Fee | 7,500 | | | | | | | | | 7,500 | | | | | | | | | |
| Direct Construction | 2,144,540 | | | | | | | | | | 464,430 | 368,505 | 318,505 | 173,355 | 173,355 | 173,355 | 173,355 | 173,355 | 127,127 |
| Bond Upgrades | 21,000 | | | | | | | | | | 10,950 | 10,050 | | | | | | | |
| Property Tax Payments | 91,312 | | | | | | | | | | | 91,312 | | | | | | | |
| Insurance | | | | | | | | | | | | | | | | | | | |
| Eng/Perm Settlements | 200,000 | | | | | | | | | | 200,000 | | | | | | | | |
| Legal Fees | 150,000 | | | | | | | | | | 150,000 | | | | | | | | |
| Homeowner Warranty Ins | 100,000 | | | | | | | | | 100,000 | | | | | | | | | |
| Permitting/Misc Fees | 200,000 | | | | | | | | | | 200,000 | | | | | | | | |
| Administration Fee | 200,000 | | | | | | | | | | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 |
| Condo Association Fee | 15,000 | | | | | | | | | | 1,364 | 1,364 | 1,364 | 1,364 | 1,364 | 1,364 | 1,364 | 1,364 | 1,364 |
| Construction | 300,000 | | | | | | | | | | 260,465 | 7,918 | 8,627 | 3,656 | 3,656 | 3,656 | 3,283 | 3,283 | 2,612 |
| Lender Third Party Exp | 60,000 | | | | | | | | | 60,000 | | | | | | | | | |
| Moving Expenses | 30,000 | | | | | | | | | | 3,030 | 3,030 | 3,030 | 3,030 | 3,030 | 3,030 | 3,030 | 3,030 | 3,000 |
| Marketing/Advertising | 150,000 | | | | | | | | | | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | | | |
| Mgmt Fee/Developer | 100,000 | | | | | | | | | 100,000 | | | | | | | | | |
| Net Disbursements | 17,774,554 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,597,500 | 1,332,006 | 533,646 | 375,122 | 224,102 | 224,102 | 224,102 | 198,109 | 198,109 | 151,700 |

# Exhibit 2

**Entered on Docket**
**July 15, 2008**

_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

STEPHEN R. HARRIS, ESQ.
BELDING, HARRIS & PETRONI, LTD.
**Nevada Bar No. 001463**
417 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 786-7600
Facsimile: (775) 786-7764

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * *

IN RE:

MM CONDOMINIUMS, LLC
a Nevada limited liability company,

Debtor.

_____/

BK-08-50557
(Chapter 11)

**FINAL ORDER AUTHORIZING
DEBTOR-IN-POSSESSION TO
USE CASH COLLATERAL AND
PROVIDE ADEQUATE PROTECTION**

Hrg. DATE:    July 8, 2008
and TIME:     2:30 P.M.
Est. Time:    10 MIN
Set By:       Judge Zive - per OST

Based on the MOTION FOR AUTHORIZATION TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363 (c)(2) ("Motion"), filed on June 10, 2008, by MM Condominiums, LLC, a Nevada limited liability company, Debtor and Debtor-In-Possession herein ("Debtor"), by and through its attorney of record, STEPHEN R. HARRIS, ESQ., of BELDING, HARRIS & PETRONI, LTD; with the Court having entered its INTERIM ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

PROVIDE ADEQUATE PROTECTION ("Interim Order"), entered on the docket on June 27, 2008, and the Debtor having noticed a hearing on a final order on Court ordered shortened time for July 8, 2008 at 2:30 P.M.; with STEPHEN R. HARRIS, ESQ., appearing on behalf of the Debtor and the Debtor's representative JOHN ROYCE, also present; and JENNIFER SMITH, ESQ. of LIONEL, SAWYER & COLLINS, appearing on behalf of Secured Creditor GE Business Financial Services (f/k/a) Merrill Lynch Business Financial Services ("GE"); and WILLIAM COSSITT, ESQ. appearing on behalf of the U.S. Trustee's Office; and the Court noting that there have been no opposition(s) or objection(s) filed to the relief requested by the Debtor and the Court having heard GE and the Debtor's verbal representations as to resolving purported conflicts in the language set forth in paragraph 9(b) of the ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION, in relation to the **Exhibit "A"** and Schedule A-2; and good cause appearing,

    **IT IS HEREBY ORDERED** that the INTERIM ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION, which Interim Order is attached to this Final Order as **Exhibit "A"** and incorporated herein by that reference, is granted by the Court on a final basis.

    **IT IS FURTHER ORDERED** that the budgeted items set forth in **Exhibit "A"** and Schedule A-2 attached to the ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION, control with respect to any purported conflict in the language set forth in paragraph 9(b).

    Dated this _____ day of July, 2008.

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

1

APPROVED AND ACCEPTED                         APPROVED AND ACCEPTED
2
STEPHEN R. HARRIS, ESQ.                        LIONEL, SAWYER & COLLINS
3   BELDING, HARRIS & PETRONI, LTD.            50 W. Liberty St., #1100
    417 W. Plumb Lane                           Reno, NV 89501
4   Reno, NV 89509

5

6

7   STEPHEN R. HARRIS, ESQ.                     JENNIFER A. SMITH, ESQ.
    Attorney for Debtor                         Attorney for GE Business
8                                               Financial Services

9

10  APPROVED AS TO FORM

11

12

13

14  WILLIAM COSSITT, ESQ.
    U.S. TRUSTEE'S OFFICE
15

16

17

18                                              ###

19

20

21

22

23

24

25

26

27

28
                                    3

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

1

APPROVED AND ACCEPTED

2

STEPHEN R. HARRIS, ESQ.

3    BELDING, HARRIS & PETRONI, LTD.
     417 W. Plumb Lane

4    Reno, NV 89509

5

6

7    STEPHEN R. HARRIS, ESQ.
     Attorney for Debtor

8

9

10   APPROVED AS TO FORM

11

12

13

14   WILLIAM COSSITT, ESQ.
     U.S. TRUSTEE'S OFFICE

15

16

17

18                                ###

19

20

21

22

23

24

25

26

27

28

APPROVED AND ACCEPTED

LIONEL, SAWYER & COLLINS
50 W. Liberty St., #1100
Reno, NV 89501

JENNIFER A. SMITH, ESQ.
Attorney for GE Business
Financial Services

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

3

# EXHIBIT "A"

**Entered on Docket**
**June 27, 2008**

_[signature]_
_____
**Hon. Gregg W. Zive**
**United States Bankruptcy Judge**

STEPHEN R. HARRIS, ESQ.
BELDING, HARRIS & PETRONI, LTD.
**Nevada Bar No. 001463**
417 West Plumb Lane
Reno, Nevada 89509
Telephone: (775) 786-7600
Facsimile: (775) 786-7764

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * *

IN RE:                                            BK-08-50557
                                                  (Chapter 11)
MM CONDOMINIUMS, LLC
a Nevada limited liability company,    **INTERIM ORDER AUTHORIZING**
                                       **DEBTOR-IN-POSSESSION TO USE CASH**
            Debtor.                    **COLLATERAL AND PROVIDE**
                                       **ADEQUATE PROTECTION**

_____/       Hrg. DATE:  June 26, 2008
                                        and TIME:   2:00 P.M.
                                        Est. Time:  10 MIN
                                        Set By:     Judge Zive - per OST

Based on the MOTION FOR AUTHORIZATION TO USE CASH COLLATERAL

PURSUANT TO 11 U.S.C. §363 (c)(2) ("Motion"), filed on June 10, 2008, by MM

Condominiums, LLC, a Nevada limited liability company, Debtor and Debtor-In-Possession

hearin ("Debtor"), by and through its attorney of record, STEPHEN R. HARRIS, ESQ., of

BELDING, HARRIS & PETRONI, LTD., with the hearing on the Motion set on Court ordered

shortened time for June 26, 2008, at 2:00 P.M.; with STEPHEN R. HARRIS, ESQ., appearing on

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

1

behalf of the Debtor and the Debtor's representative JOHN ROYCE, also present; and JENNIFER SMITH, ESQ. of LIONEL, SAWYER & COLLINS, appearing on behalf of Secured Creditor GE Business Financial Services (f/k/a) Merrill Lynch Business Financial Services ("GE"); and WILLIAM COSSITT, ESQ. appearing on behalf of the U.S. Trustee's Office; and the Court noting the Objection pleading filed by GE to the relief requested by the Debtor and the U.S. Trustee's Office raising its verbal objection to the proposed cash collateral use stipulation; and the Court considering the duly executed (but not filed and entered) ORDER AUTHORIZING DEBTOR-IN- POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION; and the Court noting the parties' acceptance of the ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION; and good cause appearing,

**IT IS HEREBY ORDERED** that the ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION, attached hereto is **Exhibit "A"** and incorporated by that reference, is granted by the Court on an interim basis, with a final hearing to be conducted on July 8, 2008, at 2:30 P.M., assuming the Debtor mails notice of the final hearing, along with the proposed **Exhibit "A"** included therein, to all creditors and parties in interest requesting notice; and further, any cash collateral monies used by the Debtor prior to the final hearing shall entitle GE to the protections set forth in 11 U.S.C. §363 (m), as well as other protections as detailed in the parties' ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND TO PROVIDE ADEQUATE PROTECTION;

**IT IS FURTHER ORDERED** that any opposition(s) to the requested final order entry shall be filed and served no later than 12:00 P.M., on July 7, 2008.

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

2

| | | |
|---|---|---|
| 1 | | |
| 2 | RESPECTFULLY SUBMITTED BY: | APPROVED AND ACCEPTED |
| 3 | STEPHEN R. HARRIS, ESQ. | LIONEL, SAWYER & COLLINS |
| 4 | BELDING, HARRIS & PETRONI, LTD.<br>417 W. Plumb Lane | 50 W. Liberty St., #1100<br>Reno, NV 89501 |
| 5 | Reno, NV 89509 | |

6-27-08

| | | |
|---|---|---|
| 7 | STEPHEN R. HARRIS, ESQ. | JENNIFER A. SMITH, ESQ. |
| 8 | Attorney for Debtor | Attorney for GE Business<br>Financial Services |
| 9 | | |
| 10 | | |
| 11 | APPROVED AS TO FORM | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | WILLIAM COSSITT, ESQ.<br>U.S. TRUSTEE'S OFFICE | |
| 16 | | |
| 17 | | |
| 18 | | ### |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

RESPECTFULLY SUBMITTED BY:

STEPHEN R. HARRIS, ESQ.
BELDING, HARRIS & PETRONI, LTD.
417 W. Plumb Lane
Reno, NV 89509

6-27-08

STEPHEN R. HARRIS, ESQ.
Attorney for Debtor

APPROVED AS TO FORM

WILLIAM COSSITT, ESQ.
U.S. TRUSTEE'S OFFICE

APPROVED AND ACCEPTED

LIONEL, SAWYER & COLLINS
50 W. Liberty St., #1100
Reno, NV 89501

Jennifer A. Smith 6/27/08

JENNIFER A. SMITH, ESQ.
Attorney for GE Business
Financial Services

###

3

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
417 WEST PLUMB LANE
RENO,
NEVADA 89509
(775) 786-7600

| | |
|---|---|
| 1 | |
| 2 | RESPECTFULLY SUBMITTED BY: |
| 3 | STEPHEN R. HARRIS, ESQ. |
| | BELDING, HARRIS & PETRONI, LTD. |
| 4 | 417 W. Plumb Lane |
| | Reno, NV 89509 |
| 5 | |

RESPECTFULLY SUBMITTED BY:

STEPHEN R. HARRIS, ESQ.
BELDING, HARRIS & PETRONI, LTD.
417 W. Plumb Lane
Reno, NV 89509

6-27-08

STEPHEN R. HARRIS, ESQ.
Attorney for Debtor

APPROVED AS TO FORM

WILLIAM COSSITT, ESQ.
U.S. TRUSTEE'S OFFICE

APPROVED AND ACCEPTED

LIONEL, SAWYER & COLLINS
50 W. Liberty St., #1100
Reno, NV 89501

JENNIFER A. SMITH, ESQ.
Attorney for GE Business
Financial Services

###

3

LAW OFFICES OF
BELDING, HARRIS
& PETRONI, LTD.
ATTORNEYS AT LAW
RENO,
417 WEST PLUMB LANE
NEVADA 89509
(775) 786-7600

# EXHIBIT "A"

Jennifer A. Smith
jsmith@lionelsawyer.com
Nevada Bar No. 610
LIONEL SAWYER & COLLINS
1100 Bank of America Plaza
50 West Liberty Street
Reno, Nevada 89501
(775) 788-8624 (Telephone)
(775) 788-8682 (Fax)

John P. Sieger
john.sieger@kattenlaw.com
Mark D. Conzelmann
mark.conzelmann@kattenlaw.com
Andrew L. Wool
andrew.wool@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 577-8681

Attorneys for Creditor GE Business Financial Services, Inc.
(f/k/a Merrill Lynch Business Financial Services, Inc.)

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 08-50557-GWZ |
| MM CONDOMINIUMS, LLC, | Chapter 11 |
| Debtor. | **ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION** |
| | **Hearing Date: June 26, 2006**<br>**Hearing Time: 2:00 p.m.** |

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 WEST LIBERTY ST
RENO,
NEVADA 89501
(775) 788-8686

1      This matter coming to be heard upon the motion ("Motion") of MM Condominiums,

2  LLC, the debtor and debtor-in-possession ("Debtor" or "Borrower"), for entry of an order

3  ("Order"), pursuant to sections 361 and 363 of title 11 of the United States Code ("Bankruptcy

4  Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"),

5  authorizing the Debtor to (a) use cash collateral which secures obligations owing to GE Business

6  Financial Services Inc. f/k/a Merrill Lynch Business Financial Services Inc. ("Lender"), subject

7  to the terms and conditions set forth herein, and (b) provide adequate protection to Lender as set

8  forth herein; and upon the proceedings held before the Court; and good and sufficient cause

9  appearing therefor,

10      **THE COURT HEREBY FINDS:**

11      A.    On April 9, 2008 ("Petition Date"), the Debtor filed a voluntary petition for relief

12  under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

13      B.    The Debtor is a single asset real estate debtor as defined in section 101(51B) of

14  the Bankruptcy Code, and is operating its business and managing its properties as a debtor-in-

15  possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16      C.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper

17  pursuant to 28 U.S.C. §§ 1408 and 1409.

18      D.    Pursuant to that certain Loan Agreement dated September 23, 2005 between

19  Debtor and Lender (as amended, "Loan Agreement"), that certain Deed of Trust, Assignment of

20  Leases and Rents, Security Agreement and Fixture Filing dated September 23, 2005 (as

21  amended, "Mortgage") and certain other documents, promissory notes, instruments and

22  agreements executed by the Debtor (collectively, with the Loan Agreement and the Mortgage,

23  "Loan Documents"), Lender has made loans and other financial accommodations to the Debtor

24  to, among other things, fund the Debtor's operations and construction ("Loan").

25      E.    All obligations and liabilities of the Debtor to Lender, whether under the Loan

26  Documents or otherwise, are secured by a valid, perfected, first priority lien upon and security

27  interest in and to all of the Debtor's assets, including real and personal property (all of the

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 WEST LIBERTY ST
RENO,
NEVADA 89501
(775) 788-8666

—

1    foregoing as more fully described in the Mortgage, and all proceeds thereof, shall be referred to

2    collectively as, "Collateral" and such liens thereon, "Pre-Petition Liens").

3          F.      All cash of the Debtor wherever located as of the Petition Date represents either

4    proceeds of the Loan from Lender to the Debtor or proceeds of the Collateral. Lender has a

5    valid, perfected, first priority lien upon and security interest in and to all of the cash of the

6    Debtor, except to the extent $250,000 (or such amount as is subsequently approved by the Court

7    and consented to by Lender, not to exceed an additional $250,000) is loaned to the Debtor by

8    Charles Royce or a related person or entity other than Lender and is Court approved (and which

9    excepted funds shall at all times be segregated from Lender's cash collateral), and these funds,

10    along with the proceeds of the Collateral, constitute "cash collateral" within the meaning of

11    section 363(a) of the Bankruptcy Code.

12          G.      As of the Petition Date, the Debtor was indebted to Lender by reason of the Loan

13    and under the Loan Documents in the approximate amount of $3,887,347.84 (together with post-

14    petition interest, fees and other accruing charges both hereunder and under the Loan Documents,

15    the "Indebtedness"), the prepetition portion which is evidenced by the Proof of Claim filed by

16    Lender on or about April 24, 2008 (the "Lender Claim"). The Indebtedness constitutes a legal,

17    valid and binding obligation of the Debtor, enforceable in accordance with its terms, no offsets,

18    defenses, or counterclaims to the Indebtedness exist, and no portion of the Indebtedness is

19    subject to avoidance or subordination. Accordingly, the filing of an objection to (or any other

20    form of contestation of) the validity, enforceability, extent, priority and/or amount of the

21    Indebtedness – other than an objection to the reasonableness of the Lender's post-petition legal

22    fees pursuant to 11 U.S.C. § 506(b) – shall constitute a Termination Event (as defined below).

23          H.      By execution of this Order, John F. Royce, Charles Royce and Alex J. Umana

24    ("Guarantors") acknowledge, agree and confirm that the execution and entry of this Order shall

25    not and does not in any way modify, reduce, revise, lessen or decrease their respective

26    obligations as guarantors and/or indemnitors under the Loan as set forth in that certain

27    Performance and Completion Guaranty, dated as of September 23, 2005, as to all three (3)

28    Guarantors, or the Limited Joinder attached to and made a part of the Loan Agreement, dated

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

3

Case: 08-50557-gwz    Doc #: 51-3    Filed: 07/05/2008    Page: 115 of 354

1    September 23, 2005, as to Guarantors, John F. Royce and Alex J. Umana only.  Each Guarantor:

2    (i) reaffirms, ratifies, and confirms that his obligations as guarantor and/or indemnitor under the

3    Loan as provided for in one or more of the aforementioned guaranty agreements remains in full

4    force and effect notwithstanding, among other things, any financial accommodations extended

5    by Lender to the Debtor pursuant to the terms of this Order or otherwise; (ii) denies and waives

6    the existence of any defenses or right of setoff which may otherwise be available to him relating

7    to such guaranty agreements; and (iii) waives and releases any and all of his claims and causes of

8    action which may exist against Lender.  The Limited Payment Guaranty, dated September 23,

9    2005, executed by Charles M. Royce, has been previously returned to the Debtor as satisfied and

10    is no longer in force.

11         I.    An immediate and critical need exists for the Debtor to be permitted access to

12    funds in order to prevent a disorderly termination or disruption of the business and to permit the

13    Debtor to attempt to achieve a reorganization.

14         J.    Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtor is

15    required to provide adequate protection to Lender in respect of the Debtor's use of the Cash

16    Collateral (as hereinafter defined).

17         K.    The Debtor has requested entry of this Order pursuant to Bankruptcy Rule

18    4001(b)(2).  Notice of the hearing on the Motion was proper and sufficient under Bankruptcy

19    Rule 4001 and no other notice need be given.

20         **NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

21         1.    Use of Cash Collateral.  Upon entry of this order, Alex J. Umana hereby accepts,

22    and shall be deemed to have accepted, service of Lender's lawsuit against, among others, Mr.

23    Umana, with respect to their respective guaranty obligations arising under the guaranty

24    agreements referred to hereinabove.  For so long as (i) the Debtor is in compliance with the terms

25    of this Order and any other orders of the Court entered in connection with the use of Cash

26    Collateral and (ii) no Termination Event (as defined herein) shall have occurred, Lender consents

27    to the Debtor's use of the Cash Collateral, provided that such use strictly complies with the

28    limitations set forth herein, including the Budget attached hereto as Exhibit A.  Notwithstanding

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
Reno,
NEVADA 89501
(775) 788-8666

4

1    anything to the contrary herein, the Debtor shall not make any Cash Collateral expenditures

2    unless such Cash Collateral expenditures are encompassed and expressly included in the Budget,

3    subject to an allowable variance of 5% for any line item expenditure made by the Debtor; and

4    *provided, further,* that none of the Cash Collateral shall be used to pay any legal fees and/or

5    expenses incurred by the Debtor.

6         2.    Certain Reporting Requirements.  The Debtor shall observe and comply with the

7    following covenants and conditions to the use of Cash Collateral.

8              a.    From and after the date hereof, monthly by the 3rd business day at the

9    beginning of each month, the Debtor shall provide Lender and counsel for Lender the following

10   information for the preceding month:  (i) a report of all cash receipts by the Debtor (showing the

11   date, amount, source and purpose of each); (ii) a list of all payments made by the Debtor

12   (showing the date, amount, payee and purpose of each); (iii) copies of all invoices issued by the

13   Debtor; (iv) copies of all sales contracts entered into by the Debtor; (vi) a statement disclosing all

14   disbursements made form the funds to be borrowed from Charles Royce or any related person or

15   entity, and the unspent balance of such funds; and (vi) such other reports as Lender may

16   reasonably request from time to time, including, without limitation, detailed monthly statements

17   from the property manager, Gaston & Wilkerson.

18             b.    The Debtor shall certify to Lender each of the following:  (i) the Debtor

19   spent Cash Collateral in accordance with the Budget; and (ii) updated monthly actual

20   performance compared to the Budget, submitted on the 3rd business day at the beginning of each

21   month for the immediately preceding month.

22        3.    Ratification of Loan Documents.  The Loan Documents are ratified and affirmed,

23   and the Debtor shall perform all of its obligations thereunder, unless modified by the terms of

24   this Order.  The Debtor hereby agrees, and the Court orders, the following modifications to the

25   Loan Documents:

26             a.    Minimum Release Price.  Schedule II (Minimum Release Price) to the

27   Loan Agreement is hereby deleted, and replaced with Schedule II (Minimum Release Price)

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

5

1    attached to this Order as Exhibit B, which minimum release price shall be $125,000.00 per unit,

2    either by sale or equity contribution.

3         b.    Exit Fee.  Section 2.7 of the Loan Agreement is hereby deleted in its

4    entirety and the following inserted in lieu thereof:

5         "2.7   Exit Fee.  Upon the repayment of the Loan (whether on the
         Maturity Date or on any other date) or upon the acceleration of the Loan
6         by Lender as provided herein, Borrower will pay to Lender an exit
         financing fee equal to the sum of Five Hundred Sixty Thousand and
7         No/100ths Dollars ($560,000); provided, however, that if the outstanding
         principal balance of the Loan is less than $1,750,000 on or before
8         December 31, 2008, then such Exit Fee shall be reduced to Four
         Hundred Sixty Thousand and No/100ths Dollars ($460,000)."

9

10        c.    Loan Modification Fee.  In consideration of the extension of the Maturity

11   Date and the other modifications to the Loan Agreement set forth herein, Debtor shall pay to

12   Lender a loan modification fee in the amount equal to one-half of one percent (.5%) of the

13   principal balance of the Loan as of the Petition Date ($3,499,733.19).  Such fee shall be deemed

14   to be earned upon the entry of this Order and shall be payable immediately upon entry of this

15   Order.

16        d.    Interest.  The first sentence of Section 2.5 of the Loan Agreement is

17   hereby deleted in its entirety and the following inserted in lieu thereof (with the remaining other

18   terms and conditions of Section 2.5 of the Loan Agreement left unmodified and in place):

19        "Section 2.5.   Interest.  Provided that no Event of Default exists, the
         principal amount of the Loan outstanding from time to time shall bear
20        interest until paid at a rate equal to a floating rate per annum equal to the
         sum of four and one-half of one percent (4.50%) plus the Base Rate (the
21        aggregate rate referred to as the "Interest Rate"), but in no event shall the
         Interest Rate be less than eight and thirty-three hundredths percent
22        (8.33%)."

23        e.    Application of Net Sale Proceeds.  Section 2.9(a)(i) of the Loan

24   Agreement is hereby deleted in its entirety and the following inserted in lieu thereof:

25        "(i)   Application of Net Sale Proceeds.  All payments to Lender in
         accordance with this Section 2.9 shall be applied first, to the payment of
26        all fees, costs and expenses of Borrower under the Loan Documents,
         second, to the payment of interest on the Loan; third, to the outstanding
27        principal balance of the Loan, and fourth, to the payment of the Exit Fee.

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

6

Case: 08-50557-gwz    Doc #: 51-3 Filed: 07/05/2008    Page: 13 of 34

1       4.   <u>Remittance of Cash Collateral.</u> From and after the date of entry of this Order until

2   the indefeasible payment in full in cash of the Indebtedness, the Debtor shall deposit on a daily

3   basis, all cash, cash equivalents and Cash Collateral arising from or constituting proceeds of the

4   Collateral in its possession or control arising from or constituting proceeds of loans from Lender

5   to the Debtor ("<u>Cash Collateral</u>") in one or more debtor-in-possession accounts which shall at all

6   times be maintained with Gaston & Wilkerson. All monies collected by the Debtor shall be held

7   in trust for the benefit of Lender, subject to the terms hereof; excluding, however, the insider-

8   loaned funds contemplated in paragraph F, *supra*. Further, to consummate the completion of the

9   Lender's Collateral, the Debtor shall borrow funds secured by a junior lien on the Collateral,

10   which loan proceeds shall be escrowed with a builder's control account in an amount equal to

11   $170,000.00.

12       5.   <u>Receipt of Payments and Proceeds.</u>  Any and all payments remitted to Lender

13   pursuant to the Budget or otherwise, shall be deemed received by Lender free and clear of any

14   interest, claim, charge, assessment, or other liability, all of which are hereby waived by the

15   Debtor. Any and all amounts paid to Lender shall be applied to the Indebtedness in the manner

16   set forth in the Loan Documents; *provided, however*, any and all Net Sales Proceeds shall be

17   used to pay down, first, accrued, unpaid reasonable enforcement costs, second, to the payment of

18   past due accrued interest on the Loans, and third, to the remaining principal balance of the Loan.

19       6.   <u>Adequate Protection Payments.</u> As adequate protection for, and to secure the

20   payment of, an amount equal to the aggregate diminution in the value of the Collateral (including

21   Cash Collateral) subsequent to the Petition Date, and as security for and an inducement to Lender

22   to permit the Debtor's use of the Collateral, the Lender Claim is hereby deemed allowed and

23   fully-secured, and the Debtor agrees and is ordered to: (a) make monthly interest-only payments

24   (commencing August 1, 2008, and the first day of each month thereafter) on the Loans pursuant

25   to and in accordance with the Loan Documents, (b) immediately upon Court entry of this Order,

26   pay $64,571.62 in reasonable unpaid legal fees accrued through June 12, 2008, in connection

27   with Lender's enforcement of the Loan Documents. From future sale or refinance closings for

28   individual condominium units, there shall be paid all accrued, unpaid post-petition non-default

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

7

1    interest on the Loan as calculated in subparagraph 3(d) herein.   So long as no Termination Event

2    exists, Lender suspends its right to charge and collect post-petition default interest.

3          7.    Adequate Protection Liens.  As further adequate protection for, and to secure the

4    payment of, an amount equal to the aggregate diminution in the value of the Collateral (including

5    Cash Collateral), and as security for and an inducement to Lender to permit the Debtor's use of

6    the Collateral, (x) the Debtor hereby grants, assigns and pledges to Lender post-petition security

7    interests and liens ("Adequate Protection Liens") of the same extent and priority as Lender's pre-

8    petition security interests in the Collateral (which interests and liens are deemed valid and

9    perfected pursuant to paragraph 6 hereof) in and to all of the Debtor's currently owned and after-

10   acquired real and personal property, which specifically includes, without any limitations, any and

11   all avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof and (y)

12   this Court grants Lender a super-priority allowed administrative expense claim pursuant to

13   section 503(b)(1) and 507(b) of the Bankruptcy Code ("Administrative Claim").

14         8.    Priority of Administrative Claim.   The Adequate Protection Liens and

15   Administrative Claim shall be senior to, have priority over, all other costs, priority or super-

16   priority claims and administrative expenses of the kind specified in sections 105, 326, 328, 330,

17   331, 503(b), 506(c), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code.  No priority claims

18   are or will be prior to or on a parity with the Administrative Claim.

19         9.    Restrictions on Use of Proceeds.  From and after the date hereof, the proceeds of

20   the Collateral and Cash Collateral, except any amounts loaned to the Debtor by Charles Royce,

21   shall only be used to pay items which are then due, expressly permitted under the Budget or this

22   Order, and in such amounts as identified in the Budget or this Order.

23         a.    Net Sales Proceeds.  Upon the Debtor's or its agents receipt of any Net

24   Sale Proceeds (as defined in the Loan Documents), all such Net Sale Proceeds shall be deemed

25   to be held in trust for the exclusive benefit of Lender and any and all such sums shall forthwith

26   be remitted to Lender for application to the Indebtedness in accordance with the provisions of

27   this Order.

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

8

b.   <u>No Transfers or Payments to Guarantors.</u>   Unless and until the Indebtedness is indefeasibly paid in full and the Loan is terminated, the Debtor is strictly prohibited from making, and the Guarantors (including, but not limited to, members of the immediate or extended family of the Guarantors as well as any entity in which one or more Guarantors or any member of one or more of their immediate or extended families holds an interest of any kind) are prohibited from receiving, any transfers of property of the Debtor's estate, including but not limited to any remuneration, payments of salary or other transfers of any other kind, to or for the benefit of one or more Guarantor; *provided, however*, in the absence of a Termination Event, Guarantors may accrue any salary due from the Debtor, provided, that such salaries can be paid solely from the segregated insider-loan funds contemplated in paragraph F, *supra*; and *provided, further*, that the Debtor may, subject to Lender's prior written approval only after review of any and all contract and/or other business terms contemplated by the parties, employ and make payments to Mountain Maintenance and/or Spectra Funding pursuant to and in accordance with any supplement to the Budget expressly approved in writing by Lender to account for such Lender-approved expenses.

c.   <u>No Surcharge; No Collateral Enhancement.</u>   No costs or expenses of administration which have or may be incurred in the Debtor's case at any time shall be charged against Lender, its claims or the Collateral, pursuant to section 506(c) of the Bankruptcy Code, without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by Lender.  Neither the surcharge provisions of section 506(c) of the Bankruptcy Code nor the enhancement of collateral provisions of section 552 of the Bankruptcy Code shall be imposed upon Lender or any of the Collateral, the Cash Collateral, or proceeds thereof.

10.   <u>The Automatic Stay.</u>  The automatic stay shall be, and hereby is, modified to the extent necessary to permit Lender to retrieve, collect, and apply payments and proceeds in respect of the Collateral, including all adequate protection payments made pursuant to this Order.

11.   <u>Termination Event.</u>  As used herein, "Termination Event" shall mean the occurrence of any of the following:  (a) March 31, 2009; (b) the conversion of the Chapter 11

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

9

1    Case to a case administered under chapter 7; (c) the dismissal of the Debtor's bankruptcy case;

2    (d) the appointment of a trustee or an examiner in the Debtor's bankruptcy case; (e) the reversal,

3    revocation, modification, amendment, stay or rescission of this Order; (f) the Debtor's failure to

4    comply with, or its default under any term or condition of, this Order or any amendment or

5    modification thereof; (g) the Debtor's aggregate Net Sales Proceeds for the time period

6    commencing on the Petition Date through and including December 31, 2008 are not at least

7    $1,750,000.00; (h) the entry of an order pursuant to section 363 of the Bankruptcy Code

8    approving the sale of substantially all of the Debtor's assets; (i) the effective date of any plan of

9    reorganization or liquidation, if confirmed; (i) entry of any order pursuant to section 364 of the

10    Bankruptcy Code authorizing the Debtor to obtain post petition credit, except for such

11    subordinated post-petition credit provided by Charles Royce or a related entity and approved by

12    the Court and consented to by Lender; (j) the automatic stay is lifted as to any party in order to

13    permit foreclosure on any of the Collateral; and (k) any attempt by the Debtor to obtain, or if any

14    other party in interest attempts to obtain, an order of this Court or other order or judgment, and

15    the effect of such order or judgment is to, invalidate, reduce or otherwise impair Lender's claims

16    and liens, or to subject any of the Collateral to any surcharge pursuant to section 506(c) of the

17    Bankruptcy Code.

18         12.    Rights Upon a Termination Event.    Upon the occurrence of a Termination Event,

19    the Debtor irrevocably consents and agrees: (A) to immediately cease all use of Cash Collateral;

20    (B) immediately freeze any and all DIP Accounts containing Cash Collateral; and (C) upon

21    Lender's filing with the Court in the Chapter 11 Case of an affidavit disclosing the occurrence of

22    a Termination Event, to the immediate entry of a final, non-appealable consent order (i)

23    authorizing immediate automatic stay relief in favor of Lender with respect to all of its

24    Collateral, (ii) dismissing the Chapter 11 Case, and (iii) barring the Debtor from refiling an

25    insolvency proceeding, including, without limitations, a bankruptcy case under any chapter of

26    the Bankruptcy Code, for a period of not less than six months. Notwithstanding anything to the

27    contrary herein, all of the rights, remedies, benefits and protections provided to Lender under this

28    Order shall survive the occurrence of a Termination Event, although Lender agrees to authorize,

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

10

1    up to any trustee's foreclosure sale, any sale at or above the release price per unit (either by sale

2    or equity contribution) specified in subparagraph 3(b) herein.  Upon such an occurrence, the

3    Indebtedness shall be immediately due and payable and Lender shall have all other rights and

4    remedies provided herein and in the Loan Documents.  In no event shall Lender be subject to the

5    equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the

6    Collateral or otherwise.

7          13.   <u>Limitations on Use of Cash Collateral</u>.  No proceeds of the Collateral, or the Cash

8    Collateral, except as noted herein, shall be used for the purpose of:  (a) objecting to or contesting

9    in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or

10    enforceability of the Indebtedness or any liens or security interests with respect thereto, or any

11    other rights or interests of Lender, or in asserting any claims or causes of action against any of

12    them; (b) selling any of the Collateral (without the prior written consent of Lender); (c) incurring

13    any new indebtedness; or (d) modifying the rights of Lender under the Loan Documents.

14          14.   <u>Execution of Documents</u>.  The Debtor shall execute and deliver to Lender all

15    documents as Lender may reasonably request to evidence, confirm, validate or perfect the liens

16    granted pursuant hereto.  All liens granted herein shall, pursuant to this Order be, and they

17    hereby are, deemed perfected, and no further notice, filing or other act shall be required to effect

18    such perfection.

19          15.   <u>Access to Debtor</u>.  The Debtor shall permit Lender, its agents and designees (i) to

20    have reasonable access to its premises and records during normal business hours and shall

21    cooperate, consult with, and provide to such persons al such non-privileged information as they

22    may reasonably request and (ii) to observe the Debtor's conduct and compliance with this Order

23    and the Loan Documents.

24          16.   <u>Acknowledgment of Indebtedness, Liens, et al</u>.  The Debtor hereby acknowledges

25    and agrees that:  (a) the repayment of any Indebtedness shall be deemed final and indefeasible,

26    not subject to subordination and otherwise unavoidable; (b) the Indebtedness is an allowed claim,

27    not subject to subordination and otherwise unavoidable, for all purposes in this Chapter 11 Case

28    and any subsequent chapter 7 case; (c) Lender's Pre-Petition Liens on the Collateral are legal,

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

11

1    valid, binding, perfected and not subject to defense, counterclaim, offset of any kind,

2    subordination and otherwise unavoidable; and (d) Lender, the Indebtedness, the Loan Documents

3    and Lender's Pre-Petition Liens on the Collateral are not subject to any other or further challenge

4    by any party-in-interest seeking to exercise the rights of the Debtor's estate, including without

5    limitation any successor thereto. The terms and conditions of this Order are reasonable and

6    appropriate, are in the best interests of the Debtor and its estate, and are consistent with and

7    satisfy the requirements and provisions of sections 363(e), 363(c)(2) and 361 of the Bankruptcy

8    Code.

9        17.    <u>Subsequent Reversal</u>.    No modification, amendment, vacation or reversal of this

10   Order shall affect the validity and enforceability of any lien or priority authorized or created

11   hereby. Any claim or lien granted to Lender hereunder arising prior to the effective date of such

12   modification, amendment, vacation or reversal shall be governed in all respects by the original

13   provisions of this Order, and Lender shall be entitled to all of the rights, remedies, privileges and

14   benefits, including the liens and priorities granted herein, with respect to any such claim.

15       18.    <u>No Waiver of Rights</u>.    This Order and the transactions contemplated hereby shall

16   be without prejudice to, and do not constitute a waiver of, or otherwise impair, the right of

17   Lender, among other things, (i) to seek additional adequate protection, including, without

18   limitation, the benefit of section 507(b) of the Bankruptcy Code; (ii) to move for relief from the

19   automatic stay; (iii) to oppose any extension of the Debtor's exclusive period for filing a plan of

20   reorganization; (iv) to request any other relief in this Chapter 11 Case; or (v) to exercise any and

21   all other rights, remedies, privileges, claims and causes of action, whether legal, equitable or

22   otherwise, which Lender may have against any other party.

23       19.    <u>Binding Effect</u>.    Upon entry, this Order shall be binding on the Debtor, its estate,

24   and Lender, and their respective successors and assigns, including, without limitation, any

25   subsequently appointed trustee in the Debtor's bankruptcy proceeding, whether in chapter 11 or

26   chapter 7. Such binding effect is an integral part of this Order.

27       20.    <u>No Partial "Take Out" Transactions</u>.    Notwithstanding anything to the contrary

28   herein or in the Loan Documents, under no circumstances may the Debtor enter or execute any

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

12

1  partial refinancing or recapitalization transaction to reduce the Indebtedness unless otherwise

2  agreed to in writing in Lender.  Accordingly, any refinancing or recapitalization transaction

3  involving the Collateral must be sufficient to indefeasibly pay in full the Indebtedness.  Insiders

4  (as that term is defined in the Bankruptcy Code) of the Borrower shall have the right to purchase

5  individual condominium units at the net Minimum Purchase Price, and the consummation of any

6  such transaction shall not, in and of itself, constitute a Termination Event.

7        21.    <u>Stay of Guaranty Litigation</u>.  Upon entry of this order so long as there has been no

8  occurrence of a Termination Event, Lender hereby agrees to stay prosecution of Lender's lawsuit

9  against the Guarantors with respect to their respective obligations arising under the guaranty

10  agreements referred to hereinabove.

11        Dated this ____ day of June, 2008.

12  APPROVED and AGREED to as to substance and form:

13  BELDING, HARRIS & PETRONI, LTD.        LIONEL SAWYER & COLLINS

14

15  By: <u>See attached signature page</u>            By: _____
         Stephen R. Harris                      Jennifer A. Smith
16  Attorneys for MM Condominiums, LLC       Attorneys for GE Business Financial
                                             Services, Inc.
17

18  JOHN F. ROYCE                            CHARLES ROYCE

19                                           By: <u>See attached signature page</u>
20  By: <u>See attached signature page</u>

21  ALEX J. UMANA

22  By: <u>See attached signature page</u>

23                                  # # #

24

25

26

27

28
LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 West Liberty Street
RENO,
NEVADA 89501
(775) 788-8666

21.    Stay of Guaranty Litigation.  Upon entry of this order so long as there has been no occurrence of a Termination Event, Lender hereby agrees to stay prosecution of Lender's lawsuit against the Guarantors with respect to their respective obligations arising under the guaranty agreements referred to hereinabove.

Dated:                          ENTERED:

                                _____

                                UNITED STATES BANKRUPTCY JUDGE

This Order is approved and agreed to as to substance and form:

MM CONDOMINIUMS, LLC                GE BUSINESS FINANCIAL SERVICES, INC

By: _____           By: _____
    Its attorney  Stephen R. Harris      Its attorney

JOHN F. ROYCE

By: _____

CHARLES ROYCE

By: _____

ALEX J. UMANA

By: _____

12

21.    <u>Stay of Guaranty Litigation</u>.  Upon entry of this order so long as there has been no occurrence of a Termination Event, Lender hereby agrees to stay prosecution of Lender's lawsuit against the Guarantors with respect to their respective obligations arising under the guaranty agreements referred to hereinabove.

Dated:                           ENTERED:

                                 _____
                                 UNITED STATES BANKRUPTCY JUDGE


This Order is approved and agreed to as to substance and form:

MM CONDOMINIUMS, LLC              GE BUSINESS FINANCIAL SERVICES, INC

By: _____      By: _____
     Its attorney                         Its attorney


JOHN F. ROYCE

By: _____


CHARLES ROYCE

By: _____

ALEX J. UMANA

By: _____

12

# EXHIBIT "A"

EXHIBIT A TO ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE
CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION

| | Jun 08 | Jul 08 | Aug 08 |
|---|---|---|---|
| | | 3 | 6 |
| Cumulative sales post Cash Collateral (Agreement) execution | | | |
| Condo Sales | | | |
| Sales (3 @ $145,000) | 0.00 | 435,000 | 435,000 |
| Sales Costs | | | |
| Closing Costs (1%) | 0.00 | -4,350 | -4,350 |
| Commissions (7%) | 0.00 | -39,150 | -39,150 |
| Concessions (3%) | 0.00 | -13,050 | -13,050 |
| Total Sales Costs | 0.00 | -56,550 | -56,550 |
| Total Condo Sales Proceeds | 0.00 | 378,450 | 378,450 |
| *(Total Condo Sales Proceeds will be disbursed to GE through escrow and applied as per Cash Collateral (Agreement)* | | | |
| Accrued post-petition interest to July 1, 2008 to be paid from sales proceeds | | 87,500 | |
| Monthly payments to be paid from sales proceeds, otherwise from Developer DIP Acct. | | | 22,056 |
| Loan Balance with GE at end of period (EOP) | 3,500,000.00 | 3,189,050 | 2,832,668 |
| Loan balance per Unit including sale fees at EOP | | 78,327 | 78,573 |
| Monthly Rental and Other Income | | 28,000 | 24,000 |
| *(To Cash Collateral Acct. with Gaston & Wilkerson)* | | | |
| Cash Collateral On Hand Including Builders Control and all DIP Accounts | 80,810 | | |
| Monthly Operating Expenses | -20,000 | -20,000 | -18,000 |
| *(Including HOA Dues on unsold Units)* | | | |
| Total Net Rental Operating Income | 60,610 | 8,000 | 6,000 |
| *(See Sample Gaston and Wilkerson attachment A-1)* | | | |
| Cash authorized expenditures at signing of Cash Collateral (Agreement) | 79,340 | | |
| *(See attachment A-2)* | | | |
| General Business Operating Expenses authorized to be paid from Cash Collateral to extent funds available therefrom | | | |
| Accountant (Spectra employee) | 2,000 | 2,000 | 2,000 |
| Home Owners Assoc. Dues Sold units | 3,420 | 3,420 | 3,420 |
| Marketing | | | |
| Model Staging and Maintenance | 100 | 100 | 100 |
| Print Advertising | 1,200 | 1,900 | 1,900 |
| Promotional | 500 | | |
| Signage | 1,000 | | |
| | 500 | 500 | 500 |
| Sales Office Rent | 6,000 | 6,000 | 6,000 |
| Staff Salaries for property Management (Spectra) | | | |
| Total Gen. Bus. Operation Exp. | 93,080 | 13,920 | 13,920 |
| *(To the extent that Cash Collateral funds are not available to pay the above expenses they will be paid from Non-Cash Collateral funds - see bel* | | | |
| Cash Infusion from Non-Cash Collateral source(s) | 250,000 | | |
| *(Guaranteed upon execution of Cash Collateral (Agreement))* | | | |
| To be deposited into Builders Control | 170,000 | | |
| To be deposited into Developer DIP Acct. | 60,000 | | |
| Other funds into Developer DIP from Loans or equity to be deposited as needed | 60,000 | 20,000 | 20,000 |
| Total Non-Cash Collateral | 310,000 | 20,000 | 20,000 |
| Expenses to be paid from Non-Cash Collateral | | | |
| Lender Legal Fees - Upon execution of (Agreement) | 64,000 | | |
| .5% Loan Modification Fee (Upon execution of (Agr) | 17,500 | | |
| | 32,450 | 5,920 | 7,920 |
| Operating Expenses not paid from Cash Collateral | | | |
| General Office Overhead | 4,500 | 4,500 | 4,500 |
| Model Rental Expense | 4,000 | 4,000 | 4,000 |
| Project Manager | 650 | | |
| Chapter 11 Quarterly Trustee Fee  (should be below paid from Non Cash Collateral) | | | |
| Sub-Total Exp. Paid from Non-Cash Collateral | 123,100 | 14,420 | 16,420 |
| Remaining Dev. Non-Cash Collateral EOP (excluding Builders Control) | 16,000 | 22,460 | 26,060 |
| Unit Rehab Expenses Paid from Non-Cash Collateral Builders Control | | | |
| Appliances | | 1,000 | 1,000 |
| Cabinet work | | 1,000 | 1,000 |
| Carpet and hardsurface | | 3,000 | 3,000 |
| Countertops | | 1,000 | 1,000 |
| Labor for improvements to units paid to Mountain Maintenance | | 10,000 | 10,000 |
| Total Rehab Expenses | | 16,000 | 16,000 |
| Remaining Builder Control Balance EOP | 170,000 | 154,000 | 138,000 |

EXHIBIT A TO ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE
CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION

| | Sep 08 | Oct 08 | Nov 08 | Dec 08 | TOTALS Jun - Dec 08 |
|---|---|---|---|---|---|
| Cumulative sales post Cash Collateral (Agreement) execution | 9 | 12 | 15 | 18 | 18 |
| **Condo Sales** | | | | | |
| Sales (3 @ $145,000) | 435,000 | 435,000 | 435,000 | 435,000 | 2,610,000 |
| Sales Costs | | | | | |
| Closing Costs (1%) | -4,350 | -4,350 | -4,350 | -4,350 | -26,100 |
| Commissions (7%) | -39,150 | -39,150 | -39,150 | -39,150 | -234,900 |
| Concessions (3%) | -13,050 | -13,050 | -13,050 | -13,050 | -78,300 |
| Total Sales Costs | -56,550 | -56,550 | -56,550 | -56,550 | -339,300 |
| Total Condo Sales Proceeds | 378,450 | 378,450 | 378,450 | 378,450 | 2,270,700 |
| *(Total Condo Sales Proceeds will be disbursed to GE through escrow and applied as per Cash Co.* | | | | | |
| Accrued post-petition Interest to July 1, 2008 to be paid from sales proceeds | 19,593 | 17,110 | 14,611 | 12,095 | |
| Monthly payments to be paid from sales proceeds, otherwise from Developer DIP Acct. | | | | | |
| Loan Balance with GE at end of period (EOP) | 2,473,800 | 2,112,461 | 1,748,822 | 1,382,286 | |
| Loan balance per Unit including exit fees at EOP | 73,345 | 69,526 | 64,959 | 59,428 | |
| Monthly Rental and Other Income | 22,000 | 20,000 | 19,000 | 18,000 | 131,000 |
| *(To Cash Collateral Acct. with Gaston & Wilkerson)* | | | | | |
| Cash Collateral On Hand Including Builders' Control and all DIP Accounts | | | | | |
| Monthly Operating Expenses | -17,000 | -16,000 | -15,000 | -14,000 | -100,000 |
| *(Including HOA Dues on unsold Units)* | | | | | |
| Total Net Rental Operating Income | 6,000 | 4,000 | 4,000 | 4,000 | 0 |
| *(See Sample Gaston and Wilkerson attachment A-1)* | | | | | |
| Cash authorized expenditures at signing of Cash Collateral (Agreement) | | | | | |
| *(See attachment A-2)* | | | | | |
| General Business Operating Expenses authorized to be paid from Cash Collateral to exten' | 2,000 | 2,000 | 2,000 | 2,000 | 14,000 |
| Accountant (Spectra employee) | 3,420 | 3,420 | 3,420 | 3,420 | 23,940 |
| Home Owners Assoc. Dues Sold units | | | | | |
| Marketing | 100 | 100 | 100 | 100 | 700 |
| Model Staging and Maintenance | 1,900 | 1,900 | 1,900 | 1,900 | 12,600 |
| Print Advertising | 500 | | | | 1,000 |
| Promotional | | | | | 1,000 |
| Signage | 500 | 500 | 500 | 500 | 3,500 |
| Sales Office Rent | 6,000 | 6,000 | 6,000 | 6,000 | 42,000 |
| Staff Salaries for property management (Spectra) | 14,420 | 13,920 | 13,920 | 13,920 | 177,080 |
| Total Gen. Bus. Operation Exp. | | | | | |
| *(To the extent that Cash Collateral funds are not available to pay the above expenses they will be below)* | | | | | |
| Cash Infusion from Non-Cash Collateral source(s) | | | | | 170,000 |
| *(Guaranteed upon execution of Cash Collateral (Agreement))* | | | | | |
| To be deposited into Builders Control | | | | | 60,000 |
| To be deposited into Developer DIP Acct. | 20,000 | 20,000 | 20,000 | 20,000 | 180,000 |
| Other funds into Developer DIP from Loans or equity to be deposited as needed | 20,000 | 20,000 | 20,000 | 20,000 | 430,000 |
| Total Non-Cash Collateral | | | | | |
| Expenses to be paid from Non-Cash Collateral | | | | | |
| Lender Legal Fees - Upon execution of (Agreement) | | | | | |
| .5% Loan Modification Fee (Upon execution of (Agr) | 9,420 | 9,920 | 9,920 | 9,920 | 95,470 |
| Operating Expenses not paid from Cash Collateral | | | | | |
| General Office Overhead | 4,500 | 4,500 | 4,500 | 4,500 | 31,500 |
| Model Rental Expense | 4,000 | 4,000 | 4,000 | 4,000 | 28,000 |
| Project Manager | 6,500 | | | 6,500 | 13,650 |
| Chapter 11 Quarterly Trustee Fee (should be below paid from Non Cash Collateral) | | | | | |
| Sub-Total Exp. Paid from Non-Cash Collateral | 24,420 | 18,420 | 18,420 | 24,920 | 240,120 |
| Remaining Dev. Non-Cash Collateral EOP (excluding Builders Control) | 21,840 | 23,220 | 24,800 | 19,880 | |
| **Unit Rehab Expenses Paid from Non-Cash Collateral Builders Control** | | | | | |
| Appliances | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Cabinet work | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Carpet and hardsurface | 3,000 | 3,000 | 3,000 | 3,000 | 18,000 |
| Countertops | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Labor for improvements to units paid to Mountain Maintenance | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| Total Rehab Expenses | 16,000 | 16,000 | 16,000 | 16,000 | 96,000 |
| Remaining Builder Control Balance EOP | 122,000 | 106,000 | 90,000 | 74,000 | |

Page 2 of 2

**Attachment A-1**

**Cash Flow (Cash)**
**MM Condominiums LLC - (1)**
**Jan 2008**

Page 1
mmcondo
2/15/2008
12:16 PM

Prepared For:
MM Condominiums LLC
1281 Terminal Way
Suite 201
Reno, NV 89502

Prepared By:
Gaston & Wilkerson Mgmt
P.O. Box 10590
Reno, NV 89510

| | Month to Date | % | Year to Date | % |
|---|---|---|---|---|
| **INCOME** | | | | |
| **RENTAL INCOME** | | | | |
| Gross Potential Rental Income | 62,410.00 | 139.82 | 62,410.00 | 139.82 |
| Rehab Units | -15,366.00 | -34.43 | -15,366.00 | -34.43 |
| Delinquent Rent | -1,549.20 | -3.47 | -1,549.20 | -3.47 |
| Rent Loss to Collections | -70.44 | -0.16 | -70.44 | -0.16 |
| Move-In Specials | -2,325.00 | -5.21 | -2,325.00 | -5.21 |
| NET RENTAL INCOME | 43,099.36 | 96.56 | 43,099.36 | 96.56 |
| **OTHER INCOME** | | | | |
| Credit Report Fees | 25.00 | 0.06 | 25.00 | 0.06 |
| Late Fees | 224.92 | 0.50 | 224.92 | 0.50 |
| NSF Charges | 100.08 | 0.22 | 100.08 | 0.22 |
| Security Deposits Forfeited | 1,012.04 | 2.27 | 1,012.04 | 2.27 |
| Utility Reimbursement | 71.48 | 0.16 | 71.48 | 0.16 |
| Miscellaneous Income | 101.50 | 0.23 | 101.50 | 0.23 |
| TOTAL OTHER INCOME | 1,535.02 | 3.44 | 1,535.02 | 3.44 |
| TOTAL INCOME | 44,634.38 | 100.00 | 44,634.38 | 100.00 |
| **OPERATING EXPENSES** | | | | |
| **ADMINISTRATION** | | | | |
| Advertising | 649.89 | 1.46 | 649.89 | 1.46 |
| Association Fees | 15,996.00 | 35.84 | 15,996.00 | 35.84 |
| Bank Charges | 15.00 | 0.03 | 15.00 | 0.03 |
| Credit Report | 35.70 | 0.08 | 35.70 | 0.08 |
| Management Fees | 1,610.45 | 3.61 | 1,610.45 | 3.61 |
| Office Expense | -148.19 | -0.33 | -148.19 | -0.33 |
| Postage | 10.94 | 0.02 | 10.94 | 0.02 |
| Telephone | 92.45 | 0.21 | 92.45 | 0.21 |
| TOTAL ADMINISTRATION | 18,262.24 | 40.92 | 18,262.24 | 40.92 |
| **CLEANING** | | | | |
| Cleaning - Carpet | 210.00 | 0.47 | 210.00 | 0.47 |
| TOTAL CLEANING | 210.00 | 0.47 | 210.00 | 0.47 |
| **UTILITIES** | | | | |
| Electric | 717.11 | 1.61 | 717.11 | 1.61 |
| Gas | 1,715.53 | 3.84 | 1,715.53 | 3.84 |
| Trash Removal | 983.70 | 2.20 | 983.70 | 2.20 |
| TOTAL UTILITIES | 3,416.34 | 7.65 | 3,416.34 | 7.65 |
| TOTAL OPERATING EXPENSE | 21,888.58 | 49.04 | 21,888.58 | 49.04 |
| NET OPERATING INCOME | 22,745.80 | 50.96 | 22,745.80 | 50.96 |
| **NON-OPERATING INCOME** | | | | |

Case: 08-50557-gwz    Doc #: 51-3    Filed: 06/27/2008    Page: 31 of 34

**Attachment A-1**

### Cash Flow (Cash)
### MM Condominiums LLC - (1)
### Jan 2008

Page 2
mmcondo
2/15/2008
12:16 PM

|  | Month to Date | % | Year to Date | % |
|---|---|---|---|---|
| Interest Income | 40.38 | 0.09 | 40.38 | 0.09 |
| TOTAL NON-OPERATING INCOME | 40.38 | 0.09 | 40.38 | 0.09 |
| NET INCOME | 22,786.18 | 51.05 | 22,786.18 | 51.05 |
| ADJUSTMENTS |  |  |  |  |
| Accounts Receivable | -900.00 |  | -900.00 |  |
| Prepaid Rent | -2,284.48 |  | -2,284.48 |  |
| Tenant Security Deposits | -1,325.00 |  | -1,325.00 |  |
| Owner Distribution | -18,081.00 |  | -18,081.00 |  |
| TOTAL ADJUSTMENTS | -22,590.48 |  | -22,590.48 |  |
| CASH FLOW | 195.70 |  | 195.70 |  |
| Beginning Cash | 3,097.22 |  |  |  |
| Ending Balance | 2,583.28 |  |  |  |

**Attachment A-2**

<u>**MM Condominium -- Immediate Disbursement Request**</u>

<u>Expenses Required to be Paid</u>:

| | |
|---|---:|
| Payables that Gaston Wilkerson has on hand from apartment operations | $8,429.00 |
| HOA dues for April and May | $21,200.00 |
| Mountain Maintenance for April maintenance and repairs of project | $5,336.25 |
| Spectra Funding - April and May management and sales personnel wages | $18,000.00 |
| Reno Gazette-Journal advertising expense | $2,500.00 |
| Home Depot - April maintenance and remodeling expenses | $5,935.00 |
| CMR MM, LLC May model rental | $4,500.00 |
| Sierra Property Maintenance painting services | $4,595.00 |
| Flooring Solutions carpet work | $1,610.00 |
| Surface Doctor counter top work | $834.50 |
| Kelly Moore | $354.00 |
| Diamond Glass | $4,046.09 |
| Misc. office expense bills (utilities, etc.) | <u>$1,000.00</u> |
| **Total expenses** | **$78,340.39** |

<u>Cash on Hand</u>:

| | |
|---|---:|
| Builder Control account | $12,133.04 |
| Gaston & Wilkerson cash on hand from rents | $35,477.46 |
| Gross rents to be collected in first week of June | <u>$33,000.00</u> |
| **Total cash available:** | **$80,610.05** |

Case: 08-50557-gwz    Doc #: 517-3    Filed: 07/05/2008    Page: 348 of 354

# EXHIBIT "B"

EXHIBIT B TO ORDER AUTHORIZING DEBTOR-IN-POSSESSION TO USE
CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION

**SCHEDULE II**

**Minimum Release Price**

| Unit Type | Square Feet | Minimum Release Price |
|---|---|---|
| 2 bedroom/<br>2 bathroom | 950 | $125,000.00 |
| 2 bedroom/<br>2.5 bathroom | 1,185 | $125,000.00 |
| 2 bedroom/<br>2.5 bathroom | 1,250 | $125,000.00 |